**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MODERNATX, INC. and MODERNA US, INC.,<br><br>  Plaintiffs,<br><br>  v.<br><br>PFIZER INC., BIONTECH SE, BIONTECH MANUFACTURING GMBH, and BIONTECH US INC.,<br><br>  Defendants. | C.A. No. 22-11378-RGS<br><br>JURY TRIAL DEMANDED |

**PLAINTIFFS MODERNATX, INC. AND MODERNA US, INC.'S**
**<u>OPENING CLAIM CONSTRUCTION BRIEF</u>**

# TABLE OF CONTENTS

I.     Introduction ........................................................................................................ 1

II.    Background ......................................................................................................... 2

III.   Legal Standard ................................................................................................... 5

IV.   Contested Terms ................................................................................................ 6

     A.     "mRNA" ('574 Patent) ............................................................................ 6

           1.     Intrinsic Evidence Supports Moderna's Proposed Construction. ............... 7

           2.     Defendants' Proposed Construction Improperly Reads in Limitations from the Specification. ........................................................... 7

     B.     "unmodified mRNA" ('574 Patent) ......................................................... 8

           1.     Intrinsic Evidence Supports Moderna's Proposed Construction. ............... 8

           2.     Defendants' Proposed Construction Improperly Imports Exemplary Language. ............................................................................... 9

     C.     "betacoronavirus" ('600 and '127 Patents) ............................................ 11

           1.     Claims Are Not Limited to Embodiments Known at the Time of the Invention. ...................................................................................... 11

           2.     Intrinsic Evidence Supports Moderna's Construction. ............................. 12

           3.     Extrinsic Evidence Supports Moderna's Construction. ............................. 14

     D.     "S protein" ('600 and '127 Patents) ........................................................ 15

           1.     Intrinsic Evidence Supports Moderna's Construction. ............................. 16

           2.     Extrinsic Evidence Supports Moderna's Construction. ............................. 17

           3.     Defendants' Proposed Construction Improperly Incorporates a Functional Limitation. ............................................................................ 18

     E.     "open reading frame" ('600 and '127 Patents) ....................................... 20

           1.     Intrinsic Evidence Supports Moderna's Construction. ............................. 20

           2.     Extrinsic Evidence Supports Moderna's Construction. ............................. 21

           3.     Defendants' Proposed Construction Rewrites the Claims by Improperly Excluding mRNA Coding Sequences. .................................. 22

# TABLE OF AUTHORITIES

## CASES

Page(s)

*Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960 (Fed. Cir. 2022) ............................................13

*Application of Swinehart*, 439 F.2d 210 (C.C.P.A. 1971) .............................................16

*Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324 (Fed. Cir. 2012) ........................22

*Baxalta Inc. v. Genentech, Inc.*, 972 F.3d 1341 (Fed. Cir. 2020) ..................................10

*Bioverativ Inc. v. CSL Behring LLC*, No. 17-00914, 2019 WL 1276030 (D. Del. Mar. 20, 2019)................................................................................................................10

*Board of Trustees of Leland Stanford Junior University v. Roche Molecular Systems, Inc.*, 528 F. Supp. 2d 967 (N.D. Cal. 2007) ..................................................12, 14

*Braintree Laboratories, Inc. v. Novel Laboratories, Inc.*, 749 F.3d 1349 (Fed. Cir. 2014) ...........9

*Continental Circuits LLC v. Intel Corp.*, 915 F.3d 788 (Fed. Cir. 2019) ......................13

*Dealertrack, Inc. v. Huber*, 674 F.3d 1315 (Fed. Cir. 2012) .........................................13

*Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358 (Fed. Cir. 2001)................................18

*Enanta Pharmaceuticals, Inc. v. Pfizer, Inc.*, No. 22-10967, 2023 WL 3269647 (D. Mass. May 5, 2023) ................................................................................................10

*Hill-Rom Services, Inc. v. Stryker Corp.*, 755 F.3d 1367 (Fed. Cir. 2014)....................13

*In re Scroggie*, 442 F. App'x 547 (Fed. Cir. 2011) .......................................................10

*Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111 (Fed. Cir. 2004)..............................................................................................................14

*Innogenetics, N.V. v. Abbott Laboratories*, 512 F.3d 1363 (Fed. Cir. 2008)................11

*Medicines Co. v. Mylan, Inc.*, 853 F.3d 1296 (Fed. Cir. 2017) .................................9, 23

*Merck & Co. v. Teva Pharmaceuticals USA, Inc.*, 395 F.3d 1364 (Fed. Cir. 2005) ....................23

*Oatey Co. v. IPS Corp.*, 514 F.3d 1271 (Fed. Cir. 2008)...............................................23

*Omega Engineering, Inc. v. Raytek Corp.*, 334 F.3d 1314 (Fed. Cir. 2003) ................12

*Openwave Systems, Inc. v. Apple Inc.*, 808 F.3d 509 (Fed. Cir. 2015)..........................13

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) ...................................................6, 7, 14, 20

*Schwing GmbH v. Putzmeister Aktiengesellschaft*, 305 F.3d 1318 (Fed. Cir. 2002)....................18

*Sorensen v. Int'l Trade Commission*, 427 F.3d 1375 (Fed. Cir. 2005) ........................................14

*Stragent, LLC v. BMW of North America, LLC*, No. 20-CV-00510, 2022 WL
3212081 (D. Del. Aug. 9, 2022) ...................................................................................10

*SuperGuide Corp. v. DirecTV Enterprises, Inc.*, 358 F.3d 870 (Fed. Cir. 2004) ........................12

*Thorner v. Sony Computer Entertainment America LLC*, 669 F.3d 1362 (Fed. Cir. 2012) ..........13

*Toro Co. v. White Consolidated Industries, Inc.*, 266 F.3d 1367 (Fed. Cir. 2001)......................18

*Visto v. Microsoft*, C.A. No. 05-546, 2007 WL 5688730 (E.D. Tex. Aug. 28, 2007)..................10

## I.      Introduction

Nearly a decade before the COVID-19 pandemic, Moderna scientists were working to solve a question that had vexed messenger RNA (mRNA) researchers for decades—a question that would prove central to unlocking the potential of mRNA as a vaccine platform:  How can one stabilize and effectively deliver mRNA to cells in the body without prematurely triggering the body's natural reaction that is designed to destroy it?  Moderna scientists discovered that a particular chemical modification to the mRNA would allow the mRNA to survive in the body long enough to do its job when formulated and delivered in tiny particles made of different fats called lipid nanoparticles.  With that finding in hand, Moderna scientists set out to develop an effective mRNA vaccine for betacoronaviruses.  Unlike conventional vaccines, which work by injecting some version or part of the virus itself into the body, mRNA vaccines work by co-opting the body's cellular machinery to make a part of the virus in the body.  That part of the virus mimics the live virus in that it teaches the body's immune system to recognize the virus.  Moderna scientists discovered that they could effectively mimic a betacoronavirus by designing an mRNA vaccine that directs the body's cells to make copies of the betacoronavirus's spike protein.  These groundbreaking inventions are reflected in the claims of the asserted patents and provide the foundational platform that enabled Moderna—and Defendants, through their infringement—to develop an mRNA-based COVID-19 vaccine in record time.

