IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MODERNATX, INC. and MODERNA US, INC.,<br><br>   Plaintiffs, Counterclaim-<br>   Defendants,<br><br> v.<br><br>PFIZER INC., BIONTECH SE, BIONTECH<br>MANUFACTURING GMBH, and BIONTECH<br>US INC.,<br><br>   Defendants, Counterclaim-<br>   Plaintiffs. | Case No. 1:22-cv-11378-RGS |

## DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF

## <u>TABLE OF CONTENTS</u>

**Page**

I.  INTRODUCTION ........................................................................................................... 1

II.  BACKGROUND ........................................................................................................... 3

    A.  The Patents-in-Suit .............................................................................................. 3

        1.  The '574 Patent ...................................................................................... 3

        2.  The '600 and '127 Patents .................................................................... 4

    B.  Moderna's Spikevax® and BioNTech-Pfizer's Comirnaty® Vaccines ................. 6

III.  DISPUTED CLAIM TERMS IN THE '574 PATENT ................................................. 7

    A.  "mRNA" ............................................................................................................... 7

    B.  "Unmodified mRNA" ........................................................................................ 10

IV.  DISPUTED CLAIM TERMS IN THE '600 AND '127 PATENTS ............................ 11

    A.  "Betacoronavirus" ............................................................................................. 12

        1.  Defendants' Proposed Construction Is Consistent with Federal
            Circuit Precedent ................................................................................. 12

        2.  The Intrinsic Record Is Consistent with the Temporal Restriction
            in Defendants' Proposed Construction .................................................. 14

    B.  S Protein ............................................................................................................. 16

    C.  Open Reading Frame ......................................................................................... 19

V.  CONCLUSION ........................................................................................................... 21

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
   314 F.3d 1313 (Fed. Cir. 2003)..................................................................................... 8

*Amgen v. Sanofi*,
   No. 21-757, 2023 WL 3511533 (U.S. May 18, 2023) ..................................................... 1

*AstraZeneca AB v. Mylan Pharma. Inc.*,
   19 F.4th 1325 (Fed. Cir. 2021) ................................................................................... 11

*Atl. Rsch. Mktg. Sys., Inc. v. Troy*,
   616 F. Supp. 2d 157 (D. Mass. 2009) ........................................................................... 8

*Aventis Pharma. Inc. v. Amino Chems. Ltd.*,
   715 F.3d 1363 (Fed. Cir. 2013)................................................................................... 15

*Braintree Labs., Inc. v. Novel Labs., Inc.*,
   749 F.3d 1349 (Fed. Cir. 2014)............................................................................ 10, 19

*Control Res., Inc. v. Delta Elecs., Inc.*,
   133 F. Supp. 2d 121 (D. Mass. 2001) ......................................................................... 18

*Cultor Corp. v. A.E. Staley Mfg. Co.*,
   224 F.3d 1328 (Fed. Cir. 2000).................................................................................. 20

*Cytyc Corp. v. TriPath Imaging, Inc.*,
   2005 U.S. Dist. LEXIS 29850 (D. Mass. Nov. 28, 2005) ..................................... 15

*In re Katz Interactive Call Processing Pat. Litig.*,
   639 F.3d 1303 (Fed. Cir. 2011).................................................................................... 9

*Innogenetics, N.V. v. Abbott Labs.*,
   512 F.3d 1363 (Fed. Cir. 2008)................................................................................... 15

*Johnson Worldwide Assocs., Inc. v. Zebco Corp.*,
   175 F.3d 985 (Fed. Cir. 1999)...................................................................................... 8

*Kopykake Enterprises, Inc. v. Lucks Co.*,
   264 F.3d 1377 (Fed. Cir. 2001)................................................................................... 13

*Martek Biosciences Corp. v. Nutrinova, Inc.*,
   579 F.3d 1363 (Fed. Cir. 2009)................................................................................... 10

*MedIdea, L.L.C. v. DePuy Orthopaedics, Inc.*,
   2018 WL 5830849 (D. Mass. Nov. 7, 2018), *aff'd*, 833 F. App'x 338
   (Fed. Cir. 2021)......................................................................................................... 18

# TABLE OF AUTHORITIES
**(continued)**

**Page(s)**

*Milliman, Inc. v. Gradient A.I. Corp.*,
  2023 WL 319633 (D. Mass. Jan. 19, 2023) .......................................................... 18

*Salazar v. Procter & Gamble Co.*,
  414 F.3d 1342 (Fed. Cir. 2005) .......................................................................... 15

*Schering Corp. v. Amgen Inc.*,
  222 F.3d 1347 (Fed. Cir. 2000) .............................................................. 12, 13, 14

*Sinorgchem Co., Shandong v. ITC*,
  511 F.3d 1132 (Fed. Cir. 2007) ................................................................. *passim*

*Starhome GmbH v. AT & T Mobility LLC*,
  743 F.3d 849 (Fed. Cir. 2014) .............................................................................. 9

*Sulzer Textil A.G. v. Picanol N.V.*,
  358 F.3d 1356 (Fed. Cir. 2004) .......................................................................... 18

*Teva Pharma. Int'l GmbH v. Eli Lilly and Co.*,
  2021 WL 723337 (D. Mass. Feb. 24, 2021) ........................................................ 10

*Trustees of Columbia Univ. in City of New York v. Symantec Corp.*,
  811 F.3d 1359 (Fed. Cir. 2016) .......................................................................... 21

