# Exhibit D

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

MODERNATX, INC. and MODERNA US, INC.,

       Plaintiffs, Counterclaim-
       Defendants,

   v.

PFIZER INC., BIONTECH SE, BIONTECH

MANUFACTURING GMBH, and BIONTECH
US INC.,

       Defendants, Counterclaim-
       Plaintiffs.

Case No. 1:22-cv-11378-RGS

**JURY TRIAL DEMANDED**

## DECLARATION OF DR. DANIEL O. GRIFFIN IN SUPPORT
## OF DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF

I, Daniel O. Griffin, M.D., Ph.D., declare as follows:

**I.      Introduction**

1.      I have been asked by counsel for BioNTech SE, BioNTech Manufacturing GmbH, and BioNTech US Inc. (together, "BioNTech") and Pfizer Inc. ("Pfizer"), to consider the way in which a skilled artisan would understand the meanings of the term "mRNA" as it appears in U.S. Patent No. 10,898,574 ("the '574 patent) (attached as Exhibit A), and the claim terms "betacoronavirus" and "S protein" as they appear in U.S. Patent Nos. 10,702,600 ("the '600 patent") (attached as Exhibit B) and 10,933,127 ("the '127 patent") (attached as Exhibit C), to a person of ordinary skill in the art ("POSA") in view of the patents' respective claims and specifications.

2.      I have also been asked to explain, as pertinent to the above questions, certain scientific and technical concepts concerning the subject matter of the patents-in-suit.

3.      I am being compensated for my time consulting in this matter at my normal hourly rate of $500 per hour.  No part of my compensation depends on the nature of my testimony or the outcome of this case.  I have no other interest in this proceeding.

**II.     Background and Qualifications**

4.      I am an infectious disease physician, board-certified in Internal Medicine and Infectious Disease with expertise in Virology, Global Health, Tropical Medicine, and Parasitology.

5.      I am presently an Instructor of Clinical Medicine and an Infectious Disease Specialist at the Columbia University Medical Center in the Department of Medicine-Division of Infectious Diseases, a position that I have held since April 2014.  I am also an Infectious Disease Physician and Chief of the Division of Infectious Disease with Optum Tri-State.

6.      I received my M.D. from the New York University School of Medicine in May

1995.  Following my Internal Medicine Residency at the University of Utah, I completed a

Fellowship in Infectious Disease at the School of Medicine at Hofstra University.  I have served

in a variety of professional leadership roles and am a member of a number of professional

associations.  For instance, I have sat on the Optum/UHG National COVID-19 Advisory

Committee since 2020 and served as the Senior Fellow for Infectious Disease with the United

Health Group Global Research and Development group.  I am also a lifetime member of the

American Medical Association, as well as a member of the Infectious Diseases Society of

America (IDSA) and since June 2020 have served on the Guideline Panel for the American

Society of Hematology (ASH) on the Use of Anticoagulation in Patients with COVID-19

(nominated by the IDSA) creating evidence-based graded recommendations for the use of

anticoagulation in patients with COVID-19.

7.      In addition to my clinical training and practice, I earned a Ph.D. in Molecular

Medicine from the Feinstein Institutes for Medical Research in June 2012.  After receiving my

Ph.D., I conducted virology research as an Associate Research Scientist in the Columbia

University Department of Biochemistry & Molecular Biophysics from April 2014 to June 2020.

8.      I have published extensively on numerous topics in the field of infectious

diseases, including COVID-19 vaccination.

9.      My academic background, professional experience, and list of publications are set

forth in my *curriculum vitae*, attached hereto as Exhibit E.

**III.    Summary of Opinions**

10.      It is my opinion, as explained below, that the phrase "mRNA" as used in the '574

patent claims is an abbreviation for "messenger ribonucleic acid," which would have been

2

understood by a POSA to be referring generally to "a ribonucleic acid (RNA) that acts as a template for protein synthesis through the process of translation."

11.     It is further my opinion, as explained below, that a POSA would have understood the '600 and '127 patent claim term "betacoronavirus" to mean "the class, existing as of October 21, 2016, of enveloped, positive-sense, single stranded RNA viruses of zoonotic origin that belonged to one of the four lineages of the betacoronavirus genera of the subfamily Coronavirinae (*e.g.*, OC43, HKU1, MERS-CoV, and SARS-CoV)."  It is further my opinion that such a person would not have understood this term in the context of these patents to be referring to future, unknown viruses that had yet to be classified.