The claim construction issues in this case—all of which have been raised by Defendants—reflect Defendants' desire to rewrite the claimed inventions into something they are not.  For example, notwithstanding the indisputable fact that the claimed inventions are exclusively directed towards the use of mRNA, Defendants have proposed constructions that would exclude mRNA applications, thereby excluding every single disclosed embodiment in the asserted patents.  As

1

another example, despite the fact that the whole point of mRNA vaccines is to avoid the use of a potentially infectious virus, Defendants propose a construction that would limit the claimed invention to just that.  In many instances, Defendants' proposed constructions are bald attempts to manufacture noninfringement positions that Defendants otherwise lack.  The Court should reject Defendants' constructions—which are contrary to Federal Circuit law—and instead apply the claims' ordinary meaning, as reflected by Moderna's proposed constructions.

## II.   Background

Vaccines train the body's immune system to recognize and fight pathogens.  Ho Decl. ¶ 16. They work by presenting the body with a part of the pathogen, known as an "antigen," which triggers a response from what is known as the adaptive immune system.  *Id.*  As part of that immune response, the body learns to make antibodies specific to the antigen.  *Id.*  When presented with the antigen in the context of an infectious pathogen in the future, the adaptive immune system can "remember" how to make those antibodies.  These antibodies bind to the antigen and mark the pathogen displaying the antigen for destruction.  The previous exposure allows the adaptive immune system to respond both more quickly and more strongly than if the adaptive immune system had never seen the antigen before.  *Id.*  The rapid, strong immune response results in less severe disease, or even prevention of disease altogether.

There are a number of traditional viral vaccine platforms, including (1) attenuated live virus vaccines (e.g., Sabin's polio vaccine), which use a version of the virus that does not make the patient very sick; (2) inactivated virus vaccines (e.g., the flu shot), which use "dead" viruses; and (3) protein vaccines (e.g., the Hepatitis B vaccine), which use viral proteins made in a lab.  Ho Decl. ¶ 17.  In these traditional platforms, the viral antigen itself is delivered directly to the body.

mRNA vaccines are completely different from traditional vaccine platforms.  Instead of

delivering the viral antigen itself (e.g., an attenuated, dead, or partial version of the disease-causing virus), like a traditional vaccine, mRNA vaccines deliver mRNA "encoding" the viral antigen (e.g., a viral protein that appears on the surface of the virus) to the patient's cells.  Ho Decl. ¶ 25.  For context, in humans and other mammals, genetic information encoding proteins is stored in deoxyribonucleic acid (DNA) as a sequence of four chemical bases:  adenine (A), cytosine (C), guanine (G), and thymine (T).  Ho Decl. ¶¶ 19-21.  That information is copied into a corresponding ribonucleic acid (RNA) as a sequence of slightly different chemical bases—adenine (A), cytosine (C), guanine (G), and uracil (U) (instead of thymine)—in a process known as transcription.[1]  Ho Decl. ¶ 22.  Thus, for example, the DNA sequence "ATGCGTTAA" becomes (i.e., is transcribed into) the RNA sequence "AUGCGUUAA."  *Id.*  Enzymes known as ribosomes then use that RNA to make chains of amino acids, known as "polypeptides," through a process called translation.  Ho Decl. ¶ 23.  Proteins are made up of one or more polypeptides.  This type of RNA is called "messenger RNA" (mRNA) because it serves as a messenger between the DNA and the ribosomes and contains the "code" for a particular protein.  Ho Decl. ¶¶ 19-23, 75.

In an mRNA vaccine, mRNA encoding the viral antigen is delivered to the patient's cells. The patient's ribosomes then read the mRNA and produce the viral antigen in the body—that is, they "express" the antigen.  The antigen mimics the pathogen and triggers the adaptive immune response just as if the antigen had been delivered directly.  Ho Decl. ¶ 25.

mRNA vaccines have several advantages over traditional vaccines, including that they are very safe—because they encode only a viral antigen (and not the full virus itself), they cannot

---

[1] DNA and RNA are also known as "polynucleotides."  Nucleotides comprise a nucleobase, sugar, and one or more phosphate groups.  Uracil refers specifically to the nucleobase portion of the nucleotide.  The corresponding nucleoside, which comprises the nucleobase and sugar, is called uridine.  Ho Decl. ¶ 22.  For the purposes of this brief, the terms are interchangeable.

result in viral infection.  Ho Decl. ¶ 26.  But there were significant technical problems to overcome before mRNA vaccines could become a reality.

One problem was that delivery of mRNA was found to trigger the body's innate immune response, resulting in poor antigen expression.  In contrast to the adaptive immune response, which takes time to learn to recognize a new pathogen, but once it does can respond specifically and strongly, the innate immune response is immediate and indiscriminately attacks anything with certain attributes marking it as "foreign."  Ho Decl. ¶¶ 30-33.  Early attempts at mRNA delivery failed because the innate immune response recognized the mRNA as foreign and destroyed the cells containing it before it could be translated into the antigen, resulting in nothing for the adaptive immune system to train on.  Ho Decl. ¶¶ 28-29, 34.

Moderna's scientists discovered that certain chemical modifications to the mRNA nucleotides can help the mRNA evade the innate immune response.  Moderna's U.S. Patent No. 10,898,574 ("the '574 patent"), which claims priority to April 2, 2012, includes data showing how specific chemical modifications to nucleotides in an mRNA, especially the substitution of uridine with 1-methylpseudouridine, result in reduced innate immune response and greater protein production compared to the corresponding unmodified mRNA.  Ho Decl. ¶ 36.  Claim 1 of the '574 patent recites:

> 1.  A method of producing a polypeptide of interest in a cell in a subject in need thereof, comprising administering to the subject a pharmaceutical composition comprising a modified messenger RNA (mmRNA) such that the mmRNA is introduced into the cell,
>
> wherein the mmRNA comprises a translatable region encoding the polypeptide of interest and comprises the modified nucleoside 1-methyl-pseudouridine, and
>
> wherein the pharmaceutical composition comprises an effective amount of the mmRNA providing for increased polypeptide production and substantially reduced innate immune response in the

cell, as compared to a composition comprising a corresponding unmodified mRNA.