**TABLE OF EXHIBITS**

| Exhibit | Document |
|---------|----------|
| A | U.S. Patent No. 10,898,574 |
| B | U.S. Patent No. 10,702,600 |
| C | U.S. Patent No. 10,933,127 |
| D | Declaration of Dr. Daniel O. Griffin in Support of Defendants' Constructions |
| E | Curriculum Vitae for Daniel O. Griffin, M.D., Ph.D. |
| F | List of Materials Considered for Daniel O. Griffin, M.D., Ph.D. |
| G | Plaintiffs ModernaTX, Inc. and Moderna US, Inc.'s List of Claim Terms to be Construed, dated April 24, 2023 |
| H | *Collins Dictionary of Science* 514 (2005) |
| I | *Penguin Dictionary of Science* 432 (3rd ed. 2009) |
| J | *Webster's New World Medical Dictionary* 271 (3rd ed. 2008) |
| K | Excerpt from prosecution history for U.S. Appl. No. 16/880,829 (September 10, 2020 Notice of Allowability) |
| L | Excerpt from prosecution history for U.S. Appl. No. 16/880,829 (December 18, 2020 Response to Examiner's Note) |
| M | Claude Fauquet, *Taxonomy, Classification and Nomenclature of Viruses*, ELSEVIER 9 (2008) |
| N | Dong Yang & Julian L. Leibowitz, *The structure and functions of coronavirus genomic 3' and 5' ends*, 206 Virus Research 120 (2015) |

## I.   __INTRODUCTION__

In 2005, Dr. Katalin Karikó and her colleague Dr. Drew Weissman at the University of Pennsylvania first published their groundbreaking research on modified mRNA nucleosides,[1] which led to solving one of the long-standing challenges of using mRNA as a potential therapeutic. They published a series of articles about this research and claimed their inventions in patents.  The work that Plaintiffs now tout in this lawsuit relied on these discoveries by Dr. Karikó and her team. (*See generally* D.I. 45, *including* Exs. 9, 10 (Moderna's co-founder, Derrick Rossi, stating that Dr. Karikó's work "is what allows these mRNA vaccines and any mRNA therapeutics down the road").)

In April 2012, Moderna filed the application that eventually issued, nine years later in January 2021, as U.S. Patent No. 10,898,574 ("the '574 patent," attached as Exhibit A), one of the patents-in-suit.  The 2012 filing discloses test data from a relatively small set of examples using mRNA technology, including compositions containing the modifications to nucleosides that had been identified by Dr. Karikó.  However, the claims of the '574 patent are far broader—purporting to claim entire classes of mRNA compositions encoding ***any*** protein, and the use of such compositions to express ***any*** protein.  While the determination of infringement and validity of these claims, including under the Supreme Court's recent decision in *Amgen v. Sanofi*, No. 21-757, 2023 WL 3511533 (U.S. May 18, 2023), is an issue for another day, their breadth necessitates construing two claim terms, "mRNA" and "unmodified mRNA."  As discussed below, BioNTech and Pfizer propose constructions of these terms that are consistent with the meanings ascribed to them in and as of the 2012 patent filing.

---

[1] The phrase "nucleoside" and other biotechnical terminology involved in this case are discussed in the Declaration of Dr. Daniel O. Griffin ("Griffin Dec."), submitted herewith as Exhibit D.

On October 21, 2016, Moderna filed the application leading to the remaining two asserted patents.  Following years of prosecution, U.S. Patent Nos. 10,702,600 ("the '600 patent," attached as Exhibit B) and 10,933,127 ("the '127 patent," attached as Exhibit C) issued on July 7, 2020, and March 20, 2021, respectively.  In these patents, Moderna describes making mRNA to encode specific portions of just three particular viruses.  But the claims are once again much broader, referring to any mRNA that encodes an "S protein" of a "betacoronavirus," or a "subunit" of such a protein.  The breadth of these claims likewise raises claim construction issues concerning the "betacoronavirus," "S protein," and "opening reading frame" claim terms, each of which are discussed below.

In the pre-*Markman* briefing exchanges, Moderna initially took the position that no claim terms required construction.  In response to Defendants' proposed constructions, however, Moderna countered with constructions that, for example:

- improperly import limitations of one independent claim into another (Section III.A, *infra*, relating to the construction of mRNA);

- add (Section IV.C, *infra*, relating to the construction of "open reading frame") or remove (Section III.B, *infra*, relating to the construction of "unmodified mRNA") language that appears in express definitions provided by the patents;

- contravene the fundamental rule of claim construction that claim terms are accorded the meaning they had at the time of the alleged invention (Section IV.A, *infra*, relating to the construction of "betacoronavirus"); or

- simply spell out acronyms without explaining what the words actually mean (Section IV.B, *infra*, relating to the construction of "S protein").

Because Defendants' proposed constructions reflect the patents' explicit definitions and/or the understanding of a person of ordinary skill in the art ("POSA") in view of the intrinsic record, they should be adopted.

## II.   BACKGROUND

### A.   The Patents-in-Suit

#### 1.   The '574 Patent

On April 2, 2012, Moderna filed an application that, through a series of "continuation" applications, issued nine years later as the '574 patent.  The '574 patent specification therefore corresponds to the text that appeared in the application filed in 2012.  That specification includes no reference to the use of mRNA for making a vaccine, no mention of COVID-19 (which did not exist until nearly eight years after the patent was filed), and no description of any pharmaceutical composition for any actual drug product.

The alleged invention of the '574 patent is said to relate to "delivery methods" that are "useful in therapeutic delivery of modified nucleic acids such as modified mRNA (mmRNA)." ('574 patent at 1:32-34; *see also id.* at 4:65-67.)  The mRNA, as the specification explains, is a "biological moiety" that "modulate[s] protein expression" (*id.* at 2:12-14), which is a general reference to the function of mRNA in the human body and countless other living organisms.  The specification also explains that the mRNA may be formulated as a "pharmaceutical composition" that could be a "saline or lipid formulation." (*Id.* at 2:28-30.)

Despite having more than 100 columns of text, the actual work by Moderna described in the '574 patent is more limited.  For example, the specification discloses test results from a relatively small set of mRNA molecules in compositions that encode particular proteins, such as: (1)"mCherry" (a fluorescent protein); (2) luciferase (another light-producing protein); (3) erythropoietin (a natural hormone); (4) granulocyte colony-stimulating factor (another natural

hormone); (5) vascular endothelial growth factor-isoform A (another natural hormone); and (6) Factor IX (a protein in blood coagulation).  (*See id.* at 62:16-68:11, 70:30-85:25.)