12.     It is my opinion, as explained below, that a POSA would have understood the phrase "S protein" of such betacoronavirus to mean "a structural protein encoded by a betacoronavirus genome that mediates virus binding to cells and virus entry via fusion of the virus and target cell membranes."  It is my opinion that replacing the "S" with the word "spike" in the phrase "S protein" is not the extent of what a POSA would have understood with respect to the meaning of that phrase.

13.     A list of materials that I have considered in forming my opinions is attached hereto as Exhibit F.

## IV.  <u>PERSON OF ORDINARY SKILL IN THE ART</u>

14.     I understand from counsel that it is the person of ordinary skill in the field of the subject matter of the patent claims through whose eyes the claims are construed.  I understand that there can be situations where the POSA is not a single person but rather a group of persons, *e.g.*, a team.  Such a situation may occur where the problem to be solved is not limited to one technical field, and a group of persons would have to assess the problem to be solved based on their respective knowledge and abilities.

3

15.     The '574 patent describes the field of invention as relating to "methods [that] are specifically useful in therapeutic delivery of modified nucleic acids such as modified mRNA," ('574 patent at 1:30-34) and further notes the embodiments relate to "compositions and methods for delivery of biological moieties, such as modified nucleic acids, engineered messenger RNA and isolated polynucleotides into cells in order to modulate protein expression" (*Id.* at 2:11–14).[1]

16.     The '600 and '127 patents are directed to "ribonucleic acid (RNA) vaccines that build on the knowledge that RNA (e.g., messenger RNA (mRNA)) can safely direct the body's cellular machinery to produce nearly any protein of interest."  ('127 patent at 3:24-29).  The '600 and '127 patents are related to a class of mRNA compositions that encode for and induce translation of an antigenic protein derived from viruses for treating respiratory illnesses.

17.     It is my opinion that a POSA with respect to the '574, '600, and '127 patents is not a single person but rather a group of persons, *e.g.*, a research team, as the subject matter of these patents concerns a combination of disciplines.

18.     With respect to the '574 patent, a POSA would include a research team with (1) one or more researchers with an advanced degree and experience in the fields of nucleic acids, working with (2) one or more individuals with an advanced degree and experience in drug delivery of nucleic acid drugs, including lipid-based drug delivery systems.[2]

19.     With respect to the '600 and '127 patents, a POSA would include a research team with (1) one or more researchers with an advanced degree and experience in the fields of nucleic

---

[1] As explained further below, "nucleotides" are organic molecules composed of a nitrogenous base, a five-carbon sugar, and a phosphate group.  Nucleotides are linked together as "polynucleotides" in the nucleic acid polymers known as deoxyribonucleic acid (DNA) and ribonucleic acid (RNA).

[2] "Lipids" are a broad class of compounds commonly known to include oils, fats, and waxes.

acids, including RNA-mediated mechanisms and/or nucleic acid therapeutics, gene therapy, and modified mRNA, working with (2) one or more individuals with an advanced degree and experience in drug delivery of nucleic acid drugs, including lipid-based drug delivery systems, and (3) one or more individuals with an advanced degree and experience in vaccines and/or virology, molecular medicine, and/or infectious diseases.[3]

## V.    LEGAL STANDARDS AND PRINCIPLES

20.    I understand that the terms appearing in a patent claim generally are given the ordinary and customary meaning that they would have had to the person of ordinary skill (or POSA) at the time of the invention in light of the patent's specification.  I understand that the patent specification may include a definition given to a claim term by the patentee, and that in such cases, the patentee's lexicography governs.  I understand that the POSA is deemed to read claim terms to understand their meaning not only in the context of the particular claim in which the term appears, but in the context of the entire patent, including the specification, the words of the claim and other claims, and the prosecution history of the patent (which I understand to make up the "intrinsic evidence" of the patent).  I understand that the construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will generally be the correct construction.

21.    In addition to the "intrinsic evidence" above, I understand that certain "extrinsic evidence," such as expert opinion and scientific dictionaries also may shed useful light on the relevant art and the way in which a POSA might use the claim term.  I further understand that

---

[3] "Virology" generally refers to a field of microbiology that includes the study of viruses and virus-like agents.

such extrinsic evidence must not contradict the meaning from the patent specification and intrinsic evidence.