'574 patent (D.I. 1-1) at 105:2-13.

Years before the COVID-19 pandemic, Moderna was working on mRNA vaccines for betacoronaviruses—the genus of viruses to which SARS-CoV-2 belongs.  All betacoronaviruses have some structural similarities.  For instance, they all have "spike proteins" sticking out from the surface of the viral membrane.  Ho Decl ¶¶ 37-38.  Spike proteins, in the context of the virus, are responsible for binding to receptors on a host cell and then fusing the host cell membrane and the viral membrane, allowing the virus to enter and infect the cell.  Ho Decl. ¶ 37.  Moderna discovered that an mRNA encoding the spike protein of the betacoronavirus MERS-CoV delivered in a lipid nanoparticle was well expressed, and that the spike protein effectively stimulated an adaptive immune response.  U.S. Patent Nos. 10,702,600 ("the '600 patent") and 10,933,127 ("the '127 patent"), which claim priority at least to October 21, 2016, contain data showing that mRNA vaccines encoding the full-length MERS-CoV spike protein induced a neutralizing immune response in mice and rabbits.[2]  Claim 1 of the '600 patent recites:

> 1.  A composition comprising:  a messenger ribonucleic acid (mRNA) comprising an open reading frame encoding a betacoronavirus (BetaCoV) S protein or S protein subunit formulated in a lipid nanoparticle.

'600 patent (D.I. 1-2) at 737:26-29.

Moderna's COVID-19 vaccine, Spikevax®, and Defendants' infringing COVID-19 vaccine, Comirnaty®, are both lipid nanoparticle mRNA compositions containing 1-methylpseudouridine-modified mRNA encoding a betacoronavirus spike protein.  Ho Decl. ¶ 39.

## III.   Legal Standard

---

[2]     The '600 and '127 patents have the same specification.  For simplicity, this brief will cite to the '600 patent specification.

In construing claim terms, courts look primarily to the intrinsic evidence of record, examining the claim language, the written description, and the prosecution history. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). Words of a claim "are generally given their ordinary and customary meaning" as understood by a person of ordinary skill in the art ("POSA"), unless the patentee has shown clear intent to disavow claim scope. *Id.* at 1312-1313, 1316. Claims are read in view of the specification, which is the single best guide to the meaning of disputed terms. *Id.* at 1315. While intrinsic evidence is most important, "extrinsic evidence in the form of expert testimony can be useful … to provide background on the technology at issue, to explain how an invention works, to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Id.* at 1318.

## IV.   Contested Terms

### A.   "mRNA" ('574 Patent)

| Moderna's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning, which is "messenger RNA, i.e., a ribonucleic acid (RNA) polynucleotide that encodes a polypeptide of interest and can be translated to produce the encoded polypeptide of interest." | "messenger ribonucleic acid, *i.e.*, a ribonucleic acid (RNA) that acts as a template for protein synthesis through the process of translation" |

Every asserted claim of the '574 patent recites "mRNA," which is a core and essential feature of Moderna's vaccine platform.[3] Moderna's proposed construction reflects the plain and ordinary meaning of "mRNA" and is consistent with the intrinsic record, which makes clear that mRNA is messenger RNA that encodes a polypeptide of interest. In contrast, Defendants' proposed construction ("acts as a template") grafts concepts from the specification that are directed

---

[3]      "mRNA" appears in every asserted claim of the '600 and '127 patents as well, but Defendants apparently only believe it requires construction in the '574 patent.

to using DNA and, therefore, is inconsistent with the intrinsic evidence and how a POSA would interpret it.

### 1.   Intrinsic Evidence Supports Moderna's Proposed Construction.

Moderna's proposal is directly supported by the claim language.  Claim 1 recites a "method of producing a polypeptide of interest," where the modified mRNA ("mmRNA") "comprises a translatable region encoding the polypeptide of interest" and where "an effective amount of the mmRNA" would "provid[e] for increased polypeptide production." '574 patent at 105:2-13. Moderna's proposed construction defines mRNA exactly as the claims describe it.

The specification further supports Moderna's construction.  The specification repeatedly describes mRNA as encoding "a polypeptide of interest." *See, e.g.*, '574 patent at 27:46-52 ("[t]he composition contains an effective amount of a ribonucleic acid engineered to avoid an innate immune response of a cell into which the ribonucleic acid enters, where the ***ribonucleic acid*** contains a ***nucleotide sequence encoding a polypeptide of interest***" (emphasis added)), 2:20-23, 28:2-8, 3:25-41, 27:62-28:2, 28:8-16, 58:8-9.  Indeed, every working example involving mRNA refers to a polypeptide of interest that the mRNA encodes and is translated to produce, and the mRNAs are even named after the polypeptides they encode.  *See., e.g., id.* at 61:35-61 ("mRNAs encoding human G – CSF"), 64:27 ("mCherry RNA"); Ho Decl. ¶¶ 46-47.

### 2.   Defendants' Proposed Construction Improperly Reads in Limitations from the Specification.

"[O]ne of the cardinal sins of patent law" is "reading a limitation from the written description into the claims." *Phillips*, 415 F.3d at 1320.  Defendants' proposed construction not only commits that sin but takes it a step further by grafting on unrelated concepts from the specification.  In particular, the specification never describes using mRNA as a "***template*** for protein synthesis through the process of translation."  Instead, it uses "template" in unrelated

contexts. For instance, the specification frequently uses "template" to refer to the DNA used to make RNA (i.e., a transcription template). *See, e.g.*, '574 patent at 85:62-86:34 ("Modified mRNA is generated from a cDNA template .…"); *id.* at 59:51-62 (describing digestion of the DNA template after transcription). The specification also uses "template" in the context of describing a process for determining the sequence of a nucleic acid. *Id.* at 11:49-51. But the asserted claims are not directed to using DNA to make RNA or sequencing nucleic acids; they are directed to making a polypeptide of interest using mRNA. Defendants' proposed construction inappropriately mixes concepts from the specification and, therefore, is unsupported and contrary to the plain meaning. Ho Decl. ¶¶ 50-54.