The claims that ultimately issued in 2021 are not tethered to the mRNA that Moderna made, used, and described in the patent specification.  Rather, the claims use functional language that covers a vast scope of materials.  Claim 2, for example, recites:

> A pharmaceutical composition comprising: a plurality of lipid nanoparticles comprising a cationic lipid, a sterol, and a PEG-lipid, wherein the lipid nanoparticles comprise ***an mRNA encoding a polypeptide***, wherein the mRNA comprises one or more uridines, one or more cytidines, one or more adenosines, and one or more guanosines and wherein substantially all uridines are modified uridines.

(574 patent at 105:1-22)  Accordingly, Moderna claims mRNA that can encode any "polypeptide," and the claimed pharmaceutical compositions encompass exceedingly broad classes of lipid materials.  (*Id.*)

### 2.     The '600 and '127 Patents[2]

On October 21, 2016, Moderna filed an application that, once again through a series of continuation applications, issued more than four years later as the '600 and '127 patents, on July 7, 2020, and March 2, 2021, respectively.  In its 2016 application, Moderna stated the known biological fact that "RNA (e.g., messenger RNA) can safely direct the body's cellular machinery to produce nearly any protein of interest," which could range from "native proteins to antibodies and other entirely novel protein constructs that can have therapeutic activity inside and outside of cells."  ('600 patent at 3:24-27.)

In this 2016 application, Moderna described using mRNA to produce certain "antigenic

---

[2]  Because the specifications for the '600 and '127 Patents are essentially identical, the '600 patent specification is referenced for convenience.

polypeptides" to target a "respiratory disease." (*Id.* at 1:26-40, 4:1-5.)  The application was based on Moderna's work relating to four specific mRNA compositions that encode parts of three specific viruses:  (1) a full length "fusion protein" from a "human papilloma" virus; (2) a "hemagglutinin-neuraminidase" or fusion protein obtained from a "parainfluenza virus type 3"; and (3) a full length "spike protein" or "S2 subunit" from a "MERS-CoV" virus.  (*See id.* at 209:45-210:62, 211:45-212:21, 213:60-214:56.)   These particular mRNAs were encapsulated in two different lipid formulations.  (*See id.* at 212:47-54.)  Unlike the '574 patent, the specification for the '600 and '127 patents does not require that these particular mRNA molecules include nucleoside modifications; rather, the specification explains that the nucleic acids may be "chemically modified" or "not chemically modified." (*Id.* at 19:16-18.)  As with the '574 patent, there is no description of mRNA encoding SARS-CoV-2, or parts of SARS-CoV-2, or compositions constituting vaccines for SARS-CoV-2.

Claim 1 of the '600 patent is exemplary, and recites "[a] composition, comprising: a messenger ribonucleic acid (mRNA) comprising an open reading frame encoding a betacoronavirus (BetaCoV) S protein or S protein subunit formulated in a lipid nanoparticle." ('600 patent at 737:26-29.)  Claim 1 of the '127 patent recites:

> A method comprising administering to a subject a messenger ribonucleic acid (mRNA) comprising an open reading frame encoding a betacoronavirus (BetaCoV) S protein or S protein subunit formulated in a lipid nanoparticle in an effective amount to induce in the subject an immune response to the BetaCoV S protein or S protein subunit, wherein the lipid nanoparticle comprises 20-60 mol % ionizable cationic lipid, 5-25 mol % neutral lipid, 25-55 mol % cholesterol, and 0.5-15 mol % PEG-modified lipid.

('127 patent at claim 741:11-19.)

Importantly, in allowing these claims of Moderna's patents referring to "betacoronavirus," the U.S. Patent and Trademark Office Examiner stated that the claims covered only "betacoronaviruses ***that were known as of October 21, 2016*** (e.g., OC43, HKU1, MERS and SARS-CoV) and not SARS-CoV-2 (COVID-19)" because the application issuing as the patents were filed "several years before the discovery of" SARS-CoV-2.  (Ex. K, September 10, 2020 Notice of Allowance), p. 4.)[3]

**B.     Moderna's Spikevax® and BioNTech-Pfizer's Comirnaty® Vaccines**

On January 10, 2020, scientists associated with Fudan University in Shanghai and the University of Sydney published the genome sequence of a "novel coronavirus," now known as "SARS-COV-2," which is responsible for "COVID-19."  (*See* Edward C. Holmes & Yong-Zhen Zhang, *Novel 2019 coronavirus genome*, https://virological.org/t/novel-2019-coronavirus-genome/319 (Jan. 10, 2020).)  This virus, as the name suggested, was new to the world, originating in Wuhan, China in late 2019, and quickly spread throughout the world soon after.  There was no therapeutic available to combat the illness caused by this virus.

BioNTech and Moderna, each of whom had already been working for years in the mRNA field, independently created mRNA structures designed to encode a modified form of the SARS-CoV-2 spike protein, and then further worked with those structures to create mRNA-based vaccines.  Although both vaccines encode for modified portions of SARS-CoV-2, the mRNA sequences and compositions used in the BioNTech and Moderna vaccines are quite different.  (*See, e.g.*, D.I. 45, Ex. 16.)

---

[3]  Unless otherwise indicated, all emphases (bolding and italics) throughout this brief have been added.

## III.   DISPUTED CLAIM TERMS IN THE '574 PATENT

In their infringement contentions, Plaintiffs have asserted claims 1-4 and 6-10 of the '574 patent.  The claim term "mRNA" appears in each asserted claim, while the term "unmodified mRNA" appears only in claim 1.