## VI.   THE '574 PATENT

### A.   Overview and Technical Background

22.     The '574 patent is entitled "Delivery and Formulation of Engineered Nucleic Acids."  I understand that it issued on January 26, 2021 and that it traces back through a series of applications to U.S. Patent Application No. 13/437,034, which was filed on April 2, 2012.  The named inventors are Antonin de Fougerolles and Sayda M. Elbashir.

23.     The '574 patent states that it is directed to "formulations, compositions and methods for delivering biological moieties such as modified nucleic acids into cells to modulate protein synthesis."  ('574 patent at Abstract.)[4]

24.     The specification describes nucleic acids, including mRNAs, that create in a living organism, or "encode," at least one polypeptide and contain one or more modified nucleosides (referred to as "modified nucleic acids" or "modified nucleic acid molecules" or "engineered nucleic acids").  The modified mRNA is disclosed as inducing protein production.  For example, the '574 patent states, "Described herein are compositions and methods for delivery of . . . engineered messenger RNA and isolated polynucleotides into cells in order to modulate protein expression."  (*Id.* at 2:11-14.)

25.     Before discussing mRNA further, I provide a brief overview of nucleic acids, RNA and DNA.  Below I show an illustration of an example of RNA and DNA.  In the example shown, these are complex molecules that may include numerous different components in many different possible combinations.  Among the parts of these nucleic acids we can see below are a

---

[4] A "moiety" generally refers to a part of a molecule.

"backbone" of sugars and phosphate groups linked together.  Linked to the backbone are nitrogenous bases.  The four nitrogenous bases typically found in DNA, in countless combinations, are guanine, adenine, cytosine, and thymine.  The four nitrogenous bases typically found in RNA are guanine, adenine, cytosine, and uracil (in place of thymine).[5]  The five-carbon sugar found in DNA is deoxyribose, and the five-carbon sugar found in RNA is ribose.  A "nucleoside" is a "nucleotide" but without the phosphate group.  The particular sequence of nitrogenous bases can be referred to as the genetic "code."  And each grouping of three sequential nitrogenous bases is referred to as a "codon."



26.     In a living organism, if the molecules are functioning properly, a part of the body known as a "ribosome"[6] is involved in translating the series of three nitrogenous bases (codons)

---

[5] There are instances in which DNA and RNA can be combined and/or one or more nitrogenous bases of one can be found in the other.

[6] A ribosome is a complex molecular machine that produces proteins from amino acids during a process called protein synthesis.

into molecules known as amino acids, which are linked together to create proteins.  This is a key aspect of life – the creation of proteins in living organisms from DNA and RNA through the process of translating the genetic code.  In the process of genetic engineering, scientists deliberately alter or create DNA or RNA in such a way that it can be inserted into a living organism to create specific proteins.

27.     The specification's statement that mRNA can be used to modulate, or induce, protein expression reflects the basic nature of mRNA.  For example, messenger RNA has been defined as "act[ing] as the template for protein synthesis.  Each codon (a set of three bases on the RNA molecule) is matched up with the corresponding amino acid in accordance with the genetic code.  This process (translation) takes place in the ribosomes."  (Collins 2005, *Messenger RNA (mRNA)* Ex. H.)  This definition reflects the underlying steps by which mRNA achieves protein expression, *i.e.*, creating a protein from an mRNA sequence.

28.     In order to understand a particular mRNA structure, a POSA would need to know the particular sequence of nucleotides, as well as other components of the particular molecule that may be necessary for it to function in a living organism.[7]  Even if a POSA is told the protein that an mRNA molecule is supposed to make, that information would not define a specific mRNA structure, including because different mRNA structures can potentially encode the same protein if they function correctly, though they may not do so as effectively (this is known as "redundancy" of RNA).

---

[7] RNA and DNA must include portions beyond the nucleotides in order for them to function. There are countless structural possibilities, with various names including "5' caps," "untranslated regions" (UTRs), and "polyadenosine (poly-A) tails."  An understanding of the specific details of all these possibilities is not necessary for the claim construction issues discussed in my declaration.