**B.     "unmodified mRNA" ('574 Patent)**

| Moderna's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning, which is: "mRNA prior to being changed." | "any mRNA molecule prior to being changed in any way; mRNA molecules may undergo a series of modifications whereby each modified mRNA molecule may serve as the unmodified starting mRNA molecule for a subsequent modification" |

Claim 1 of the '574 patent recites "unmodified mRNA" as the standard to which the claimed chemically modified mRNA is compared when evaluating whether there has been increased polypeptide production and a reduced innate immune response. Moderna's proposed construction of "unmodified mRNA" reflects the express definition of "unmodified" in the specification and is consistent with the plain and ordinary meaning of the term. *See, e.g.*, '574 patent at 54:64-66 (defining "unmodified"). Defendants' proposed construction goes beyond the definition of the term and will confuse the jury.

**1.     Intrinsic Evidence Supports Moderna's Proposed Construction.**

The meaning of "unmodified mRNA" flows directly from the definition of "unmodified" in the specification:

> Unmodified:  As used herein, ***"unmodified"*** refers to any substance, compound or molecule ***prior to being changed*** in any way.  Unmodified may, but does not always, refer to the wild type or native form of a biomolecule.  Molecules may undergo a series of modifications whereby each modified molecule may serve as the "unmodified" starting molecule for a subsequent modification.

'574 patent at 54:64-55:3 (emphasis added).  The phrase "[a]s used herein," is definitional, and the remainder of the sentence that follows such a phrase should be treated as such.  *See, e.g.*, *Medicines Co. v. Mylan, Inc.*, 853 F.3d 1296, 1306 (Fed. Cir. 2017) ("as defined herein" and "refers to" are definitional); *Braintree Labs., Inc. v. Novel Labs., Inc.*, 749 F.3d 1349, 1356 (Fed. Cir. 2014) (reversing claim construction inconsistent with specification statement "[term] as used herein").

Other parts of the intrinsic record confirm Moderna's proposed construction.  First, the claim makes clear that "unmodified mRNA" means mRNA prior to being changed by referring to mRNA modified with 1-methyl-pseudouridine and comparing the polypeptide production and innate immune response to a "***corresponding*** unmodified mRNA."  '574 patent at 105:2-13 (emphasis added).  Second, the examples in the specification set forth several comparisons that are consistent with this construction; in each comparison, the "unmodified mRNA" is an mRNA synthesized using naturally occurring nucleotides before those nucleotides are chemically modified.  *See, e.g.*, '574 patent at 78:39-47 (Example 23, unmodified mRNA made from natural nucleotides); 84:2-15 (Example 30, same); 81:6-9 (Example 26: "For intravenous administration, the data reveal a four to five fold increase in neutrophil count above control at day 5 with G-CSF mmRNA but not with unmodified G-CSF mRNA or non-specific controls."); 81:15-45 (Table 14) (describing the unmodified mRNA used in Example 26 as "G-CSF (no modification)").

### 2. Defendants' Proposed Construction Improperly Imports Exemplary Language.

Defendants' proposed construction starts with the '574 patent's definition of "unmodified," but then improperly includes non-limiting language that is not definitional and is expressly

optional—i.e., "mRNA molecules *may* undergo a series of modifications whereby each modified mRNA molecule *may* serve as the unmodified starting mRNA molecule for a subsequent modification."  The permissive, non-limiting language does not define the term "unmodified," and it would be inappropriate as a matter of law to incorporate this exemplary language into the claim. *See, e.g.*, *Enanta Pharms., Inc. v. Pfizer, Inc.*, No. 22-10967, 2023 WL 3269647, at *4 (D. Mass. May 5, 2023) (rejecting attempt to read additional two sentences in the same paragraph of the patent specification into the construction after finding them "exemplary rather than definitional" and citing several similar cases); *Bioverativ Inc. v. CSL Behring LLC*, No. 17-00914, 2019 WL 1276030, at *8 (D. Del. Mar. 20, 2019) (declining to include two sentences in the same paragraph of the patent specification in the construction as these are "exemplary, rather than definitional, and not lexicography"); *Visto v. Microsoft*, C.A. No. 05-546, 2007 WL 5688730, at *14 (E.D. Tex. Aug. 28, 2007) (rejecting attempt to read additional sentences in the same paragraph of the patent specification into the construction because "the proposed addition shows examples of possible devices that could fit the definition" and "is not part of the definition"); *see also Baxalta Inc. v. Genentech, Inc.*, 972 F.3d 1341, 1349 (Fed. Cir. 2020) (declining to include exemplary language in a construction and explaining that the specification's use of "may also include," "e.g.," and "such as" did not indicate intent to define); *In re Scroggie*, 442 F. App'x 547, 549-50 (Fed. Cir. 2011) (affirming the Board's refusal to include "as in an office or at home" in the construction of "personal computer" because it is "not part of the definition, but merely lists exemplary contexts in which personal computers are found").  Indeed, Defendants' superfluous language about what *may* occur would only serve to unnecessarily complicate the construction and potentially confuse the jury.  *Stragent, LLC v. BMW of N. Am., LLC*, No. 20-CV-00510, 2022 WL 3212081, at *4 (D. Del. Aug. 9, 2022) (rejecting proposed construction because it included an example that could

confuse a jury and calling out "one particular embodiment" runs "the risk that the jury will view that particular embodiment as a requirement").

### C.   "betacoronavirus" ('600 and '127 Patents)

| Moderna's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning, which is: "an enveloped, positive-sense, single stranded RNA virus of zoonotic origin that belongs to one of the four lineages of the betacoronavirus genus of the subfamily Coronavirinae (e.g., OC43, HKU1, MERS-CoV, and SARS-CoV)" | "as of October 21, 2016, any of the enveloped, positive-sense, single stranded RNA viruses of zoonotic origin that belonged to one of the four lineages of the betacoronavirus genera of the subfamily Coronavirinae (e.g., OC43, HKU1, MERS-CoV, and SARS-CoV)" |

The term "betacoronavirus" appears in every claim of the '600 and '127 patents to describe the category of virus to which the invention applies.  The parties generally agree on what a "betacoronavirus" is.  The '600 and '127 patents explain that "[b]etacoronaviruses … are positive-sense, single-stranded RNA viruses of zoonotic origin," that they are "one of four genera of coronaviruses of the subfamily Coronavirinae," that the "betacoronavirus genus contain[s] four … lineages," and that "[t]he BetaCoVs of the greatest clinical importance concerning humans are OC43 and HKU1 of the A lineage, SARS-CoV of the B lineage, and MERS-CoV of the C lineage." '600 patent at 2:46-59.  Both parties' proposed constructions track this description from the patents' specification, which is the plain and ordinary meaning of the term.