### A.   "mRNA"

| Term | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|------|-----------------------------------|-----------------------------------|
| mRNA | Plain and ordinary meaning, which is:<br><br>"messenger RNA, i.e., a ribonucleic acid (RNA) polynucleotide that encodes a polypeptide of interest and can be translated to produce the encoded polypeptide of interest." | "messenger ribonucleic acid, *i.e.*, a ribonucleic acid (RNA) that acts as a template for protein synthesis through the process of translation" |

Defendants' proposed construction of "mRNA" that is based on the patent specification and the POSA's understanding of that term.  Plaintiffs' responsive construction, however, attempts to limit "mRNA" to a ribonucleic acid that encodes "a polypeptide *of interest*," rather than proteins (including polypeptides) more generally.[4]  As explained below, limiting "mRNA" in this manner contradicts the intrinsic record and how a POSA would have understood that term.

***First***, the claim language demonstrates that "mRNA" is a material that encodes proteins, including polypeptides—not just polypeptides that are "of interest" to some unspecified person.  The contrast of the two independent claims—claims 1 and 2—illustrates why this is so.  Whereas claim 1 is limited to an mRNA encoding a "polypeptide of interest," independent claim 2 recites "an *mRNA encoding a polypeptide*"—without using the term "of interest."  The fact that claim 1

---

[4]  The '574 patent does not appear to distinguish between "polypeptide," "protein," and "peptide." ('574 patent, at 52:28-31 ("Polypeptide: As used herein, "polypeptide" means a polymer of amino acid residues linked together by peptide bonds. *The term [polypeptide], as used herein, refers to proteins, polypeptides, and peptides of any size, structure, or function*.").)

has the additional limitations "of interest"—whereas independent claim 2 does not—confirms that the term "mRNA" itself is not so limited.  *See Atl. Rsch. Mktg. Sys., Inc. v. Troy*, 616 F. Supp. 2d 157, 162 (D. Mass. 2009) ("[W]hen a patent claim 'does not contain a certain limitation and another claim does, that limitation cannot be read into the former claim.'") (quoting *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1326 (Fed. Cir. 2003)).

**Second**, the specification confirms Defendants'—and undercuts Plaintiffs'—construction. Like the claims, the specification uses "mRNA" to describe a template for protein synthesis, without limiting the resulting product to a "polypeptide of interest."  (*See, e.g.*, '574 patent at 5:10-18 ("This invention provides nucleic acids, including RNAs, specifically mRNAs, that encode at least one polypeptide . . . .").)  The '574 patent also describes mRNA that encodes different types of proteins, including "polypeptide variants," "targeting moieties," "cell penetrating peptides," "fusion proteins," and reporter proteins.  (*Id.* at 6:30-59; 86:58-63; *see also id.* 3:65-4:29; Ex. D, Griffin Dec. at ¶¶ 24, 27, 34, 36.)  The "varied use" of "mRNA" throughout the specification "demonstrates the breadth of the term."  *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 991 (Fed. Cir. 1999).  Moreover, where the specification describes mRNA that encodes a "polypeptide of interest," the specification uses this term expressly (*see, e.g.*, '574 patent at 2:20-23, 5:41-44; 27:62-28:2), which further confirms that "mRNA," as used generally, should not be defined as mRNA encoding a "polypeptide of interest."

**Third**, Defendants' proposed construction reflects how a POSA would have understood "mRNA" as of the '574 patent's priority date, as demonstrated by contemporaneous definitions of "mRNA."  The Federal Circuit has "made clear that dictionaries and treatises can often be useful in claim construction, particularly insofar as they help the court 'to better understand the underlying technology' and the way in which one of skill in the art might use the claim terms."

*Starhome GmbH v. AT & T Mobility LLC*, 743 F.3d 849, 856-58 (Fed. Cir. 2014).  Such sources confirm that a POSA would have understood that mRNA encodes for *any* protein, not merely a "polypeptide of interest."  (*See* Ex. H, COLLINS DICTIONARY OF SCIENCE (2005) (mRNA "acts as the template for protein synthesis"); *accord* Ex I, PENGUIN DICTIONARY OF SCIENCE, 3rd Eds. (2009) ("single-stranded RNA which serves as the template for protein synthesis"); Ex. J, WEBSTER'S NEW WORLD MEDICAL DICTIONARY, 3rd Eds (2008) ("[T]he key intermediary in gene expression, which translates the DNA's genetic code into the amino acids that make up proteins."); Ex. D, Griffin Dec. at ¶¶ 26-27, 34-36.)  In addition, the POSA would have understood that naturally occurring mRNA encodes proteins in nearly all organisms, regardless of whether it is "of interest" to anyone.

Furthermore, Plaintiffs' proposed construction creates ambiguity as to which of the proteins described in the specification would qualify as a "polypeptide of interest."  (*Id.* at ¶¶ 34, 36.)  For example, the specification describes how mRNA can encode for reporter proteins called "mCherry" and "luciferase," *see, e.g. id.* 3:65-4:29, which are fluorescent and light-producing proteins used to measure gene expression.  (Ex. D, Griffin Dec. at ¶¶ 29, 36.)  It is unclear whether such proteins (which generally have no therapeutic use) would qualify as a "polypeptide of interest."  In this way, Plaintiffs' proposed construction effectively excludes mRNA embodiments described in the specification, contradicting the "strong presumption against a claim construction that excludes a disclosed embodiment."  *In re Katz Interactive Call Processing Pat. Litig.*, 639 F.3d 1303, 1324 (Fed. Cir. 2011).

The Court should reject Plaintiffs' proposed construction of "mRNA" in favor of Defendants' construction, which (1) reflects how "mRNA" is used in the '574 patent claims, (2) is

supported by the specification, and (3) is consistent with how the term would have been understood by the POSA.