29.     In the '574 patent, Moderna discloses test results from a relatively small set of examples of mRNA molecules in compositions that encode particular proteins.  First, Moderna reported test data for mRNA molecules that encode proteins that fluoresce or produce light, which can be used in experimental research, including (1) "mCherry"; and (2) "luciferase."  (*See* '574 patent at 65:30-67:45, 70:30-71:44; 73:15-76:7.)  Second, Moderna reported test data for mRNA molecules that produce proteins which stimulate red and white blood cell production in the body:  (1) erythropoietin (EPO); and (2) granulocyte colony-stimulating factor (G-CSF). (*See id.* at 70:30-71:44, 75:3-76:7; 77:35-51.)  Third, Moderna reported test data for an mRNA molecule that produces a protein which stimulates the formation of blood vessels, known as endothelial growth factor-isoform A (VEGF-A).  (*See id.* at 78:15-79:33.)  Lastly, Moderna reported test data for an mRNA molecule that produces a protein that is involved in blood coagulation, known as Factor IX.  (*See* '574 patent at 79:34-80:7.)

30.     The '574 patent also refers to modifying the nucleosides/nucleotides.  The specification refers broadly to the existence of many different chemical modifications to the different nucleosides, not specific to any particular mRNA structure.  (*Id.* at 2:47-3:24; 7:60-10:59.)  For the particular mRNAs that Moderna made to encode the proteins noted in paragraph 29 above, Moderna describes using four pairs of chemical modifications:  (1) uridine was changed to "pseudouridine" and cytosine was changed to "5-methylcytosine," (2) uridine was changed to "N1-methylpseudouridine" and cytosine was changed to "5-methylcytosine," and (3) uridine was changed to "pseudouridine" and cytosine was changed to "N1-5-methylcytosine."  (*Supra* ¶ 29; *see also id.* at 56:24-30; 74:52-59; 80:12-22*.*)

31.     The specification also states that one of ordinary skill could formulate a pharmaceutical composition for localized and systemic delivery of mRNA.  (*Id.* at 2:28-30;

21:56-61.)  For the mRNA molecules noted in paragraph 29 above, Moderna states that it used

the following compositions:  (1) "naked" mRNA, which is just mRNA formulated in a buffer

solution; and (2) mRNA formulated in known lipid-based formulations for use with nucleic

acids.  (*Supra* ¶ 29.)

32.     The '574 patent contains 10 claims, including two claims that I understand are

referred to as "independent" because they do not refer to other patent claims – *i.e.*, claims 1 and

2.  Independent claims 1 and 2 are reproduced below (with references to RNA in italics):

> 1.  A method of producing a polypeptide of interest in a cell in a
> subject in need thereof, comprising administering to the subject a
> pharmaceutical composition comprising a modified ***messenger
> RNA (mmRNA)*** such that the ***mmRNA*** is introduced into the cell,
> wherein the ***mmRNA*** comprises a translatable region encoding the
> polypeptide of interest and comprises the modified nucleoside 1-
> methyl-pseudouridine, and wherein the pharmaceutical composition
> comprises an effective amount of the ***mmRNA*** providing for
> increased polypeptide production and substantially reduced innate
> immune response in the cell, as compared to a composition
> comprising a corresponding unmodified ***mRNA***.

> 2.  A pharmaceutical composition comprising:

> a plurality of lipid nanoparticles comprising a cationic lipid, a sterol,
> and a PEG-lipid, wherein the lipid nanoparticles comprise an ***mRNA***
> encoding a polypeptide, wherein the ***mRNA*** comprises one or more
> uridines, one or more cytidines, one or more adenosines, and one or
> more guanosines and wherein substantially all uridines are modified
> uridines.

('574 patent at 105:1-105:21.)

**B.     Claim Construction**

**1)      "mRNA"**

33.     I understand that the parties dispute the meaning of "mRNA" as used in the '574

patent claims.  I understand the parties' respective constructions are set forth below:

10

| Term | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|------|-----------------------------------|-----------------------------------|
| mRNA | Plain and ordinary meaning, which is:<br><br>"messenger RNA, i.e., a ribonucleic acid (RNA) polynucleotide that encodes a polypeptide of interest and can be translated to produce the encoded polypeptide of interest." | "messenger ribonucleic acid, *i.e.*, a ribonucleic acid (RNA) that acts as a template for protein synthesis through the process of translation" |

34.     In my opinion, the POSA would have interpreted the term "mRNA," as used in the '574 patent, to mean "messenger ribonucleic acid, i.e., a ribonucleic acid (RNA) that acts as a template for protein synthesis through the process of translation."  I understand that Plaintiffs propose that mRNA should be limited to "a ribonucleic acid (RNA) polynucleotide that encodes a polypeptide of interest and can be translated to produce the encoded polypeptide of interest."  I disagree with Plaintiffs' proposed construction, as it is unnecessarily complex, repetitive, and inaccurate in that the POSA would have understood that the technical phrase "mRNA" is referring to a molecule that encodes all different forms of proteins, not only "polypeptides of interest."