Defendants, however, go one step further and seek to limit the term "betacoronavirus" only to viruses that were known at the time that the patents were filed (which would artificially exclude SARS-CoV-2).  That additional limitation is contrary to controlling precedent, the intrinsic record, and extrinsic evidence.

### 1.   Claims Are Not Limited to Embodiments Known at the Time of the Invention.

Federal Circuit "law allows for after-arising technology to be captured within the literal scope of valid claims that are drafted broadly enough." *Innogenetics, N.V. v. Abbott Labs.*, 512

F.3d 1363, 1371-72 (Fed. Cir. 2008) (holding that claimed detection of hybrids was not limited to methods known as of the patent's priority date).  This is particularly true where the term at issue refers to a category that POSAs would have known would expand over time.  *See SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 878-79 (Fed. Cir. 2004) (claim to "regularly received television signal" included digital signals even though only analog signals were used at the time where POSAs knew of digital video signals and nothing in specification indicated their exclusion).  For example, in *Board of Trustees of Leland Stanford Junior University v. Roche Molecular Systems, Inc.*, the district court held that the term "antiretroviral agents" should not be construed to be limited to those agents known at the time of invention.  The court explained that "[i]t is clear from the publication history and the prolific research being conducted by HIV researchers on protease inhibitors, that a person of ordinary skill in the art would have known that the category of 'antiretroviral agents' would only expand over time to include these new agents," and in fact the defendant "itself use[d] the term antiretroviral agents to describe new drug therapies that were unveiled in 1995."  528 F. Supp. 2d 967, 980-981 (N.D. Cal. 2007).  Accordingly, unless there is a clear statement in the intrinsic record disclaiming betacoronaviruses discovered after October 21, 2016 (which there is not), it would be legal error to construe the claims to exclude such betacoronaviruses.

### 2.     Intrinsic Evidence Supports Moderna's Construction.

Nothing in the claim language, specification, or prosecution history disclaims betacoronaviruses discovered after October 21, 2016.  The Federal Circuit "indulge[s] a 'heavy presumption' that claim terms carry their full ordinary and customary meaning unless the patentee unequivocally imparted a novel meaning to those terms or expressly relinquished claim scope during prosecution."  *Omega Engineering, Inc. v. Raytek Corp.*, 334 F.3d 1314 (Fed. Cir. 2003) (quotations omitted).  The Federal Circuit "depart[s] from the plain and ordinary meaning of claim

terms based on the specification in only two instances:  lexicography and disavowal." *Apple Inc. v. Wi-LAN Inc.*, 25 F.4th 960, 967 (Fed. Cir. 2022) (quoting *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014)).  "To act as its own lexicographer, a patentee must clearly set forth a definition of the disputed claim term other than its plain and ordinary meaning and must clearly express an intent to redefine the term."  *Id.*  And "the standard for disavowal of claim scope" is likewise "exacting," requiring statements "both so clear as to show reasonable clarity and deliberateness, and so unmistakable as to be unambiguous evidence of disclaimer." *Openwave Sys., Inc. v. Apple Inc.*, 808 F.3d 509, 513 (Fed. Cir. 2015) (quoting *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1366 (Fed. Cir. 2012); *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1322 (Fed. Cir. 2012)); *see also Continental Circuits LLC v. Intel Corp.*, 915 F.3d 788, 795-97 (Fed. Cir. 2019) (describing only one embodiment in the specification is not a disavowal of claim scope).

Far from disclaiming betacoronaviruses discovered after a certain date, the specification explicitly states that betacoronaviruses beyond those exemplified in the specification are encompassed by the claims.  After listing examples, including MERS-CoV, SARS-CoV, HCoV-OC43, and HCoV-HKU1, the specification states "*[o]ther* betacoronaviruses *are encompassed* by the present disclosure."  '600 patent at 7:67-8:3 (emphasis added).  Similarly, the specification contemplates future embodiments by explaining that "any strain of SARS-CoV" can be used in the vaccine. *Id.* at 36:29-31 ("The present disclosure is not limited by a particular strain of SARS-CoV.  The strain of SARS-CoV used in a vaccine may be any strain of SARS-CoV."); *see also id.* at 35:45-47 (same for MERS).  Nothing in the specification comes anywhere close to the "unmistakable" disclaimer that the Federal Circuit requires to limit "betacoronaviruses" to only those that were known as of October 2016. *Thorner*, 669 F.3d at 1366-67.

There is likewise no disclaimer in the file history; rather, Moderna explicitly stated that the inventions cover betacoronaviruses discovered after October 21, 2016. The examiner, in her Notice of Allowance for the '127 patent, stated (incorrectly) that the claims "are interpreted as be[ing] directed to betacoronaviruses that were known as of October 21, 2016 (e.g., OC43, HKU1, MERS and SARS-CoV) and not SARS-CoV-2 (COVID-19)." Ex. A at MOD_000291465 ('127 patent file history, Sept. 18, 2020 Notice of Allowance at 4). But, as Moderna explained in detail in response, such an interpretation would be contrary to both law and how a POSA would have understood the term:

> The application does not limit betacoronaviruses only to members of that genus that were known as of October 21, 2016, and there is no basis to so limit the claims .… *The claim term "betacoronavirus (BetaCoV)" therefore is not temporally limited and encompasses the entire genus of betacoronaviruses, including SARS-CoV-2 (COVID-19).*

Ex B at MOD_000291493-94 ('127 patent file history, Dec. 18, 2020 Response to Examiner's Note at 1-2) (emphasis added). After Moderna explained the examiner's error, the claims issued without further comment or action from the examiner. *Sorensen v. Int'l Trade Comm'n*, 427 F.3d 1375, 1379 (Fed. Cir. 2005) ("[I]t is the applicant, not the examiner, who must give up or disclaim subject matter that would otherwise fall within the scope of the claims." (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1124 (Fed. Cir. 2004)); *see Phillips*, 415 F.3d at 1317 ("[B]ecause the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes.").