### B.    "Unmodified mRNA"

| Term | Plaintiffs' Construction | Defendants' Construction |
|------|--------------------------|--------------------------|
| unmodified mRNA | Plain and ordinary meaning, which is: "mRNA prior to being changed." | "any mRNA molecule prior to being changed in any way; mRNA molecules may undergo a series of modifications whereby each modified mRNA molecule may serve as the unmodified starting mRNA molecule for a subsequent modification" |

Defendants' proposed construction of "unmodified mRNA" is based on "lexicography," *i.e.*, the express definition of the word "unmodified" contained in the '574 patent specification, as applied to the word "mRNA."  *See Braintree Labs., Inc. v. Novel Labs., Inc.*, 749 F.3d 1349, 1356 (Fed. Cir. 2014) (explaining that "lexicography" in a patent "must govern the claim construction analysis").  Where "the specification explains and defines a term used in the claims, without ambiguity or incompleteness, there is no need to search further for the meaning of the term." *Sinorgchem Co., Shandong v. ITC*, 511 F.3d 1132, 1138 (Fed. Cir. 2007); *see also Teva Pharma. Int'l GmbH v. Eli Lilly & Co.*, 2021 WL 723337, at *5 (D. Mass. Feb. 24, 2021) (adopting Defendants' construction because "the specification sets out an express definition and [Defendants'] proposed construction mirrors that definition"); *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1380 (Fed. Cir. 2009) (express definition in the specification is controlling).  That is precisely the case here.

Under the heading "Definitions," the '574 patent contains the following statement, using the word "unmodified" in quotation marks to signify definitional status:[5]

---

[5]  The use of quotation marks is a "strong indication that what follows is a definition." *Sinorgchem*, 511 F.3d at 1136.

> Unmodified:  As used herein, **"*unmodified*"** refers to any substance, compound or molecule prior to being changed in any way . . . . Molecules may undergo a series of modifications whereby each modified molecule may serve as the **"*unmodified*"** starting molecule for a subsequent modification.

('574 patent at 54:64-55:3.)  Defendants' construction applies this precise definitional language, with the word "mRNA" substituted for "molecule" because the "molecule" in the claim is "mRNA."  As such, it tracks the lexicography of the patent, and therefore must be adopted.

By contrast, Plaintiffs' proposed construction "mRNA prior to being changed" is inconsistent with the intrinsic record.  ***First***, where, as here, the patentee provides such an express definition, the "plain and ordinary meaning" must yield to the lexicography supplied by the patent. *See Phillips*, 415 F.3d at 1316; *AstraZeneca AB v. Mylan Pharma. Inc.*, 19 F.4th 1325, 1330 (Fed. Cir. 2021).  ***Second***, Plaintiffs' proposed construction omits key definitional elements provided in the specification.  For example, in addressing the situation where an mRNA molecule undergoes a series of modifications, the '574 patent "clearly, deliberately, and precisely defined" unmodified mRNA to include each modified mRNA molecule that serves as the "unmodified" starting mRNA molecule for a subsequent modification.  *See Sinorgchem*, 511 F.3d at 1136.  Because Plaintiffs' proposed construction improperly excludes embodiments that are included in the breadth of the term, as confirmed by the specification, it should be rejected.  *See, e.g., id.* at 1137-40.

## IV.    DISPUTED CLAIM TERMS IN THE '600 AND '127 PATENTS

In their infringement contentions, Plaintiffs have asserted claims 1-2, 4-6, 8-12, 16-17, 20-21 and 26 of the '600 patent and claims 1-3, 6-9, 11-13, 17-18, and 20 of the '127 patent.  The claim terms discussed below are applicable to each of the asserted claims.

### A.      "Betacoronavirus"

| Term | Plaintiffs' Construction | Defendants' Construction |
|------|--------------------------|--------------------------|
| betacoronavirus | plain and ordinary meaning, which is:  an enveloped, positive-sense, single stranded RNA virus of zoonotic origin that belongs to one of the four lineages of the betacoronavirus genus of the subfamily Coronavirinae (*e.g.*, OC43, HKU1, MERSCoV, and SARS-CoV) | as of October 21, 2016, any of the enveloped, positive-sense, single stranded RNA viruses of zoonotic origin that belonged to one of the four lineages of the betacoronavirus genera of the subfamily Coronavirinae (*e.g.*, OC43, HKU1, MERSCoV, and SARS-CoV) |

The parties' dispute centers on whether the scope of "betacoronavirus" should be assessed as of October 21, 2016, the patents' filing date.  It is well-established that "[a] court construing a patent claim seeks to accord a claim the meaning it would have to a person of ordinary skill in the art ***at the time of the invention***."  *Phillips*, 415 F.3d at 1313 (internal quotations omitted).  Because Defendants' proposed construction is consistent with this fundamental rule of claim construction, as well as the intrinsic record, Defendants respectfully request that it be adopted.

### 1.      Defendants' Proposed Construction Is Consistent with Federal Circuit Precedent

In *Schering Corp. v. Amgen Inc.*, the Federal Circuit applied this rule to reject a construction that would have "enlarge[d] the scope of the patent to embrace technology arising after its filing."  222 F.3d 1347, 1353 (Fed. Cir. 2000).  In that case, the parties disputed the meaning of the claim term "polypeptide of the INF-α type."  When originally filed, the patent application used the term "leukocyte interferon," which described the inventive polypeptides by their source.  *Id.* at 1352.  During patent prosecution, this term was replaced with "INF-α" in the claims due to the subsequent discovery of additional types of polypeptides produced by leukocytes. *Id.*  Because the accused product used a DNA sequence encoding multiple INF-α subtypes, including subtypes discovered after the patent's filing, the parties disputed whether the claim term

"INF-α" should be construed to "encompass[] all INF-α subtypes" or be limited to "INF-α-1," "the only interferon subtype that Dr. Weissmann's patents describe and embrace." *Id.* at 1351-52, 1354.

The Federal Circuit held that the term was limited to "INF-α-1," explaining that the new claim language "did not ***and could not*** enlarge the scope of the patent to embrace technology arising after its filing" because "court[s] must determine what the term meant at the time the patentee filed the '901 application." *Id.* at 1353. In accordance with this legal principle, the court determined that, "[b]ecause, at the time of the '901 application, neither Dr. Weissmann nor others skilled in the art knew of the existence of, let alone the identity of, the specific polypeptides now identified as subtypes of IFN-α, those subtypes cannot be within the scope of the claims." *Id.* at 1353-54 (explaining that claim terms must be interpreted "to cover no more than what the specification supported at the time of filing" to avoid "reward[ing] Dr. Weissmann for inventions he did not make").