35.     In organisms that have DNA inside their cells, such as mammals and humans, mRNA acts as an intermediary between the DNA, which stores genetic information in its nucleotide sequence, and the proteins that carry out the functions of life.  In nearly all living organisms, the sequence of nucleotides in DNA cannot be translated directly into proteins.  The body transcribes the DNA into mRNA, which is then transported to another area of the body (known as the cytoplasm), where a ribosome translates the genetic code of the mRNA into a protein.

11

36.     A POSA would have understood that mRNA is a molecule involved in the synthesis of all proteins, not only "polypeptides of interest."  Indeed, as discussed above, the examples of proteins encoded by the mRNA in the patent examples were "reporter proteins" such as luciferase and mCherry.  (*Id.* at 65:30-66:25, 70:30-71:45.)  Such reporter proteins generally do not have a particular therapeutic value, but instead are used in research such as measuring expression of other proteins.

## VII.   THE '600 AND '127 PATENTS

### A.     Overview and Technical Background

37.     The '600 and '127 patents are both titled "Betacoronavirus mRNA Vaccine," and issued on July 7, 2020 and March 2, 2021, respectively.  I understand that both patents trace back through a series of applications to an application filed October 21, 2016, referred to as PCT Application No. PCT/US/2016/058327.  (*See* '600 patent at cover.)  The named inventors on both patents are Giuseppe Ciaramella and Sunny Himansu.  I understand that, as members of the same patent family, the '600 and '127 patents share essentially the same specification.  For ease of reference, I have referred to the '600 patent below.  My comments regarding the '600 patent apply equally to the '127 patent.

38.     The '600 and '127 patents relate to a class of mRNA compositions that encode for a protein that is derived from a virus.  The viral component is referred to as an antigen because it generally stimulates the body to produce antibodies to combat the antigen.  (*See* '600 patent at 4:48-61.)  The patents state that the mRNA compositions, which produce the antigen protein, may be administered to protect the subject against the virus from which the antigenic protein was derived.  (*See id.; see also id.* at 3:29-47.)  This is the basic principle by which vaccines function if they are successful – an antigen is administered that causes the body to create an immune response, thereby protecting the body from future infection by the actual virus.

39.     In these patents, while discussing the use of mRNA compositions, Moderna does

not identify a particular mRNA structure.  There is also no discussion of whether these particular

mRNA molecules had modifications to the nucleotides.  Earlier in the patent, Moderna had

suggested that chemical modifications were not necessary:  "In some embodiments the nucleic

acid vaccines described herein are chemically modified.  In other embodiments the nucleic acid

vaccines are unmodified." (*Id.* at 18:31-33.)

40.     Moderna exemplifies the mRNA by identifying what proteins the mRNA encodes

(*i.e.*, produces).  Moderna describes making mRNA that encodes proteins that are parts of ***three***

different viruses:  (1) a full length "fusion protein" from a "human papilloma" ("hMPV") virus;

(2) a "hemagglutinin-neuraminidase" or fusion protein obtained from a "parainfluenza virus type

3" ("PIV3"); and (3) a full length "Spike (S) protein" or "S2 subunit" from a "MERS-CoV"

virus.  (*See id.* at 209:45-210:62, 211:45-212:21, 213:60-214:56.)

41.     The '600 and '127 patents generally state that the mRNA vaccines may be used to

induce an immune response against various known viruses:  "The RNA (e.g., mRNA) vaccines

of the present disclosure may be used to induce a balanced immune response against hMPV,

PIV, RSV, MeV, and/or BetaCoV (e.g., MERS-CoV, SARS-CoV, HCoV-OC43, HCoV-229E,

HCoV-NL63, HCoV-NL, HCoV-NH and/or HCoV-HKU1)."  ('600 patent at 3:31-36.)