### 3.    Extrinsic Evidence Supports Moderna's Construction.

The extrinsic evidence confirms that the term "betacoronavirus" is a "category, the contents of which expand over time." *Stanford*, 528 F. Supp. 2d at 980. A POSA in October 2016 would

have understood that "betacoronavirus" was a genus of viruses, only some of which had been identified. Ho Decl. ¶¶ 57-61. A POSA would also have understood that viruses continuously evolve and that there would be new viruses in the future that would be identified and would fall into the taxonomic group of betacoronaviruses. *Id.* Indeed—then and now—there were well-known methods to classify new viruses into the betacoronavirus genus, established by the International Committee on Taxonomy of Viruses ("ICTV"), and, in particular, the Coronavirus Study Group, based on well-known and commonly used tools for comparing genetic sequences. Ho Decl. ¶ 63. There would have been no need for such rules and committees absent an understanding that new betacoronaviruses would be identified. Reading the claims in light of the specification, a POSA would have understood that the invention was applicable to yet-to-be-detected betacoronaviruses. Ho Decl. ¶¶ 56-63.

There can be no doubt that SARS-CoV-2 is a betacoronavirus as contemplated by the '600 and '127 patents' claims. Within hours of its sequence becoming available, the scientific community definitively recognized it as a betacoronavirus closely related to SARS-CoV-1 (which is expressly exemplified in the specification, *e.g.*, '600 patent at 14:22-24) based on genetic comparisons. Ho Decl. ¶ 64. Thus, a POSA in October 2016 would have foreseen the possibility of new betacoronaviruses—such as SARS-CoV-2—and considered them to be encompassed. Ho Decl. ¶¶ 61-64.

Because nothing about the claims or specification indicates an intent to depart from the ordinary meaning of "betacoronavirus," the term cannot be limited only to betacoronaviruses known on October 21, 2016.

### D. "S protein" ('600 and '127 Patents)

| Moderna's Proposed Construction | Defendants' Proposed Construction |
|---|---|

| Plain and ordinary meaning, which is: "spike protein" | "a structural protein encoded by a betacoronavirus genome that mediates virus binding to cells and virus entry via fusion of the virus and target cell membranes" |
|---|---|

The term "S protein" appears in every claim of the '600 and '127 patents to describe the viral antigen that the claimed mRNA encodes. "S protein" refers to a "spike protein," a commonly used term in the context of coronaviruses that requires no construction. '600 patent at 7:25-32. Defendants' proposed construction—while accurately describing the function of a spike protein in an infectious, live betacoronavirus—improperly seeks to import that function into the definition of "S protein" in the claims, even though the S protein encoded by the claimed mRNA will never be part of an infectious virus and never performs that function. Defendants' construction is contrary to law and to the understanding a POSA would have had from reading the claims in light of the specification.

### 1.   Intrinsic Evidence Supports Moderna's Construction.

First, Moderna's proposed construction is consistent with the claim language, which makes clear that the "S protein" limitations recited in the claim are not functional, but refer to structural elements of the claim.[4]   *See, e.g.*, '600 patent at 737:26-29 ("S protein or S protein subunit"); '127 patent (D.I. 1-3) at 741:11-19 (same).

Second, the specification clearly states that "S protein" refers to "spike protein." *E.g.*, '600 patent at 7:25-32 (referring three times to "spike protein (S)"). The specification provides detailed guidance as to the structure of the S protein to be used in the disclosed invention in the form of multiple exemplary sequences. For example, the specification explains that the disclosed betacoronavirus vaccines may comprise an mRNA encoding a betacoronavirus "antigenic

---

[4]   Structural limitations define what an invention ***is***, whereas functional limitations define what an invention ***does***. *See In re Swinehart*, 439 F.2d 210, 212 (C.C.P.A. 1971).

polypeptide" identified by any one of a number of nucleotide and/or amino acid sequences expressly reproduced in certain tables in the specification.  *Id.* at 8:17-9:24, 35:36-44, 36:24-28. Those tables, in turn, provide exemplary nucleic acid and/or amino acid sequences for spike proteins and spike protein subunits for a variety of betacoronaviruses.  *Id.* at 258:14-276:67, Table 10 (nucleic acid sequences for MERS spike proteins and spike protein subunits); *id.* at 277:1-284:67, Table 11 (amino acid sequences for SARS, OC43, and HKU1 spike proteins and spike protein subunits); *id.* at 285:1-292:45, Table 12 (cGenBank Accession numbers for full-length spike glycoprotein amino acid sequences).[5]  The specification's disclosure of sequences further confirms that "S protein" as used in the claims refers to structure, not function.  Nothing in the file history suggests otherwise.

## 2.    Extrinsic Evidence Supports Moderna's Construction.

The extrinsic evidence further confirms that a POSA would also have understood that a spike protein is still a spike protein even if it has been taken out of the context of a full betacoronavirus and even if there is some variation from a working, naturally occurring spike protein such that, for example, it is not able to mediate fusion.  Ho Decl. ¶¶ 68-69.[6]  A POSA would have understood that, in the context of the claims, the S protein encoded by the mRNA would not "mediate virus binding to cells and virus entry via fusion of the virus and target cell

---

[5]    To be clear, these sequences are not limiting:  The specification makes clear that they are examples only, and a POSA would have understood that additional betacoronaviruses could be identified having other spike proteins (*see supra* § IV.C).  The specification further makes clear that variants of these sequences are also considered "spike proteins."  *See, e.g.*, '600 patent at 8:48-55.

[6]    Indeed, Defendants refer to the mRNA in their vaccine as encoding the spike protein, even though the encoded spike protein does not mediate fusion of cell membranes and contains amino acid mutations compared to wild-type SARS-CoV-2 spike protein.  *E.g.*, Ex. C at 19 (Comirnaty® prescribing information) ("Each 0.3 mL dose of COMIRNATY supplied in multiple dose vials with purple caps and labels with purple borders contains 30 mcg of a nucleoside-modified messenger RNA (mRNA) encoding the viral spike (S) glycoprotein of SARS-CoV-2.").

membranes," because there was no viral membrane to fuse, but that it was nevertheless an S protein.  Ho Decl. ¶¶ 68-71.

### 3.   Defendants' Proposed Construction Improperly Incorporates a Functional Limitation.

Defendants' proposed construction ignores the very nature of the invention and seeks to rewrite the claims as if they were part of a live virus, by reciting a "betacoronavirus genome" and including a functional limitation (i.e., "mediates virus binding to cells and virus entry via fusion of the virus and target cell membranes") that the invention does not perform.  The Federal Circuit has admonished against importing functional limitations into structural claim elements.  *E.g.*, *Schwing GmbH v. Putzmeister Aktiengesellschaft*, 305 F.3d 1318, 1324 (Fed. Cir. 2002) ("Where a claim uses clear structural language, it is generally improper to interpret it as having functional requirements."); *Toro Co. v. White Consol. Indus., Inc.*, 266 F.3d 1367, 1371 (Fed. Cir. 2001) ("An invention claimed in purely structural terms generally resists functional limitations."); *Ecolab, Inc. v. Envirochem, Inc.*, 264 F.3d 1358, 1367 (Fed. Cir. 2001) ("Where the function is not recited in the claim itself by the patentee, we do not import such a limitation.").