Plaintiffs' proposed "betacoronavirus" construction suffers from the same infirmity as the patentee's construction in *Schering*. Specifically, by omitting the "as of October 21, 2016" temporal reference for defining the scope of "betacoronavirus," Plaintiffs' construction improperly attempts to capture viruses, such as SARS-CoV-2 (COVID-19), that did not even exist as of that date. *See, e.g.*, *Kopykake Enter., Inc. v. Lucks Co.*, 264 F.3d 1377, 1383 (Fed. Cir. 2001) ("As we explained in *Schering* . . . when a claim term understood to have a narrow meaning when the application is filed later acquires a broader definition, the literal scope of the term is limited to what it was understood to mean at the time of filing.").

    **2.**    **The Intrinsic Record Is Consistent with the**
                **Temporal Restriction in Defendants' Proposed Construction**

The intrinsic record confirms that Plaintiffs' construction is improper.  For example, the

patent specification, as filed on October 21, 2016, described the term "betacoronavirus" in the

***present tense***:

> [Betacoronaviruses] ***are*** enveloped, positive-sense, single-stranded
> RNA viruses of zoonotic origin.  The coronavirus genera are each
> composed of varying viral lineages, with the betacoronavirus genus
> containing four such lineages.  The BetaCoVs of the greatest clinical
> importance concerning humans are OC43 and HKU1 of the A
> lineage, SARS-CoV of the B lineage, and MERS-CoV of the C
> lineage.

('600 Patent at 2:50-57.)  Consistent with *Schering*, a POSA would have understood the present-

tense framing of this definition as of Moderna's October 21, 2016 patent filing to refer only to the

***then-existing*** betacoronaviruses, *i.e.*, those known as of October 21, 2016.

Likewise, the prosecution history removes any potential doubt as to the proper construction

of "betacoronavirus."  In the notice by the patent Examiner giving reasons for allowing the '127

patent to issue, the Examiner expressly stated that the claims were "interpreted as [being] directed

to betacoronaviruses that ***were known*** as of October 21, 2016 (e.g., OC43, HKU1, MERS and

SARS-CoV)":

> The instant application was effectively filed on October 21, 2016,
> several years before to the discovery of SARS-CoV-2 (COVID-19).
> Prior to January 2020, neither the prior art nor the instant
> specification described/disclosed SARS-CoV-2 (COVID-19).
> Accordingly, ***the current method claims and claims directed to
> compositions comprising mRNA encoding a betacoronavirus S
> protein or S protein subunit formulated in a lipid nanoparticle
> are interpreted as begin directed to betacoronaviruses that were
> known as of October 21, 2016 (e.g., OC43, HKU1, MERS and
> SARS-CoV) and not SARS-CoV-2 (COVID-19)***.

(Ex. K, September 10, 2020 Notice of Allowance.)  Such "[s]tatements about a claim term made

by an examiner during prosecution of an application may be evidence of how one of skill in the

art understood the term at the time the application was filed." *Cytyc Corp. v. TriPath Imaging, Inc.*, 2005 U.S. Dist. LEXIS 29850, at *30 (D. Mass. Nov. 28, 2005) (quoting *Salazar v. Procter & Gamble Co.*, 414 F.3d 1342, 1347 (Fed. Cir. 2005)).

In response to the Examiner's comment, the applicants stated merely that the "patent claims properly encompass embodiments that were not known at the time that the application was filed." (Ex. L, Response to Examiner's Note at 1-2 (citing *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1370 (Fed. Cir. 2008)).) *Innogenetics*, however, does not contradict the Examiner's accurate interpretation of the patent. *Innogenetics* merely rejected an argument that broad claim language should be limited to the specific "embodiments" of the patent, rather than the broader meaning justified by the patent as a whole. *See id.* at 1370-72. That situation is not present here: the Examiner's statements did not seek to limit the claim only to the specific embodiments in the patent (*i.e.*, the mRNAs that made the disclosed and tested proteins). Moreover, *Innogenetics* did not, and could not, overrule *Schering* because it did not address the situation where—as here[6]— the intrinsic record confirms that a patent's claims are limited to a genus of compositions known as of the time of patent filing.

---

[6] The claims specify that the "mRNA" encodes a portion of the "betacoronavirus," namely an "S protein" or "subunit" of that protein. (Ex. D, Griffin Dec. at ¶¶ 38, 40, 42-43.) The specification provides no other guidance for the actual design of such an "mRNA." Thus, if "betacoronavirus" is not limited to only those that existed as of October 21, 2016, the uncertainty concerning the design of the claimed "mRNA" would only be exacerbated. (*Id.* at ¶¶ 28, 46, 51.) The situation is therefore unlike *Innogenetics*, and Defendants' proposed construction is necessary to circumscribe the scope of the claimed class of structures or compositions themselves. *See, e.g.*, *Aventis Pharma. Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013) ("Claims, however, must be construed in light of the appropriate context in which the claim term is used.").

### B.     S Protein

| Claim Term | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
| --- | --- | --- |
| S protein | Plain and ordinary meaning, which is: "spike protein" | "A structural protein encoded by a betacoronavirus genome that mediates virus binding to cells and virus entry via fusion of the virus and target cell membranes" |

Defendants' proposed construction of "S protein," which clarifies the meaning and scope of the claim term for the jury, is firmly rooted in the language of the specification and consistent with how a POSA would have understood the term.  In contrast, Plaintiffs' construction—which merely fills in the abbreviation of "S" with the word "spike"—provides no context or meaning to the jury, as required by the Federal Circuit and Supreme Court.  *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995) (claim construction ascertains "the meaning and scope of the patent claims asserted to be infringed"), *aff'd*, 517 U.S. 370 (1996).  The Court should adopt Defendants' construction.