Moderna does not report creating any mRNA compositions to induce an immune response

against any of these classes of viruses other than against the three viruses discussed in paragraph

40 above, *i.e.*, hMPV, PIV3, and MERS-CoV.

42.     The '600 patent contains a total of 26 claims, including 4 independent claims—

claims 1, 16, 24, and 26.  The independent claims are reproduced below:

1. A composition, comprising: *a messenger ribonucleic acid (mRNA)* comprising an open reading frame *encoding a betacoronavirus (Beta-CoV) S protein or S protein subunit* formulated in a lipid nanoparticle.

16. A composition, comprising: *a messenger ribonucleic acid (mRNA)* comprising a 5' untranslated region (UTR), an open reading frame *encoding a betacoronavirus (BetaCoV) S protein or S protein subunit*, a 3' UTR, and a poly(A) tail, formulated in a lipid nanoparticle that comprises 20-60% ionizable cationic lipid, 5-25% neutral lipid, 25-55% cholesterol, and 0.5-15% PEG-modified lipid.

24. A composition, comprising: *a messenger ribonucleic acid (mRNA)* comprising a 5' cap analog, a 5' untranslated region (UTR), an open reading frame *encoding a betacoronavirus (BetaCoV) S protein*, a 3' UTR, and a poly(A) tail, formulated in a lipid nanoparticle that comprises 20-60% ionizable cationic lipid, 5-25% DSPC, 25-55% cholesterol, and 0.5-15% PEG-DMG, wherein the ionizable cationic lipid has the structure of Compound 25, and wherein at least 80% of the uracil in the open reading frame has a 1-methylpseudouridine modification.

26. A lipid nanoparticle, comprising: *a messenger ribonucleic acid (mRNA)* comprising an open reading frame *encoding a betacoronavirus (BetaCoV) S protein or S protein subunit*; wherein the lipid nanoparticle comprises 20-60% ionizable cationic lipid, 5-25% neutral lipid, 25-55% cholesterol, and 0.5-15% PEG-modified lipid.

('600 patent at 737:26-29, 738:25-32, 738:64-739:2 (emphasis added).)

43.     The '127 patent includes 21 claims with only 2 independent claims—claims 1 and

17—which are reproduced below:

1. A method comprising administering to a subject *a messenger ribonucleic acid (mRNA)* comprising an open reading frame *encoding a betacoronavirus (BetaCoV) S protein or S protein subunit* formulated in a lipid nanoparticle in an effective amount to induce in the subject an immune response to *the BetaCoV S protein or S protein subunit*, wherein the lipid nanoparticle comprises 20-60 mol % ionizable cationic lipid, 5-25 mol % neutral lipid, 25-55 mol % cholesterol, and 0.5-15 mol % PEG-modified lipid.

17.  A method comprising administering to a subject an *mRNA* comprising a 5' cap analog, a 5' untranslated region, an open reading frame *encoding a BetaCoV S protein or S protein subunit*, a 3' untranslated region, and a poly(A) tail formulated in a lipid nanoparticle in an effective amount to induce in the subject an immune response to *the BetaCoV S protein or S protein subunit*, wherein the lipid nanoparticle

comprises 20-60 mol % ionizable cationic lipid, 5-25 mol % neutral lipid,
25-55 mol % cholesterol, and 0.5-15 mol % PEG-modified lipid.

('127 patent at 741:11-19, 742:24-33 (emphasis added).)

**B.      Claim Construction[8]**

**1)      "betacoronavirus"**

44.      I understand that the parties dispute the construction of the term

"betacoronavirus," as set forth below:

| Claim Term | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| betacoronavirus | Plain and ordinary meaning, which is:  "an enveloped, positive-sense, single stranded RNA virus of zoonotic origin that belongs to one of the four lineages of the betacoronavirus genus of the subfamily Coronavirinae (*e.g.*, OC43, HKU1, MERS-CoV, and SARS-CoV)" | "As of October 21, 2016, any of the enveloped, positive-sense, single stranded RNA viruses of zoonotic origin that belonged to one of the four lineages of the betacoronavirus genera of the subfamily Coronavirinae (*e.g.*, OC43, HKU1, MERS-CoV, and SARS-CoV)" |

45.      A POSA would have interpreted "betacoronavirus" as used in the '600 and '127

patents, and as of the original filing date of the application for those patents, to mean, "as of

October 21, 2016, any of the enveloped, positive-sense, single stranded RNA viruses of zoonotic

origin that belonged to one of the four lineages of the betacoronavirus genera of the subfamily

Coronavirinae (*e.g.*, OC43, HKU1, MERS-CoV, and SARS-CoV)."  Specifically, a POSA would

understand that the inventors were addressing then-known betacoronaviruses in that language.  A

POSA would not have imagined the patent claims to be referring to any viruses, unknown at the

time, that could first come into existence sometime in the future.