Here, the portion of the specification discussing mediating virus binding to cells and fusing virus and target cell membranes refers to the function of the S protein ***in a live virus***:

> The S protein is particularly essential in mediating virus binding to cells expressing receptor dipeptidyl peptidase-4 (DPP4) through receptor binding domain (RBD) in the S1 subunit, whereas the S2 subunit subsequently mediates virus entry via fusion of the virus and target cell membranes (Li F. J Viral 2015; 89(4):1954-64; Raj V.S. et al. Nature 2013; 495(7440):251-4).

'600 patent at 34:53-59.  The two papers cited in this passage likewise refer to the membrane fusion as a function of the protein ***in a live virus***.  Ex. D at 1954 (Li 2015) ("Receptor recognition by viruses is the first and essential step of viral infections of host cells.  An envelope-anchored spike protein mediates coronavirus entry into host cells by first binding to a receptor on the host

cell surface and then fusing viral and host membranes."); Ex. E at 251 (Raj 2013) ("Coronaviruses infect a wide range of mammals and birds.  Their tropism is primarily determined by the ability of the spike (S) entry protein to bind to a cell surface receptor.").[7]  Similarly, the portions of the specification that refer to a viral "genome" (the term "betacoronavirus genome" appears nowhere in the specification) refer to the genome of an infectious virus.  *E.g.*, '600 patent at 2:60-65 (referring to "genome sequencing" of MERS-CoV from sputum samples from a patient); *id.* at 34:20-26 (referring to "genomes" of MERS-CoV and then stating that it has "strong tropism for non-ciliated bronchial epithelial cells, evades the innate immune response and antagonizes interferon (IFN) production in infected cells"); *id.* at 34:36-53 (stating that the "genome of MERS-CoV encodes" at least ten different proteins, and then explaining their roles in viral replication, pathogenesis, and virulence).

The claimed invention, by contrast, relates to an mRNA construct, i.e., not a live virus and not a viral genome.  The specification explains that the mRNA vaccines described are meant to "prevent" viral infections.  '600 patent at 3:48-56.  The whole point of the invention is to provide a vaccine that will induce an adaptive immune response to an antigenic polypeptide—in this case, the S protein (or subunit)—without actually infecting the subject.  *Id.* at 7:14-32, 185:25-31.  A POSA would have understood from this context that the function of the spike protein encoded by the mRNA was ***not*** to "mediate virus binding to cells and virus entry via fusion of the virus and target cell membranes," but to provide an antigen recognizable to the body as spike protein, so that antibodies produced in response would recognize the spike protein structure of a live virus ***later***.  The S protein need not be "encoded by a betacoronavirus genome" to do that; indeed there is nothing in the claims or the specification to suggest the entire genome or any original viral material

---

[7]     "Tropism" refers to the virus's ability to infect different types of cells.  Ho Decl. ¶ 67.

has to encode the spike.  Thus, Defendants' construction not only improperly incorporates functional limitations—which do not belong in the construction of this structural claim term—but also incorporates an irrelevant function that the invention does not perform.

   E.    **"open reading frame" ('600 and '127 Patents)**

| Moderna's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and ordinary meaning, which is:  "in a DNA, a continuous stretch of DNA beginning with a start codon, and ending with a stop codon and encodes a polypeptide, or, in an mRNA, a corresponding stretch of mRNA" | "a continuous stretch of DNA beginning with a start codon (e.g., methionine (ATG)), and ending with a stop codon (e.g., TAA, TAG or TGA) and encodes a polypeptide" |

   The term "open reading frame" ("ORF") appears in every asserted claim of the '600 and '127 patents to describe the part of the mRNA sequence that codes for the S protein.  The claim construction dispute here reflects Defendants' attempt to construe "open reading frame" to be a **DNA** coding sequence, thereby **excluding mRNA** sequences from the claims.  This is entirely improper as the claims are expressly directed to mRNA and the specification refers to mRNA ORFs over 100 times.  Defendants' proposed construction, which would re-write the claim to exclude mRNA sequences is incorrect.

   1.    **Intrinsic Evidence Supports Moderna's Construction.**

   "Open reading frame" is a common term used in biology to refer to a polypeptide coding sequence in **either** DNA or mRNA, depending on the context.  Ho Decl. ¶¶ 77-80.  Here, the plain language of the claims makes clear that "open reading frame" must encompass an mRNA ORF and is not limited to a DNA ORF.  For example, claim 1 of the '600 patent recites:  "a **messenger ribonucleic acid (mRNA)** comprising an open reading frame encoding a betacoronavirus (BetaCoV) S protein."  '600 patent at 737:26-29.  As the claim itself is explicitly directed to mRNA ORFs, the term must be construed with reference to **mRNA**.  *Phillips*, 415 F.3d at 1314 ("[T]he context in which a term is used in the asserted claim can be highly instructive.").

Further, the specification makes clear that the entire invention is directed to mRNA.  *E.g.*, '600 patent Title ("Betacoronavirus ***mRNA*** Vaccine"); *id.* at Abstract ("The disclosure relates to respiratory virus ***ribonucleic acid (RNA)*** vaccines and combination vaccines, as well as methods of using the vaccines and compositions comprising the vaccines." (emphases added)).   The specification uses the term "open reading frame" or "ORF" to encompass an mRNA polypeptide coding sequence ***over 180 times***.  *E.g.*, *id.* at 4:48-56, 4:62-5:3, 5:10-19, 7:14-18, 7:52-8:1, 9:23-29, 11:33-45, 12:41-56, 13:12-22, 34:36-41, 35:36-40, 36:24-28, 37:62-38:6, 41:32-39, 48:24-34, 65:33-53, 66:34-54, 67:6-31, 192:15-19, 194:14-16, 195:66-196:12, 196:30-36, 197:49-52, 198:14-22, 198: 51-59, 199:16-24, 199:41-59, 202:37-49, 202:58-203:3.  In each case, a POSA would have immediately understood that "open reading frame" in the context of mRNA encompasses an mRNA polypeptide coding sequence, because an mRNA with a DNA ORF is not possible and would not produce a polypeptide.  *Infra* § IV.E.2.