***First***, Defendants' proposed construction of "S protein" is anchored in the specification, which distinguishes the S protein from other proteins.  For example, the first part of Defendants' proposed construction, "a structural protein encoded by a betacoronavirus genome," is based on the specification's description of an S protein as one of four major betacoronavirus structural proteins.  (*See* '600 Patent at 34:36-41 ("The genome of MERS-CoV[7] encodes at least . . . four major structural proteins, including spike (S) [protein].");  *see also id.* at 7:23-32, 8:4-11, 35:50-59.)   The other three structural proteins include the "envelope (E), nucleocapsid (N), and membrane (M) proteins."  (*Id.* at 34:39-40.)  The specification describes these as part of a specific

---

[7] MERS-CoV is a type of betacoronavirus.

betacoronavirus known as of October 21, 2016 (*e.g.*, MERS-CoV).  (*Id.* at 7:23-28.)  Given these disclosures, "S protein" is properly construed in part as "a structural protein encoded by a betacoronavirus genome."

The latter part of Defendants' proposed construction, "mediates virus binding to cells and virus entry via fusion of the virus and target cell membranes," is likewise rooted in the specification's disclosure.  According to the specification, "[t]he S protein is particularly ***essential in mediating virus binding to cells*** expressing receptor dipeptidyl peptidase-4 (DPP4) through receptor-binding domain (RBD) in the S1 subunit, whereas the S2 subunit subsequently ***mediates virus entry via fusion of the virus and target cell membranes***."  (*Id.* at 34:53-58.)  The specification's description of the S protein's function served an important purpose:  it distinguished S protein from the other structural proteins on the betacoronavirus, such as the envelope protein (E), nucleocapsid protein (N), and membrane protein (M).  (*Id.* at 34:48-58.)  Defendants' construction thus "stays true to the claim language and most naturally aligns with the patent's description of the invention."  *Phillips,* 415 F.3d at 1316.

***Second***, Defendants' construction is consistent with how a POSA would have understood the term "S protein."  As Dr. Griffin explains, consistent with the specification, a POSA would have understood as of October 21, 2016 that S proteins of such betacoronaviruses consisted of two subunits:  the S1 subunit, which contained the receptor-binding domain that bound to receptors on the cell surface, and the S2 subunit, which fused to the envelope of the virus with the host cell membrane.  (Ex. D, Griffin Dec. at ¶ 55, 57.)  As Dr. Griffin further explains, the POSA would have appreciated that the S protein plays a crucial role in mediating the process by which betacoronaviruses bound itself to and entered cells.  (*Id.* at ¶¶ 56-57.)  The POSA would thus view Plaintiffs' construction, which merely replaces S with "spike," as incomplete because a POSA

would understand that the S protein was defined not just by its appearance, but also by its function. (*Id.* at ¶ 58.)

*Third*, Defendants' proposed construction of "S protein," which is based on the specification disclosure, clarifies the meaning and scope of the patent claims asserted to be infringed—as is required where the term does not have a "meaning[] which would be apparent to the laypeople who will act as finders of fact in this dispute." *MedIdea, L.L.C. v. DePuy Orthopaedics, Inc.*, 2018 WL 5830849, at *5 (D. Mass. Nov. 7, 2018), *aff'd*, 833 F. App'x 338 (Fed. Cir. 2021). Namely, Defendants' construction provides that the "S protein" was (1) encoded by a betacoronavirus and (2) mediates virus binding and entry into cells.

As courts in this district have found, "[c]laims must be translated into plain English so that a jury will understand. Thus, accurate words that convey the essence of the invention are needed." *Control Res., Inc. v. Delta Elecs., Inc.*, 133 F. Supp. 2d 121, 127 (D. Mass. 2001); *see also Milliman, Inc. v. Gradient A.I. Corp.*, 2023 WL 319633, at *2-3 (D. Mass. Jan. 19, 2023) (construing the term "token" to ensure that it will be understandable to the lay jury). Plaintiffs' proposed replacement of the letter "S" with the word "spike" does nothing to help a lay juror determine whether a given protein falls within the scope of the claims. On the contrary, it generates confusion; the juror would bear the legal responsibility to search the patent specification to determine what the figurative word "spike" appended to "protein" refers to in the claims, and what role it played in the virus's function. *See, e.g., Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1366 (Fed. Cir. 2004) ("[T]he district court must instruct the jury on the meanings to be attributed to all disputed terms used in the claims in suit so that the jury will be able to 'intelligently determine the questions presented.'" (citation omitted)). Plaintiffs' construction raises more questions than answers.

Accordingly, the Court should adopt Defendants' proposed construction.

### C.      Open Reading Frame

| Claim Term | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
| --- | --- | --- |
| "open reading frame"<br><br>('600 Patent: Claims 1-2, 10, 16-17, 20, 26; '127 Patent: Claims 1-2, 13, 17-18, 20) | Plain and ordinary meaning, which is:<br><br>"In a DNA, a continuous stretch of DNA beginning with a start codon, and ending with a stop codon and encodes a polypeptide, or, in an mRNA, a corresponding stretch of mRNA" | "a continuous stretch of DNA beginning with a start codon (e.g., methionine (ATG)), and ending with a stop codon (e.g., TAA, TAG or TGA) and encodes a polypeptide" |

Once again, Defendants' position rests on the bedrock principle of "lexicography," relying on the definition set forth in the specification, which ends the need to "search further for the meaning of the term." *Sinorgchem*, 511 F.3d at 1138.  The specification of the '600 and '127 patents explicitly defines the term "open reading frame" as follows:

> An "open reading frame" is a continuous stretch of DNA beginning with a start codon (e.g., methionine (ATG)), and ending with a stop codon (e.g., TAA, TAG or TGA) and encodes a polypeptide.

('600 patent at 62:50-53.)  This express definition[8]—precisely the construction that Defendants propose here—is binding; it is the beginning and the end of the claim construction inquiry.  *See, e.g.*, *Braintree Labs.*, 749 F.3d at 1356.