---

[8] While I do not cite the columns and lines of the '127 patent, my opinion equally applies to the
'127 patent because of the commonality of the patent specifications.

46.     My opinion is informed by the language of the patent specification, referring to the betacoronaviruses existing at the time of that statement, and the context in which that term appears in the claims of the patents.  The claims of the '600 and '127 patents are directed to a composition with mRNA "encoding a betacoronavirus (BetaCoV) S protein or S protein subunit."  (*See e.g.,* '600 patent at claim 1; '127 patent at claim 1.)  The mRNA is not identified with any particular structure.  The context of what the mRNA is encoding (*i.e.*, the S protein or subunit of that S protein) is a fuller recitation of its function, and, if the particular viruses are known, then the S proteins might be known, and the subunits might be known, which is at least a class of structures that has some bounds (though the bounds are incredibly large).  But without knowing the viruses that exist, a POSA, as of October 21, 2016, could not have possibly identified proteins the mRNA in fact encodes.  Simply referring to "betacoronavirus (BetaCoV) S protein or S protein subunit" does not identify an actual class of proteins unless the reference was to a betacoronavirus S protein or subunit of an S protein of a virus known at the time of filing the patent.  There is nothing in the patent to suggest that the named inventors envisioned, or discussed at any point in the patent specification, inventing mRNAs for all future S proteins and subunits of S proteins of all future betacoronaviruses.

47.     The patentee's use of the present tense in referencing betacoronaviruses confirms my opinion regarding how a POSA would have understood the meaning of "betacoronavirus" in the relevant timeframe.  For example, the patent specification states:  "They ***are*** enveloped, positive-sense, single-stranded RNA viruses of zoonotic origin."  ('600 patent at 2:50-52 (emphasis added).)  Use of the present tense in the specification was consistent with a POSA understanding that the patentee was referring to a class of viruses known when the application

for the patent was filed.  Moreover, a POSA reading the specification in October 21, 2016, could not have classified a virus that did not exist as being within the genus of betacoronaviruses.

48.     The patent specification also states that "[b]etacoronaviruses (BetaCoVs) are one of four genera of coronaviruses of the subfamily Coronavirinae in the family Coronaviridae, of the order Nidovirales," which was how the ICTV[9] classified betacoronaviruses until 2018.  ('600 patent at col. 2:47-50.)  A POSA would have known that if the viruses were not meant to be the viruses in existence as of October 21, 2016, the meaning of the class itself could change over time.  For example, since 2018, the ICTV classified "betacoronavirus" as belonging to the order Nidovirales, suborder Cornidovirinaea, family Coronaviridae, subfamily ***Orthocoronavirinae***, and genus Betacoronavirus.  Thus, the patent specification's reference to the subfamily Coronavirinae suggests that the patentee intended to limit the term "betacoronaviruses" to those viruses that were known as of October 21, 2016, and not viruses such as SARS-CoV-2, which no one had known of (or the nucleic acid sequences allowing it to be identified as betacoronaviruses) until much later.

49.     The patentee further confirmed that the scope of "betacoronavirus," in the context of mRNA encoding that virus's S protein, was coextensive with betacoronaviruses that were known as of the effective filing date by referring to "***The*** BetaCoVs ***of the greatest clinical importance concerning humans***," *i.e.*, the subset of the then-existing BetaCoVs within the scope of the disclosure, "***are*** OC43 and HKU1 of the A lineage, SARS-CoV of the B lineage, and MERS-CoV of the C lineage.  MERS-CoV is the first betacoronavirus belonging to lineage C

---

[9]  ICTV stands for the International Committee on Nomenclature of Viruses, which serves the purpose of developing a worldwide-recognized taxonomy and nomenclature for all viruses.  (Ex. M, Fauquet 2008 at 10.)  The ICTV is guided by volunteer virologists with a range of specialties in human, animal, insect, bacteria, fungi, algae and plant viruses.

that is known to infect humans." ('600 patent at 2:54-59.)  These were all existing viruses at the time of the application filing.