Looking to the file history, the examiner clearly understood "open reading frame" in the claims to encompass an mRNA ORF.  First, the examiner allowed the claims without objection to the impossibility of having a DNA ORF in an mRNA molecule.  Second, the examiner actually made an amendment to a claim to specify that the RNA comprising an "open reading frame" was messenger RNA:  "136.  A composition, comprising: a <u>messenger</u> ribonucleic acid (<u>m</u>RNA) comprising an open reading frame encoding a betacoronavirus (BetaCoV) S protein or S protein subunit formulated in a lipid nanoparticle."  Ex. F at MOD_000032296 ('600 patent file history, May 12, 2020 Notice of Allowability at 3).  The examiner would not have made that amendment if the "open reading frame" of the claims referred exclusively to DNA.

### 2.    Extrinsic Evidence Supports Moderna's Construction.

Extrinsic evidence confirms that a POSA would have understood the claim language to provide for an mRNA ORF and that it cannot be limited to DNA.  As an initial matter, a POSA

would have understood the claim cannot be limited to a DNA ORF because an mRNA comprising a DNA ORF is not possible.  Ho Decl. ¶¶ 82-85.  mRNAs and DNAs are separate kinds of molecules, with mRNA made from ribonucleic acid and DNA made from deoxyribonucleic acid. *Compare* '600 patent at 3:9, *with id.* at 3:24.  It makes no scientific sense to have an mRNA comprising a DNA ORF.  Ho Decl. ¶¶ 76-80, 82-84, 91.[8]  Instead, a POSA would have understood that a DNA ORF would be found in DNA.  Ho Decl. ¶ 77, 79-80, 86, 91.  In contrast, a POSA would have understood that an mRNA ORF, i.e., what is claimed, would be found in ***mRNA***.  Ho Decl. ¶¶ 78-84, 89, 91-92.

This well-accepted understanding of an mRNA ORF was described in the literature.  For example, Lewin's Cells, a foundational molecular biology textbook, defines "open reading frame (ORF)" in the glossary as "the complete set of codons read by the ribosome ***in an mRNA*** that begins with an initiation (start) codon and ends with a termination (stop) codon."  Ex. G at 998 (Lewin's Cells (2d ed. 2011)) (emphasis added).

### 3. Defendants' Proposed Construction Rewrites the Claims by Improperly Excluding mRNA Coding Sequences.

Defendants' apparent (and illogical) position is that the inventors disclaimed mRNA coding sequences from the invention, despite the explicit language of the claims claiming mRNA and the serial disclosures of mRNA ORFs spanning nearly two hundred sentences in the specification.  But that position is facially unsupportable.  The Federal Circuit applies a "stringent standard" and will only depart from a term's ordinary meaning when the patentee has shown a

---

[8]    Even if some kind of mixed RNA/DNA molecule existed (it does not), such a molecule could not be translated to produce a polypeptide and would therefore be inconsistent with the very idea of the inventions.  Ho Decl. ¶ 91.  Indeed, the specification says "'[m]essenger RNA' (mRNA) refers to any polynucleotide that encodes a … polypeptide … and can be translated to produce the encoded polypeptide."  '600 patent at 41:55-60.  An mRNA with a DNA open reading frame would not be an mRNA according to that understanding because it could not "be translated to produce the encoded polypeptide."  Ho Decl. ¶ 91.

clear intent to deviate from that meaning by either (1) acting as his own "lexicographer" or (2) disavowing claim scope in the specification or prosecution history. *Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1330 (Fed. Cir. 2012). "When a patentee acts as his own lexicographer in redefining the meaning of particular claim terms away from their ordinary meaning, he must clearly express that intent in the written description." *Merck & Co. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1370 (Fed. Cir. 2005). There is no such lexicography or disclaimer here.[9]

Further, Defendants' construction ***would exclude every disclosed embodiment*** by referring to an impossible construct that could not produce a betacoronavirus spike protein: an mRNA (which by definition is made from ribonucleotides) with a DNA ORF (which by definition is made from deoxyribonucleotides). Ho Decl. ¶¶ 76-80, 82-84, 91. The Federal Circuit has repeatedly made clear that it does not "interpret claim terms in a way that excludes embodiments disclosed in the specification" unless there is a clear disclaimer. *Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1276-77 (Fed. Cir. 2008). For the reasons explained above, there is no such disclaimer here.

In sum, the ordinary meaning of "open reading frame" clearly includes mRNA open reading frames; that understanding is consistent with how the term is used in the claims and nearly 200 times in the specification; and Defendants' contention that Moderna somehow redefined the term to recite an impossibility is contrary to Federal Circuit law.

---

[9] Defendants may try to argue lexicography based on a passage in the specification stating that "[a]n 'open reading frame' is a continuous stretch of DNA beginning with a start codon (e.g., methionine (ATG)), and ending with a stop codon (e.g., TAA, TAG or TGA) and encodes a polypeptide." '600 patent at 62:50-53. But that statement comes nowhere close to lexicography. *See Medicines Co.*, 853 F.3d at 1306 (explaining that lexicography requires definitional language like "as defined herein"). Further, this portion of the specification is referring to DNA in vitro transcription template (i.e., to make mRNA)—not the mRNA ORF itself. Ho Decl. ¶85-86.

Date:  May 26, 2023

Respectfully submitted,

_/s/ Kevin S. Prussia_
William F. Lee (BBO# 291960)
Emily R. Whelan (BBO# 646982)
Kevin S. Prussia (BBO# 666813)
Andrew J. Danford (BBO# 672342)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000
william.lee@wilmerhale.com
emily.whelan@wilmerhale.com
kevin.prussia@wilmerhale.com
andrew.danford@wilmerhale.com

Amy K. Wigmore (BBO# 629275)
WILMER CUTLER PICKERING
  HALE AND DORR LLP
2100 Pennsylvania Avenue NW
Washington, DC 20037
(202) 663-6000
amy.wigmore@wilmerhale.com

_Counsel for Plaintiffs ModernaTX, Inc. and Moderna US, Inc._

<u>**CERTIFICATE OF SERVICE**</u>

I, Kevin Prussia, hereby certify that on May 26, 2023, I caused the foregoing Opening Claim Construction Brief to be electronically filed with the Clerk of the Court using the CM/ECF system, which will simultaneously serve notice of such filing to counsel of record to their registered electronic mail addresses.

/s/ *Kevin S. Prussia*

Kevin S. Prussia (BBO# 666813)