Plaintiffs, on the other hand, seek to *alter* the express definition in the specification by reading in language that *expands* that definition to refer to open reading frames made of RNA, not

---

[8]  The patent sets off the defined term in quotation marks, a "strong indication that what follows is a definition." *Sinorgchem*, 511 F.3d at 1136.  And the patent uses a similar format to define other claim terms nearby; "open reading frame" is just one of four terms defined right next to each other in a list.  This repeated definitional structure confirms Plaintiffs' clear intent to define the term "open reading frame."

DNA as the specification recites.  (*See* D.I. 70, p. 3 (Plaintiffs Construction:  "***In a DNA,*** a continuous stretch of DNA beginning with a start codon, and ending with a stop codon and encodes a polypeptide, ***or, in an mRNA, a corresponding stretch of mRNA***").)  This is wholly improper.

     ***First***, Plaintiffs' attempt to ignore the patent's lexicography is contrary to law that the "patentee must be bound by the express definition."  *Sinorgchem*, 511 F.3d at 1136; C*ultor Corp. v. A.E. Staley Mfg. Co*., 224 F.3d 1328, 1331 (Fed. Cir. 2000) (while multiple alternative embodiments might have otherwise fallen within the ordinary meaning of the claim term "water-soluble polydextrose," the patent's lexicography limited the claim scope to only "that prepared with a citric acid catalyst").

     ***Second***, Plaintiffs cannot escape their own definition by contending that the reference to DNA is inconsistent with focusing on mRNA.  Defining "open reading frame," as the patent does, in terms of a stretch of DNA that encodes a protein fits hand-in-glove with the rest of the specification.  For example, the '600 patent explains that DNA is a "polynucleotide[]" that encodes proteins.  (*See, e.g.*, '600 patent at 41:42-43 ("the terms 'nucleic acid' and 'polynucleotide' are used interchangeably"); *Id.* at 41:44-53 ("[n]ucleic acids may be or may include ribonucleic acids (RNAs), deoxyribonucleic acids (DNAs), . . . or chimeras or combinations thereof.").)  Moreover, the specification contemplates mRNA containing an open reading frame with "a continuous stretch of DNA" because the "open reading frame" of mRNA can include DNA.  (*Id.* at 41:44-53.)  Thus, claims to mRNA comprising an "open reading frame," where the open reading frame includes a stretch of DNA per the definition of open reading frame, is consistent with the specification's definition of that term.

     But even if Plaintiffs were to contend that there was conflict between the definition of open reading frame as including a stretch of DNA, and its use in the claim as a component of the claimed

mRNA, Plaintiffs still would not be entitled to their proposed construction. Any alleged conflict "cannot override the express definitional language," *Sinorgchem*, 511 F.3d at 1138, and they certainly do not entitle the Plaintiffs to supplant the express definition of "open reading frame" in its specification, *Trs. of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1366 (Fed. Cir. 2016). If Plaintiffs say the claims do not make sense under the patent's express definition, that is a matter to take up as part of the validity inquiry, not something to be "fixed" at claim construction. *See Chef Am. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004) ("This court, however, repeatedly and consistently has recognized that courts may not redraft claims, whether to make them operable or to sustain their validity.").

## V.    <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that the Court adopt their proposed claim constructions, which reflect the meanings that a POSA would have ascribed to the disputed claim terms at the time of the invention based on the intrinsic record.

*        *        *

Dated:  May 26, 2023

| | |
|---|---|
| DEFENDANT AND COUNTERCLAIM-PLAINTIFF PFIZER INC. | DEFENDANTS AND COUNTERCLAIM-PLAINTIFFS BIONTECH SE, BIONTECH MANUFACTURING GMBH, AND BIONTECH US INC. |

DEFENDANT AND COUNTERCLAIM-PLAINTIFF PFIZER INC.

By their Counsel,

/s/ *Lee Carl Bromberg*
_____
Lee Carl Bromberg (BBO # 058480)
Erik Paul Belt (BBO # 558620)
Wyley Proctor (BBO # 666613)
**MCCARTER & ENGLISH LLP**
265 Franklin Street
Boston, MA 02110
P: 617.449.6500
F: 617.607.9200
lbromberg@mccarter.com
ebelt@mccarter.com
wproctor@mccarter.com

OF COUNSEL:

Thomas H. L. Selby
Stanley E. Fisher
Kathryn S. Kayali
Michael Xun Liu
D. Shayon Ghosh
Julie Tavares
Derrick M. Anderson
Haylee Bernal Anderson
**WILLIAMS & CONNOLLY LLP**

680 Maine Avenue, S.W.
Washington, DC 20024
Telephone: 202-434-5000
Facsimile: 202-434-5029

*Attorneys for Defendant and Counter-Claim Plaintiff Pfizer Inc.*

DEFENDANTS AND COUNTERCLAIM-PLAINTIFFS BIONTECH SE, BIONTECH MANUFACTURING GMBH, AND BIONTECH US INC.

By their Counsel,

/s/ *Jeffrey S. Robbins*
_____
Jeffrey S. Robbins, BBO #421910
Joseph D. Lipchitz, BBO #632637
Gregory M. Boucher, BBO #665212
**SAUL EWING LLP**
131 Dartmouth Street, Suite 501
Boston, MA 02116
Tel: (617) 723-3300

OF COUNSEL:

Bruce M. Wexler
Eric W. Dittmann
Young J. Park
Simon F. Kung
Rebecca A. Hilgar
Ryan Meuth
**PAUL HASTINGS LLP**
200 Park Avenue
New York, NY 10166
(212) 318-6000

*Attorneys for Defendants and Counter-Claim Plaintiffs BioNTech SE, BioNTech Manufacturing GmbH, and BioNTech US, Inc.*

**<u>CERTIFICATE OF SERVICE</u>**

I, Lee Carl Bromberg, hereby certify that this document filed through the ECF system on May 26, 2023 will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

<u>/s/ *Lee Carl Bromberg*</u>
Lee Carl Bromberg