50.     Having the scope of the claim term "betacoronavirus" be coextensive with viruses known as of October 21, 2016, also makes scientific sense because the criteria for which viruses belong to the betacoronavirus genus changes over time.

51.     Without tethering "betacoronavirus" to a temporal frame of reference, the full scope of betacoronaviruses itself has no bounds.  A POSA also would not know which criteria to apply to determine whether a virus at a given time was a "betacoronavirus" that could be used for an mRNA vaccine, even assuming an mRNA could be designed and used that would function to make a S protein or subunit of the S protein.

52.     Accordingly, a POSA, as of the time of the asserted inventions of the '600 and '127 patents, would understand "betacoronaviruses" as used in the patent claims to refer to the enveloped, positive-sense, single stranded RNA viruses of zoonotic origin, as of October 21, 2016, that belonged to one of the four lineages of the betacoronavirus genera of the subfamily Coronavirinae (*e.g.*, OC43, HKU1, MERS-CoV, and SARS-CoV).

**2)     "S protein"**

53.     I understand that the parties dispute the construction of the term "S protein," as set forth below:

| Claim Term | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| S protein | Plain and ordinary meaning, which is: "spike protein" | "A structural protein encoded by a betacoronavirus genome that mediates virus binding to cells and virus entry via fusion of the virus and target cell membranes" |

54.     A POSA would have interpreted "S protein" as used in the '600 and '127 patents to mean "a structural protein encoded by a betacoronavirus genome that mediates virus binding to cells and virus entry via fusion of the virus and target cell membranes."

55.     The spike protein is one of four major structural proteins of betacoronaviruses, along with the nucleocapsid, membrane, and envelope proteins.  It also protrudes from the envelope, along with the membrane protein and the envelope protein.  The spike protein forms trimers (or, "spikes") on the surface of the virus particles.  The betacoronavirus spike protein consists of the S1 and S2 subunits.  The betacoronavirus spike protein plays a pivotal role in infection with the virus.  Cleavage of the spike protein at the site separating S1 and S2 is believed to facilitate the S1 subunit binding with the target cell.

56.     The first clause of Defendants' proposed construction ("a structural protein encoded by a betacoronavirus genome") is how a POSA would have understood an S protein in the context of the patents, *i.e.*, a structural protein encoded by the betacoronavirus.  This is consistent with the patent specification referring to S protein as one of the structural proteins in the virus MERS.  This was the only betacoronavirus known as of October 21, 2016 for which Moderna made an mRNA composition.  ('600 patent at 34:36-41.)  This is also consistent with how the POSA would have understood the S protein in the literature at the time.  *See* Ex. N, Yang et al., *The structure and functions of coronavirus genomic 3' and 5' ends*, Virus Research 206:120–133 (2015).

57.     The second clause of Defendants' proposed construction ("that mediates virus binding to cells and virus entry via fusion of the virus and target cell membranes") is also taken from the patent specification, and consistent with how the S protein functioned in the context of the claims.  In particular, the specification explains how the "S protein," and particularly two

"subunits" of the S protein, played a crucial role in mediating the process by which the coronaviruses identified in the patents bound to and entered cells (thus making persons sick): "The S protein is particularly essential in mediating virus binding to cells expressing receptor dipeptidyl peptidase-4 (DPP4) through receptor-binding domain (RBD) in the S1 subunit, whereas the S2 subunit subsequently mediates virus entry via fusion of the virus and target cell membranes."  (*Id.* at 34:53-58.)

58.     Moderna's proposed construction of "S protein" as simply referring to "spike protein" would be viewed by a POSA as simply expanding the letter "S" to what it stands for in the phrase, rather than providing a meaning for the phrase itself.  Even calling it just a "structural protein encoded by the coronavirus genome" is not definitional of "S protein" because the coronavirus genome as of October 21, 2016, encoded proteins that were not "spike proteins" and which also appeared on the surface of the virus.  Accordingly, a POSA would view Plaintiffs' definition of S protein as insufficient to clarify the scope of the term.

*        *        *        *

Executed this 26th day of May, 2023.

I declare under penalty of perjury that the foregoing is true and correct.

By:  _____
        Dr. Daniel O. Griffin, M.D., Ph.D.