**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MODERNATX, INC. and MODERNA US, INC., <br><br>            Plaintiffs, Counterclaim-<br>           Defendants, <br><br>     v. <br><br> PFIZER INC., BIONTECH SE, BIONTECH MANUFACTURING GMBH, and BIONTECH US INC., <br><br>            Defendants, Counterclaim-<br>           Plaintiffs. | Case No. 1:22-cv-11378-RGS |

## DEFENDANTS' RESPONSIVE CLAIM CONSTRUCTION BRIEF

# <u>TABLE OF CONTENTS</u>

**Page**

I.      INTRODUCTION ................................................................................................. 1

II.     RESPONSE TO MODERNA'S BACKGROUND STATEMENT ................................ 2

    A.      The '574 Patent ........................................................................................ 2

    B.      The '600 and '127 Patents ........................................................................ 4

    C.      The Parties' COVID-19 Vaccines Designed in 2020 ............................ 5

III.    DISPUTED CLAIM TERMS IN THE '574 PATENT .......................................... 6

    A.      "mRNA" ................................................................................................... 6

    B.      "Unmodified mRNA" ............................................................................. 7

IV.     DISPUTED CLAIM TERMS IN THE '600 AND '127 PATENTS ............................ 9

    A.      "Betacoronavirus" ................................................................................... 9

        1.      Under *Schering*, the Claim Scope Is Properly Limited to the
            "Betacoronavirus" Genus Existing at the Time of Alleged
            Invention ......................................................................................... 10

        2.      BioNTech and Pfizer Are Not Limiting Moderna to the Disclosed
            Embodiments, and Moderna's Cases Do Not Override *Schering*........... 12

        3.      The Intrinsic Evidence Confirms the Temporal Restriction
            in BioNTech and Pfizer's Proposed Construction ................................... 15

        4.      Extrinsic Evidence Does Not Support Moderna's Construction ............. 18

    B.      "S Protein" ............................................................................................... 18

    C.      "ORF" ...................................................................................................... 20

V.      CONCLUSION ................................................................................................... 23

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AstraZeneca UK Ltd. v. Watson Lab'ys, Inc. (NV)*,
   905 F. Supp. 2d 589 (D. Del. 2012)...................................................................... 21

*August Tech. Corp. v. Camtek, Ltd.*,
   655 F.3d 1278 (Fed. Cir. 2011)............................................................................ 22

*Bd. of Trs. of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*,
   528 F. Supp. 2d 967 (N.D. Cal. 2007) ....................................................... 12, 14, 15

*Braintree Lab'ys, Inc. v. Novel Lab'ys, Inc.*,
   749 F.3d 1349 (Fed. Cir. 2014)............................................................................. 8

*Carnegie Mellon Univ. v. Hoffmann-LaRoche, Inc.*,
   55 F. Supp. 2d 1024 (N.D. Cal. 1999) ................................................................. 19

*Chef Am., Inc. v. Lamb-Weston, Inc.*,
   358 F.3d 1371 (Fed. Cir. 2004)............................................................................ 23

*CIAS, Inc. v. All. Gaming Corp.*,
   504 F.3d 1356 (Fed. Cir. 2007)............................................................................ 23

*Control Res., Inc. v. Delta Elecs., Inc.*,
   133 F. Supp. 2d 121 (D. Mass. 2001) .................................................................... 2

*Cytyc Corp. v. TriPath Imaging, Inc.*,
   No. 03-11142, 2005 U.S. Dist. LEXIS 29850 (D. Mass. Nov. 28, 2005) ............. 16

*Deckers Corp. v. U.S.*,
   752 F.3d 949 (Fed. Cir. 2014).............................................................................. 13

*Enanta Pharms., Inc v. Pfizer, Inc.*,
   No. 22-10967, 2023 WL 3269647 (D. Mass. May 5, 2023)................................. 8, 9

*Falana v. Kent State Univ.*,
   669 F.3d 1349 (Fed. Cir. 2012)............................................................................ 22

*Hill-Rom Servs., Inc. v. Stryker Corp.*,
   755 F.3d 1367 (Fed. Cir. 2014)............................................................................ 19

*Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*,
   493 F.3d 1358 (Fed. Cir. 2007)............................................................................ 20

*Innogenetics, N.V. v. Abbott Lab'ys*,
   512 F.3d 1363 (Fed. Cir. 2008).................................................................. 12, 13, 14

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Intellectual Ventures I, LLC v. Lenovo Group Ltd.*,
    365 F. Supp. 3d 200 (D. Mass. 2019) ................................................... 21

*IQASR LLC v. Wendt Corp.*,
    825 Fed. Appx. 900 (Fed. Cir. 2020) ................................................... 18

*Laitram Corp. v. NEC Corp.*,
    163 F.3d 1342 (Fed. Cir. 1998) ........................................................... 22

*Medicines Co. v. Mylan, Inc.*,
    853 F.3d 1296 (Fed. Cir. 2017) ....................................................... 8, 21

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    572 U.S. 898 (2014) ........................................................................... 17

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ....................................................... 1, 11

*PureCircle USA Inc. v. SweeGen, Inc.*,
    No. 18-01679, 2022 WL 1769118 (C.D. Cal. May 23, 2022) .............. 19

*Salazar v. Procter & Gamble Co.*,
    414 F.3d 1342 (Fed. Cir. 2005) ........................................................... 16

*Schering Corp. v. Amgen Inc.*,
    222 F.3d 1347 (Fed. Cir. 2000) ...................................................*passim*

*Shire Dev. LLC v. Teva Pharms. USA, Inc.*,
    No. 17-01696, 2019 WL 969638 (D. Del. Feb. 28, 2019) ..................... 8

*Sinorgchem Co. v. ITC*,
    511 F.3d 1132 (Fed. Cir. 2007) ...................................................*passim*

*SuperGuide Corp. v. DirecTV Enters., Inc.*,
    358 F.3d 870 (Fed. Cir. 2004) ....................................................... 12, 13

*TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*,
    529 F.3d 1364 (Fed. Cir. 2008) ........................................................... 22

*Tr. of Columbia Univ. in City of New York v. Symantec Corp.*,
    811 F.3d 1359 (Fed. Cir. 2016) ........................................................... 23

*Univ. of Mass. v. L'Oréal S.A.*,
    36 F.4th 1374 (Fed. Cir. 2022) ........................................................... 17

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F.3d 1576 (Fed. Cir. 1996)...................................................................................... 16

**Rules**

37 C.F.R. § 1.114 ......................................................................................................... 17

**TABLE OF EXHIBITS**

| Exhibit[1] | Document |
|---|---|
| A | U.S. Patent No. 10,898,574 |
| B | U.S. Patent No. 10,702,600 |
| C | U.S. Patent No. 10,933,127 |
| D | Declaration of Dr. Daniel O. Griffin in Support of Defendants' Constructions |
| E | Curriculum Vitae for Daniel O. Griffin, M.D., Ph.D. |
| F | List of Materials Considered for Daniel O. Griffin, M.D., Ph.D. |
| G | Plaintiffs ModernaTX, Inc. and Moderna US, Inc.'s List of Claim Terms to be Construed, dated April 24, 2023 |
| H | *Collins Dictionary of Science* 514 (2005) |
| I | *Penguin Dictionary of Science* 432 (3rd ed. 2009) |
| J | *Webster's New World Medical Dictionary* 271 (3rd ed. 2008) |
| K | Excerpt from prosecution history for U.S. Appl. No. 16/880,829 (September 10, 2020 Notice of Allowability) |
| L | Excerpt from prosecution history for U.S. Appl. No. 16/880,829 (December 18, 2020 Response to Examiner's Note) |
| M | Claude Fauquet, *Taxonomy, Classification and Nomenclature of Viruses*, ELSEVIER 9 (2008) |
| N | Dong Yang & Julian L. Leibowitz, *The structure and functions of coronavirus genomic 3' and 5' ends*, 206 Virus Research 120 (2015) |
| O | Excerpts from the deposition of Dr. David D. Ho, dated June 23, 2023 |
| P | Linde Schoenmaker *et al., mRNA-lipid nanoparticle COVID-19 vaccines: Structure and stability,* 601 Int. J. of Pharmaceutics 120586 at Table 1 (2021) |
| Q | Jesper Pallesen *et al., Immunogenicity and structures of a rationally designed prefusion MERS-CoV spike antigen*, 114(35) Proceedings of the Nat'l Acad. of Scis. E7348 (2017) (D. Ho Deposition Ex. 11) |
| R | Excerpts from the deposition of Dr. Daniel O. Griffin, dated June 23, 2023 |
| S | Family information from the United States Patent & Trademark Office Patent Center for U.S. Patent Application No. 16/897,734 (Continuation of Application that Issued as U.S. Patent No. 10,933,127) |

---

[1] All references to Exhibits A-N are exhibits in support of Defendants' Opening Claim Construction Brief (D.I. 76) and references to Exhibits O-S are exhibits in support of Defendants' Responsive Brief.

## I.   <u>INTRODUCTION</u>

BioNTech and Pfizer's claim constructions track the express language in the patent specifications, prosecution histories, and context of the alleged inventions that occurred in 2012 (for the '574 patent) and 2016 (for the '600 and '127 patents). These sources "most naturally align[] with the patent's description of the invention," and are controlling in the *Markman* process. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (en banc). Moderna's assertion that BioNTech and Pfizer are "rewrit[ing] the claimed inventions into something they are not" (Plaintiffs' Opening Claim Construction Brief ("PBr.") at 1) is wrong.

**<u>mRNA ('574 patent)</u>:**  Moderna's expert declarant, Dr. David D. Ho, testified that mRNA "acts as a template for encoding a protein" and does so through the process of "translation." (Ex. O, Ho Tr. at 73:10-15.) Accordingly, BioNTech and Pfizer will agree to adopt the language of Moderna's proposed construction of "mRNA" with additional language confirming that mRNA is acting as a template for protein synthesis through the process of translation, namely: "messenger ribonucleic acid, *i.e.*, a ribonucleic acid (RNA) that acts as a template for encoding a polypeptide of interest through the process of translation." (D.I. 70 at 2.)

**<u>Unmodified mRNA ('574 patent)</u>:**  The parties agree (1) that lexicography applies and (2) where the definition appears in the '574 patent specification. (PBr. at 8, 12-13; D.I. 75 at 16, n.5; Ex. O, Ho Tr. at 127:15-128:19; 129:18-24.) Specifically, the word "unmodified" appears in quotes with two sentences supplying a definition that must, as a matter of law, be applied. Moderna's own cited cases confirm that its efforts to ignore the second instance of "unmodified" appearing in quotation marks, and therefore also forming the definition, should be rejected.

**<u>Betacoronavirus ('600/'127 patents)</u>:**  As discussed below, the parties' experts agree as to the state of the art as of 2016 and the limited number of compositions that were actually made and used in the '600 and '127 patents. (Ex. O, Ho Tr. at 137:18-139:17, 148:18-21, 150:23-151:18;

D.I. 76-4 at ¶¶ 22-32, 37-43.)  The Federal Circuit's holding in *Schering Corp. v. Amgen Inc.*,

where that patent's claim language "did not and could not enlarge the scope of the patent to

embrace technology arising after its filing," is controlling.  222 F.3d 1347, 1353 (Fed. Cir. 2000).

Moderna's patent claims refer to mRNA encoding the S protein or S protein subunit of a genus of

betacoronaviruses in existence as of October 21, 2016—a scope far broader than the work

described in the patent—and the same interpretation given by the Patent Office Examiner when

allowing the patent to issue.  Moderna does not dispute the operative facts existing as of 2016 and

only relies on court decisions after *Schering* that are distinguishable and did not (and could not)

overrule *Schering*.

**S Protein ('600/'127 patents):**  BioNTech and Pfizer's construction of "S protein" is the

specification's definition of that protein.   (Defendants' Opening Claim Construction Brief

("DBr.") at 17.)  Moderna's complaint that this definition includes "function" does not make that

definition any less controlling.  Dr. Ho confirmed that the specification describes the functional

meaning that appears in BioNTech and Pfizer's construction and that the word "spike" is

figurative.  (Ex. O, Ho Tr. at 188:13-189:1; 193:19-25.)  For Moderna to merely say "S protein"

is construed as "spike protein" gives no context or meaning to the term and would not be helpful

to the jury.  *See, e.g.*, *Control Res., Inc. v. Delta Elecs., Inc.*, 133 F. Supp. 2d 121, 127 (D. Mass.

2001).

**ORF ('600/'127 patents):**  This term has lexicography in the patent specification.  If

Moderna felt that this lexicography was a mistake, it could have and should have amended the

patent specification.  The public is entitled to rely on the definition set forth in the patent.

## II.   RESPONSE TO MODERNA'S BACKGROUND STATEMENT

### A.   The '574 Patent

The entirety of Moderna's background as it pertains to the '574 patent is found in a single

paragraph on page 4, citing paragraph 36 of Dr. Ho's declaration.  (PBr. at 4.)  There, Moderna contends that "Moderna's scientists discovered that certain chemical modifications to the mRNA nucleotides can help the mRNA evade the innate immune response."  (*Id*.)  But Dr. Ho's declaration did not say that, and Dr. Ho testified he was not offering that opinion.  (Ex. O, Ho Tr. at 100:10-17.)  Instead, Dr. Ho recognized that, before the '574 patent was filed in 2012, two scientists from the University of Pennsylvania, Drs. Katalin Karikó and Drew Weissman, "discovered that modifying the nucleosides of RNA prevents the molecules from being destroyed prematurely, increasing their protein production capacity and ability to appropriately activate the immune system."  (Ex. O, Ho Tr. at 93:3-8; 94:25-95:7; 95:16-20; 98:4-18; 98:25-100:8.)  Dr. Ho attended the award ceremony at his university (Columbia University) where Drs. Karikó and Weissman received the prestigious Horwitz Prize for this groundbreaking work.  (Ex. O, Ho Tr. at 98:4-18.)  .)  In fact, Dr. Ho agreed they had discovered the very type of modifications discussed in paragraph 36 of his declaration.  (Ex. O, Ho Tr. at 93:3-8; 94:25-95:7; 98:25-100:8.)  Dr. Ho was present when his university (Columbia University) honored Drs. Karikó and Weissman with the prestigious Horwitz Prize for this groundbreaking work.  (Ex. O, Ho Tr. at 98:4-18.)

Dr. Ho also agreed with the explanation of BioNTech and Pfizer's expert, Dr. Daniel O. Griffin, about what Moderna actually made and used in the '574 patent.  (D.I. 76-4 at ¶ 29; Ex. O, Ho Tr. at 103:9-104:18.)  Dr. Ho explained, as Dr. Griffin did, that in the '574 patent, Moderna was specifically using ***pairs*** of chemical modifications to mRNA, one of which was always "N1-5-methylcytosine," to encode the small set of disclosed proteins.  (D.I. 76-4 at ¶ 30; Ex. O, Ho Tr. at 106:12-16; 107:1-18; 116:19-23; 120:4-11.)  Yet, Moderna nowhere mentions this chemical modification in its background discussion, and cannot assert that the COVID-19 vaccines use it.  Dr. Ho also agreed that the '574 patent specification does not show the use of N-1-

methylpseudouridine alone to increase protein production or cause innate immune response reduction (Ex. O, Ho Tr. at 120:4-11), and agreed that vaccines are not discussed at all in the '574 patent (*id.* at 51:21-52:6). In short, the mRNA compositions made and used in the '574 patent are nothing like the vaccines at issue in this case. And the high-level concepts Moderna discusses in its brief (*e.g.*, mRNA chemical modifications) were conceived previously by other scientists.

### B.      The '600 and '127 Patents

After Drs. Karikó and Weissman first published their groundbreaking discovery unlocking chemical modifications of mRNA in 2005 to increase their stability, they and other scientists continued to advance mRNA research. Meanwhile, companies like Acuitas (who partnered with BioNTech for the COVID-19 vaccine), were advancing lipid nanoparticle technology for use with mRNAs. Moderna did not, and cannot, cite anything that attributes to it the first idea of using mRNA to make a vaccine or using lipid nanoparticles to deliver mRNA. (*See, e.g.*, Ex. O, Ho Tr. at 70:14-25; 71:23-72:5.)

By 2016, the basic idea of targeting the spike protein of a coronavirus for a vaccine was known. (Ex. O, Ho Tr. at 54:23-56:21; 57:2-3; 57:8-14.) In fact, Dr. Ho published research in 2005 discussing the spike protein of SARS-CoV as an antigen target for vaccine development. (Ex. O, Ho Tr. at 191:10-193:12; 54:23-55:13; 55:22-56:21; 57:2-3; 57:8-14)

In the '600 and '127 patents, Moderna reports making mRNA vaccine compositions for just three specific viruses (hMPV, PIV3, and MERS-CoV), one of which was classified as a "betacoronavirus" (MERS-CoV). (*See* D.I. 76-4 at ¶ 40; *see also* Ex. O, Ho Tr. at 138:23-139:17.) Moderna tested them only in mice and rabbits. (Ex. O, Ho Tr. at 181:13-182:6.) The patents have no data for use of any other vaccine; indeed, they have no data for use of any SARS-CoV vaccine. (*Id.* at 185:13-15; D.I. 76-4, at ¶ 41.) The '600 and '127 patents also do not describe chemical modifications as a requirement for the three mRNA vaccines made and used in that patent. (*See*

D.I. 76-4 at ¶ 39; *see also* Ex. O, Ho Tr. at 136:22-137:8.)  And the '600 and '127 patents do not describe the LNP formulations used years later in 2020 by Moderna or BioNTech.  (*See* Ex. O, Ho Tr. at 84:2-6.)

Finally, the '600 and '127 patent examples do not specify all the parts of an mRNA vaccine in addition to a coding sequence that would be required for a particular vaccine to function.  (Ex. O, Ho Tr. at 75:23-76:7 (putting aside sequence, mRNA has other structural components); 80:21-81:7.)  Indeed, even if a vaccine could produce antibodies, that does not necessarily mean the vaccine will treat the disease caused by the virus.  (*See id.* at 36:3-36:22.)

### C.     The Parties' COVID-19 Vaccines Designed in 2020

There can be no legitimate dispute that the vaccine independently designed by BioNTech (Comirnaty®) is different in structure from Moderna's COVID-19 vaccine (Spikevax®).  This includes different mRNA sequences, untranslated regions, caps, tails, and other complex structures designed to make an mRNA function.  (*See* Ex. O, Ho Tr. at 86:2-16 (the two vaccines are alike at a "high level" in that they are mRNA vaccines and comprise lipid nanoparticles, generally); D.I. 45-16, Xuhua Xia, *Detailed Dissection and Critical Evaluation of the Pfizer/BioNTech and Moderna mRNA Vaccines*, 734(9) Vaccines 1, 1-2 (2021).)  The lipid nanoparticles that encase the mRNA also contain different materials and proportions.  (*See, e.g.*, Ex. P, Linde Schoenmaker *et al., mRNA-lipid nanoparticle COVID-19 vaccines: Structure and stability,* 601 Int. J. of Pharmaceutics 120586 at Table 1 (2021).)  Dr. Ho, who has been studying COVID-19 vaccines since the start of the pandemic, had never taken the view that the vaccines designed by Moderna and BioNTech are copies of one another.  (Ex. O, Ho Tr. at 86:2-86:25.)

Also, a modification to the spike protein encoded by the mRNA, called a "2P mutation," was used in each of the vaccines designed by BioNTech and Moderna, the discovery of which is credited to scientists at the U.S. National Institutes of Health in 2017, a year after the '600 and

'127 patents were filed.  (*See* Ex. O, Ho Tr. 64:16-65:5; 65:13-19; 66:5-8; 66:15-22; 66:25-67:3; 67:6-7; Ex. Q, Jesper Pallesen *et al*., *Immunogenicity and structures of a rationally designed prefusion MERS-CoV spike antigen*, 114(35) Proceedings of the Nat'l Acad. of Scis. E7348 (2017).)  The '600 and '127 patents do not teach encoding such a modified form of spike protein. (Ex. O, Ho Tr. at 66:16-22.)

## III.  DISPUTED CLAIM TERMS IN THE '574 PATENT

### A.  "mRNA"

The parties' opening briefs addressed two distinctions between their respective constructions of "mRNA":  (1) the use of the phrase "polypeptide of interest" versus "protein," and (2) the reference to mRNA acting as a "template" for protein synthesis.  (*See* DBr. at 7-10.) During his deposition, Dr. Ho confirmed that RNA is a template for protein synthesis (with  DNA being a template for the creation of RNA).  (Ex. O, Ho Tr. at 73:7-12; Ex. R, Griffin Tr. at 70:4-17.)  This is consistent with the specification, which uses the word "template" in connection with both DNA and mRNA.  ('574 patent at 48:66-67 (referring to "production of an RNA *template* from a DNA sequence (e.g., by transcription)"); Ex. R, Griffin Tr. at 183:11-184:11.)[2]  There is also no dispute that polypeptides are generally proteins.  (Ex. R, Griffin Tr. at 66:7-8.)

Accordingly, in the interest of efficiency, BioNTech and Pfizer are willing to adopt Moderna's construction with one addition based on Dr. Ho's testimony to confirm that mRNA is acting as a template for the synthesis of the protein, as follows:  "messenger ribonucleic acid, *i.e.*, a ribonucleic acid (RNA) that acts as a template for encoding a polypeptide of interest through the

---

[2] This is also consistent with standard technical dictionaries available as of the patent application filing date, which describe mRNA as a template for protein synthesis.  (D.I. 76-8 ("Messenger RNA (mRNA) acts as the template for protein synthesis"); Ex. R, Griffin Tr. at 74:11-21.)

process of translation."[3]  (D.I. 70 at 2.)

**B.      "Unmodified mRNA"**

Although Moderna previously asserted that "unmodified mRNA" should be given its "[p]lain and ordinary meaning" (*see* D.I. 70 at 2), it now concedes that the '574 patent contains an "express definition of 'unmodified' in the specification" (PBr. at 8).  Moderna's proposed construction, however, improperly truncates the definition in the specification.  It should therefore be rejected in favor of BioNTech and Pfizer's construction, which tracks the patentee's lexicography.

The specification contains a definitional paragraph expressly using the word "unmodified" in quotation marks, twice, as follows:

> ***Unmodified***:  As used herein, ***"unmodified"*** refers to any substance, compound or molecule prior to being changed in any way. . . .  Molecules may undergo a series of modifications whereby each modified molecule may serve as the ***"unmodified"*** starting molecule for a subsequent modification.

('574 patent at 54:64-55:3 (emphasis added); DBr. at 11.)  BioNTech and Pfizer's proposed construction tracks this language from the specification:  "any mRNA molecule prior to being changed in any way; mRNA molecules may undergo a series of modifications whereby each modified mRNA molecule may serve as the unmodified starting mRNA molecule for a subsequent modification."  (DBr. at 10.)

Moderna attempts to justify ignoring the second-quoted use of "unmodified" in the patent specification's express definition, above, by contending that "[t]he phrase 'as used herein,' is

---

[3] Dr. Ho testified that the "polypeptide of interest" was a peptide of interest "to the person who's reading [the patent]."  (Ex. O, Ho. Tr. at 121:2-9; 133:2-6.)  The '574 patent specification identifies "polypeptides of interest" as "[g]enerally those which are naturally occurring in the mammalian genome."  (Ex. A, 5:42-44; Ex. R, Griffin Tr. at 95:5-96:17.)  Pursuant to D.I. 70 at 1, BioNTech and Pfizer reserve any indefiniteness arguments until later in the litigation.

definitional" *only* for "the ***remainder of the sentence*** that follows such a phrase." (PBr. at 9 (emphasis added and alteration in original).) But the *Medicines* and *Braintree Lab's* decisions cited by Moderna do not support such an arbitrary linguistic rule. Instead, they hold that the phrase "as used herein" signals definitional language, and that the patentee's lexicography must govern the claim construction analysis. *See Medicines Co. v. Mylan, Inc.*, 853 F.3d 1296, 1306 (Fed. Cir. 2017) (explaining that a term in quotation marks followed by the phrases "refers to" or "as defined herein" signals a definition); *Braintree Lab'ys, Inc. v. Novel Lab'ys, Inc.*, 749 F.3d 1349, 1356 (Fed. Cir. 2014) (reversing claim construction that failed to heed the patentee's lexicography consisting of a single sentence). Neither case holds that only the words appearing in the same sentence as the one starting with "as used herein" constitutes definitional language.

*Enanta Pharms., Inc v. Pfizer, Inc.*, also cited by Moderna, confirms that context matters: subsequent sentences appearing in a definitional passage that "further explain, broaden or limit the definition set forth in the first sentence" can form part of a lexicography-based construction. No. 22-10967, 2023 WL 3269647, at *4 (D. Mass. May 5, 2023) (citing *Sinorgchem Co. v. ITC*, 511 F.3d 1132, 1136 n.2 (Fed. Cir. 2007)). It does not say, by contrast, that the inclusion of terms such as "can be," "may or may not," or "typically" will prove necessarily improper when found in a lexicographical construction. *Shire Dev. LLC v. Teva Pharms. USA, Inc.*, No. 17-01696, 2019 WL 969638, at *10 (D. Del. Feb. 28, 2019); *see also Enanta Pharms*, 2023 WL 3269647, at *4 (noting that even an "exemplary clause" can "provide[] a meaningful limitation on . . . preceding language in the specification" (citing *Sinorgchem*, 511 F.3d at 1136 & n.2)). Accordingly, the language used and its context must be considered. *See Enanta Pharms.*, 2023 WL 3269647, at *2–6 (conducting a sentence-by-sentence analysis of language and finding two sentences lexicographical and four sentences non-lexicographical).

Here, the definitional sentence of the patent specification appearing at column 54, line 67 through column 55, line 3 (which contains the second instance of "unmodified" in quotation marks) explains and broadens the first definitional sentence appearing at column 54, lines 64-66 (which contains the first use of "unmodified" in quotation marks). That sentence ensures that any modified molecules that serve as "starting molecule[s] for a subsequent modification" would qualify as "unmodified" within the context of the '574 patent. ('574 patent at 54:66-55:3.) It is thus part of the lexicography and not merely "exemplary." (PBr. at 9-10.); *see Enanta*, 2023 WL 3269647, at *4; *Sinorgchem*, 511 F.3d at 1136. This is true irrespective of the use of "may" in that sentence. *Shire Dev. LLC*, 2019 WL 969638, at *10 (recognizing that dictionaries regularly define a term "by what it is, by what it may be, or by what it is typically").

Moderna also ignores the import of the word "unmodified" being "set off by quotation marks," which is "often a strong indication that what follows is a definition." *Sinorgchem*, 511 F.3d at 1136-40. The patentee's decision to place quotation marks around "unmodified" in the sentence beginning "Molecules may" confirms that this sentence forms part of the specification's express definition. In fact, this definitional text is so clear that Moderna instructed their claim construction expert that he need not engage in any claim construction analysis. (*See* Ex. O, Ho Tr. at 127:15-128:19; D.I. 75 at 16 n.5.) Because Moderna's proposed construction excludes subject matter expressly required by the patent's definition, it should be rejected.

## IV.   DISPUTED CLAIM TERMS IN THE '600 AND '127 PATENTS

### A.   "Betacoronavirus"

There is no dispute that the application giving rise to the '600 and '127 patents was effectively filed on October 21, 2016, and that the statement in the specification identifying the genus of "betacoronavirus" ('600 patent at 2:46-59) was written and current as of that date. (Ex. O, Ho Tr. at 147:6-16; D.I. 76-4 at ¶¶ 45-49; Ex. R, Griffin Tr. at 112:7-14, 124:4-11, 129:10-

130:1.)  As of October 21, 2016, a POSA would have also had access to external sources if they wanted to know what specific viruses constituted "betacoronaviruses" at that time.  (Ex. O, Ho Tr. at 148:18-21; Ex. R, Griffin Tr. at 106:20-107:2.)  BioNTech and Pfizer's proposed construction allows for that broad construction of the '600 and '127 patent claims.  (DBr. at 14.)

There is also no dispute that "betacoronaviruses" at the time of the alleged invention on October 21, 2016 would not have included the virus that causes COVID-19 (*i.e.*, SARS-CoV-2), as that virus did not come into existence until 2019 and was not characterized until 2020.  (*See* Ex. O, Ho Tr. at 153:17-154:4; 154:14-21 (Moderna's expert Dr. Ho agreeing that, when the '600 patent was filed, SARS-CoV-2 was not known).)  Nor is there a dispute that the '600 and '127 patents do not describe SARS-CoV-2 or a treatment for this virus, which was never made by the named inventors.  (Ex. O, Ho Tr. at 153:17-154:4; 154:14-21, 179:10-15.)

The claim construction dispute thus turns on the applicability of Federal Circuit precedent prohibiting a claim construction from "enlarg[ing] the scope of the patent to embrace technology arising after its filing."  *Schering*, 222 F.3d at 1353.  As the Federal Circuit in *Schering* held, "court[s] must determine what the term meant at the time the patentee filed the . . . application." *Id.*  This Federal Circuit precedent applies here:  the '600 and '127 patent claims cannot be interpreted to cover every vaccine using any mRNA encoding any S protein or S protein subunit of every future virus so long as that virus is called—once discovered—a betacoronavirus.  What the patentee said and meant to claim was a vaccine for betacoronaviruses existing at the time of the alleged invention—which is in fact already a genus far broader and more generous than what was actually made and tested by the named inventors.

1.      **Under *Schering*, the Claim Scope Is Properly Limited to the "Betacoronavirus" Genus Existing at the Time of Alleged Invention**

The Federal Circuit has made clear that "[a] court construing a patent claim seeks to accord

a claim the meaning it would have to a person of ordinary skill in the art ***at the time of the invention***." *Phillips*, 415 F.3d at 1313 (emphasis added). The time of the alleged invention of the '600 and '127 patents was before October 2016. As explained below, the statement in the specification identifying the "betacoronavirus" genus was referring to viruses existing as of that date. ('600 patent at 2:46-59 (identifying betacoronaviruses as "one of four genera of coronaviruses of the subfamily Coronavirinae"); D.I. 76-4 at ¶48; Ex. O, Ho Tr. at 141:1-6.)[4]

As discussed above, Moderna's and BioNTech and Pfizer's experts agreed that the specification describes mRNA compositions that encode parts of three specific viruses, only one of which was a betacoronavirus: a full-length "spike protein" or "S2 subunit" from a "MERS-CoV" virus. (Ex. O, Ho Tr. at 137:18-139:17; D.I. 76-4 at ¶¶ 40-41; '600 patent at 209:45-210:62, 211:45-212:21, 213:60-214:56.) Under BioNTech and Pfizer's construction, however, the claims would encompass mRNA compositions that encode the S protein or S protein subunit of any other betacoronavirus known as of October 21, 2016.

Moderna argues that the '600 and '127 patents support a broader construction because "strains" of the viruses disclosed are also covered. (PBr. at 13.) But BioNTech and Pfizer's construction already allows for that breadth. And, as Moderna's expert explained, SARS-CoV-2 was a ***novel virus*** in 2019, and was ***not*** a "strain" of betacoronaviruses from 2016, *i.e.*, SARS-CoV or MERS. (Ex. O, Ho Tr. at 153:10-12, 180:12-18; Ex. R, Griffin Tr. at 185:2-24.)

It is also important to note that the breadth of the claims overall is magnified by the breadth of the phrase "betacoronavirus" because the claims are reciting any mRNA that encodes any S

---

[4] In fact, the current definition of the genus "betacoronaviruses" does not match the phrasing used in the '600 and '127 patents. (Ex. R, Griffin Tr. at 140:19-141:18; 141:10-143:17.) The '600 and '127 patents refers to the "subfamily" being "[c]oronavirinae." ('600 patent at 2:46-59.) Today, however, the genus "betacoronavirus" falls within a subfamily referred to as "[o]rthocoronavirinae." (D.I. 76-4 at ¶ 48.)

protein or any S protein subunit of any "betacoronavirus."  (*See, e.g.*, '600 patent at claim 1; PBr. at 15.)  Dr. Ho agreed that the term "mRNA" is "very, very, very broad."  (Ex. O, Ho 51:10-11.) There is no possibility that the named inventors, as of October 21, 2016, had described a claim scope as broad as every mRNA encoding every S protein or S protein subunit of every betacoronavirus that would come into existence any time in the future, much less a vaccine using that mRNA.  As Moderna's expert acknowledged, one would need to know the S protein or S protein subunit (and therefore, necessarily, the novel virus) to have any chance at designing an mRNA that may or may not successfully encode the protein (and then of course determine whether a vaccine could be created).  (Ex. O, Ho Tr. at 178:22-179:15.)

Under these facts, *Schering* requires that the scope of "betacoronavirus" be limited to the viruses that were known as of the effective filing date, consistent with BioNTech and Pfizer's proposed construction.  (DBr. at 12-13.)  In fact, the rationale of *Schering* can be adapted to the facts here:  "Because, at the time of the ['600 and '127 patent] application[s], neither [the Moderna inventors] nor others skilled in the art knew of the existence of, let alone the identity of, the specific [viruses] now identified as [within a genus of betacoronavirus], those [viruses] cannot be within the scope of the claims."  *Schering*, 222 F.3d at 1353-54.  The betacoronaviruses that the named inventors in this case could have described and embraced were those that were known as of October 21, 2016.  (Ex. O, Ho Tr. at 148:8-11; Ex. R, Griffin Tr. at 106:20-107:2.)  Under *Schering*, new future betacoronaviruses are not within the scope of the '600 and '127 patent claims.

### 2. BioNTech and Pfizer Are Not Limiting Moderna to the Disclosed Embodiments, and Moderna's Cases Do Not Override *Schering*

Moderna relies on three cases decided after *SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870 (Fed. Cir. 2004); *Innogenetics, N.V. v. Abbott Lab'ys*, 512 F.3d 1363 (Fed. Cir. 2008); and *Bd. of Trs. of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 528 F. Supp.

2d 967 (N.D. Cal. 2007).  As shown below, these cases are neither in conflict with *Schering* nor control on the present facts.[5]

In *SuperGuide*, the Federal Circuit interpreted the claim term "regularly received television signal" to refer to a video signal received by a mixer rather than a signal conventionally broadcast at the time of the invention.  358 F.3d at 879.  The district court had construed the term to exclude data in digital format because that format was not used for broadcasting at the time.  *Id.* at 878. On appeal, the Federal Circuit refused to limit the video data to analog format when (1) the patent itself recognized the use of analog and digital formats and (2) there was "little doubt that those skilled in the art knew of the existence of digital video data at the time."  *Id.* at 879.  Thus, *SuperGuide* is irrelevant to the instant dispute because it did not address a patentee trying to define a claimed genus so broadly as to cover every future unknown structure that would eventually be classified into that genus.

Moderna's reliance on *Innogenetics* is equally misplaced.  There, the Federal Circuit addressed a patent relating to a method for detecting and classifying hepatitis C virus genotypes in a biological sample.  512 F.3d. at 1368.  The genotypes at issue were known as of the invention date.  *See generally id.* at 1370.  On appeal, the Federal Circuit affirmed the district court's claim constructions, under which the accused infringer stipulated to infringement.  *Id.* at 1368-69, 1371. Thus, while *Innogenetics* supports that broad claim language should not be limited to the specific "embodiments" of the patent, but rather given the broader meaning justified by the patent as a whole, it is inapplicable here.  *See id.* at 1370-72.  As discussed in the previous section, BioNTech and Pfizer's construction is not limited to the specific embodiments disclosed in the '600 and '127

---

[5] If there was conflict, *Schering* would control as the earlier precedent.  *Deckers Corp. v. U.S.*, 752 F.3d 949, 959 (Fed. Cir. 2014) (binding a later panel to an earlier panel's determination).

patents, but includes a broad genus of any S protein or S protein subunit parts of "betacoronaviruses" that were known at the time of the alleged invention.

In their opening brief, Moderna takes out of context the following statement from *Innogenetics*: "Our case law allows for after-arising technology to be captured within the literal scope of valid claims that are drafted broadly enough." (PBr. at 11-12 (quoting *Innogenetics*, 512 F.3d at 1371-72).) The statement was made in the context of the Court refusing to reverse a finding that the accused infringer forfeited a noninfringement argument based on the accused assay using a detection method "that did not exist at the time of filing." 512 F.3d at 1371-72. In other words, the *Innogenetics* court did not make the quoted statement in the context of construing a claim term, but to refute an overbroad pronouncement of law relating to patent infringement.

Finally, in *Stanford*, "[t]he patents involve correlating measurements of HIV nucleic acids obtained via a PCR assay with determining whether or not a[n AIDS/HIV] therapy is effective." 528 F.Supp. 2d at 971. The accused infringer in *Stanford* argued that the term "antiretroviral agent" should include only drugs that were available to doctors for treating AIDS/HIV-infected patients at the time of the patent filing. *Id.* at 979. In rejecting the accused infringer's proposed construction, the district court reasoned that the term was intended to describe a category of pharmaceuticals. *Id.* at 980.

The facts of *Stanford* are readily distinguishable from the present case and *Schering*. In *Stanford*, the inventive aspect of the patents related to "correlating measurements of HIV nucleic acids obtained via a PCR assay," not administering any particular type of "antiviral agent." *Id.* at 971. In other words, practicing the claims at issue in *Stanford* did not require knowing which specific "antiretroviral agent" was administered; the claimed method simply measured the biological effects (*e.g.*, the HIV RNA copy numbers) resulting from administration of that

14

"antiretroviral agent" (whatever it was).

Thus, construing the claims in *Stanford* to include an "antiretroviral agent" that was not administered by doctors as of the date of filing is not in conflict with the *Schering* decision, namely, that claim terms must be interpreted "to cover no more than what the specification supported at the time of filing" to avoid "reward[ing] Dr. Weissmann for inventions he did not make." *Schering*, 222 F.3d at 1353-54.  Like the term "INF-α" that was at issue in *Schering* (DBr. at 12-13), and unlike the "antiretroviral agent" that was at issue in *Stanford*, the identity of the betacoronavirus in this case is a foundational aspect of the claims.

In sum, BioNTech and Pfizer's proposed construction is consistent with the '600 and '127 patents, *Schering*, and the cases cited by Moderna.  Moderna's proposed construction far exceeds the subject matter made and used in the '600 and '127 patents, runs counter to *Schering*, and is unlike the breadth of any construction given in the cases it cites.

### 3. The Intrinsic Evidence Confirms the Temporal Restriction in BioNTech and Pfizer's Proposed Construction

Moderna asserts that "the specification explicitly states that betacoronaviruses beyond those exemplified in the specification are encompassed by the claims." (PBr. at 13.)  In doing so, Moderna relies on the following statements:  "[o]ther betacoronaviruses are encompassed by the present disclosure" and "[t]he present disclosure is not limited by a particular strain of SARS-CoV." (*Id.*)  These statements, however, only confirm BioNTech and Pfizer's construction.

***First***, BioNTech and Pfizer's construction is not limiting the genus of "betacoronavirus" to only those exemplified in the specification.  ***Second***, BioNTech and Pfizer's construction covers the different strains of betacoronaviruses existing as of October 2016.  To be sure, SARS-CoV-2 is ***not*** a strain of SARS-CoV.  (Ex. O, Ho Tr. at 151:13-152:2; 155:19-156:8.)  Indeed, the relatively modest statements of additional breadth to "betacoronavirus" cited by Moderna

15

appearing in the '600 and '127 patents only underscores what the specification does not say:  the specification does not say that the genus includes future novel viruses that have yet to exist.

Moderna acknowledges, as it must, that the Patent Office Examiner in her Notice of Allowance, clearly stated the interpretation being given "betacoronavirus" in allowing the patent to issue.  (PBr. at 14.)  These statements are significant because "[s]tatements about a claim term made by an examiner during prosecution of an application may be evidence of how one of skill in the art understood the term at the time the application was filed."  *Cytyc Corp. v. TriPath Imaging, Inc.*, No. 03-11142, 2005 U.S. Dist. LEXIS 29850, at *30 (D. Mass. Nov. 28, 2005) (quoting *Salazar v. Procter & Gamble Co.*, 414 F.3d 1342, 1347 (Fed. Cir. 2005)).

The Examiner first noted that the application was being allowed based on mice and rabbit testing of a vaccine for a single betacoronavirus (MERS-CoV), contained in one particular lipid nanoparticle formulation.  (Ex. K, September 10, 2020 Notice of Allowance, at 3.)  Dr. Ho agreed this was why the patent was allowed.  (Ex. O, Ho Tr. at 181:13-182:6.)  The Examiner then explained that the application was filed "several years before the discovery of SARS-CoV-2 (COVID-19)," and that "neither the prior art nor the instant specification describe/disclosed SARS-CoV-2 (COVID-19)," statements which Dr. Ho also agreed were accurate.  (*Id.* at 182:18-183:2.)  Finally, the Examiner concluded that the "current method claims and claims directed to compositions comprising mRNA encoding a betacoronavirus S protein or S protein subunit formulated in lipid nanoparticle are interpreted as being directed to betacoronaviruses that were known as of October 21, 2016," with the Examiner giving examples.  (*Id.* at 183:3-10.)

The Examiner was thus generous in allowing "betacoronavirus" as a genus, but also cautious in making sure the public understood the limits on the allowed claim scope.  *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) (the intrinsic evidence, including

the file history, "constitute the public record of the patentee's claim, a record on which the public is entitled to rely").

Moderna's attempt to counter by citing the patentee's response to the Notice of Allowance (D.I. 74-2, Dec. 18, 2020 Response to Examiner's Note, at 1-2) does not undermine the Examiner's understanding as a POSA and should be accorded no weight. *See, e.g.*, *Univ. of Mass. v. L'Oréal S.A.*, 36 F.4th 1374, 1384 (Fed. Cir. 2022) (refusing to give weight to a "bare statement" from the patent applicant in response to an Examiner's statement). For example, Moderna did not disagree with the facts underpinning the Examiner's understanding of why the term "betacoronavirus" is temporally limited, including that the patent application was filed "several years before to the discovery of SARS-CoV-2 (COVID-19)" and, "[p]rior to January 2020, neither the prior art nor the instant specification described/disclosed SARS-CoV-2 (COVID-19)." (Ex. K, September 10, 2020 Notice of Allowance, at 4.) Moderna cited *Innogenetics*, but, as explained above, that case concerned not limiting a claim just to the specification's embodiments, which the Examiner did not do here.

The Examiner mailed her statement on September 10, 2020—when the pandemic was raging. The Examiner was mindful of ensuring the patents' claim scope was consistent with the scope of the specification's disclosure and knowledge of a POSA at the time of filing—not at the time of issuance or at any future point in time. If Moderna wished to ensure a broader scope, it had options to give the Patent Office and public clear notice, including requesting continued examination of its application under 37 C.F.R. § 1.114 and submitting claims expressly referring to an S protein of SARS-CoV-2. However, in view of the Examiner's statements, Moderna would not have been able to show support for such claims. Moderna cannot now obtain that breadth through claim construction. *Cf. Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014)

("[A]bsent a meaningful definiteness check, we are told, patent applicants face powerful incentives to inject ambiguity into their claims. . . . Eliminating that temptation is in order, and the patent drafter is in the best position to resolve the ambiguity in . . . patent claims.") (internal quotation omitted).[6]

### 4.   Extrinsic Evidence Does Not Support Moderna's Construction

Moderna tries to use evidence of post-2016 novel viruses (PBr. at 14-15) to argue that such viruses are within the scope of what the inventors possessed when the patent application was filed in 2016.  This is, by definition, extrinsic evidence that has limited value when construing a claim. *See, e.g.*, *IQASR LLC v. Wendt Corp.*, 825 Fed. Appx. 900, 903-04 (Fed. Cir. 2020).  Indeed, extrinsic evidence cannot override the actual disclosures of the patent and the prosecution history revealing the bases for allowance.

### B.   "S Protein"

Moderna's proposed construction does not offer any guidance to the jury on the meaning of "S protein," as it merely replaces the term "S" with the figurative word "spike."  Having decided not to elucidate this term, Moderna resorts to faulting BioNTech and Pfizer for doing so based on the function of the "spike."  But functionality is how the specification distinguishes an S protein from the other structural proteins on a betacoronavirus, and BioNTech and Pfizer's proposed construction is consistent with how a POSA would have understood this term.

*First*, the specification described an "S protein" by its ability to mediate virus binding to cells and virus entry via fusion of the virus and target cell membranes.  (*See, e.g.*, '600 patent at 34:53-59 ("The S protein is particularly essential in mediating virus binding to cells expressing

---

[6] Moderna has also been pursuing more continuation applications, which also presented an opportunity for Moderna to seek claims expressly to a SARS-CoV-2 vaccine if Moderna genuinely believed its patent specification justified such claim breadth.  (Ex. S.)

receptor dipeptidyl peptidase-4 (DPP4) through receptor binding domain (RBD) in the S1 subunit, whereas the S2 subunit subsequently mediates virus entry via fusion of the virus and target cell membranes.").)  As Dr. Ho testified, a POSA would have looked to function to help distinguish an S protein from other structural viral proteins.  (*See* Ex. O, Ho Tr. at 194:10-24.)

The mere fact that a claim term is defined by function, without more, "is not improper." *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1374-75 (Fed. Cir. 2014).  Courts have construed specific proteins based on the function they perform.  *PureCircle USA Inc. v. SweeGen, Inc.*, No. 18-01679, 2022 WL 1769118, at *9 (C.D. Cal. May 23, 2022) (adopting the construction of "'UDP-glucosyltransferase' to mean '[a] type of enzyme that is capable of transferring a glucose unit from a uridine diphosphate glucose molecule to a steviol glycoside molecule'"); *Carnegie Mellon Univ. v. Hoffmann-LaRoche, Inc.*, 55 F. Supp. 2d 1024, 1028 (N.D. Cal. 1999) (construing "DNA Polymerase I" to mean "an enzyme that is lethal or debilitating to growth of the host cell strain when expressed . . . and that exhibits three enzymatic activities").  Indeed, both sides' proposed construction of "mRNA" includes functional language explaining what mRNA does, so the jury can understand it.  "S protein" should also receive that treatment.

Moderna makes a straw man argument that raises a distinction between a *less functional* S protein (*i.e.*, one that binds the cell membrane but does not actually fuse) generated by the vaccine and a fully *functioning* S protein expressed by the live virus (*i.e.*, one that binds and fuses).[7]  But the S protein recited in the claim must be the same S protein described in the specification, and the specification describes the S protein as performing the function of mediating viral entry and fusion.  (*See* PBr. at 18-19.)  Accordingly, that is BioNTech and Pfizer's proposed construction.  Nothing

---

[7] Dr. Ho and Dr. Griffin agreed that the spike protein that resulted from mRNA compositions could bind to cell receptors.  (*See* D.I. 75 at 28 n.12; Ex. O, Ho Tr. at 198:18-199:5; Ex. R, Griffin Tr. at 172:3-5.)

in the specification, for example, discloses mutating an S protein to become nonfunctional.  (*See* Ex. O, Ho Tr. at 202:13-203:6.)

BioNTech and Pfizer's proposed construction is also consistent with the purpose of the alleged invention.  As Dr. Ho concedes, the claimed vaccine contained mRNA that encoded the S protein (as opposed to another structural protein) precisely because the S protein mediated viral entry and fusion in the live virus, making it a target antigen for a vaccine.  (Ex. O, Ho Tr. at 187:19-188:3; 192:5-16; 193:3-12; 196:15-197:11.)

***Second***, Moderna states "there is nothing in the claims or the specification to suggest the entire genome or *any original viral material has to encode the spike.*"  (PBr. at 19-20 (emphasis added).)  Not surprisingly, Dr. Ho repudiated Moderna's position, instead agreeing that the S protein of the claimed vaccine was encoded by the betacoronavirus genome.  (*See* Ex. O, Ho Tr. at 203:8-17.)  And Dr. Ho's testimony is supported by the claims themselves, which expressly state that the mRNA encoded a "*betacoronavirus* (BetaCoV) S protein."  (*See, e.g.*, '600 patent, at claim 1; '127 patent, at claim 1.)  Additionally, the specification recites that the S protein was encoded by MERS-CoV, the only example where *in vivo* data was given for a betacoronavirus vaccine.  (*See* '600 patent at 34:36-41; Ex. O, Ho Tr. at 185:13-15.)  Moderna's proposal to construe S protein as a spike protein untethered to any viral genome is contrary to a person of ordinary skill's understanding of the term.

Because Moderna effectively attempts to rewrite the claim term under the moniker of "plain and ordinary meaning," the court should reject its construction.

## C.    "ORF"

"When a patentee defines a claim term, the patentee's definition governs, even if it is contrary to the conventional meaning of the term."  *Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*, 493 F.3d 1358, 1361 (Fed. Cir. 2007).  Here, the patents explicitly define "open reading

frame" as follows:

> An "open reading frame" is a continuous stretch of DNA beginning
> with a start codon (e.g., methionine (ATG)), and ending with a stop
> codon (e.g., TAA, TAG or TGA) and encodes a polypeptide.

('600 patent, 62:50-53.)  Moderna relegates their response to this definition to a footnote at the last

page of its brief, claiming that this passage "comes nowhere close to lexicography."  (PBr. at 23

n.9.)   But to try to advance this position, Moderna ignores Federal Circuit precedent on

lexicography, which acknowledges that setting off the term in quotation marks is "a strong

indication that what follows is a definition."  *Sinorgchem*, 511 F.3d at 1136; *see also Intellectual

Ventures I, LLC v. Lenovo Group Ltd.*, 365 F. Supp. 3d 200, 206 (D. Mass. 2019).  Here, the term

set off in quotation marks is followed by "is," another hallmark that the paragraph supplies a

definition.  *Sinorgchem*, 511 F.3d at 1136; *Intellectual Ventures I, LLC* at 206.[8]

And the specification uses a similar format to define other claim terms nearby:   "open

reading frame" is just one of four terms defined right next to each other in a list that also includes

"poly-A tail," "5' untranslated region," and "3' untranslated region."  *See AstraZeneca UK Ltd. v.

Watson Lab'ys, Inc. (NV)*, 905 F. Supp. 2d 589, 593 (D. Del. 2012) ("Significantly, each of the

defined terms [in the same section as the disputed term] is set off by quotation marks, and several

. . . are later recited in the claims, indicating, again, that the inventors acted as their own

lexicographers by expressly defining claim terms in the specification.").  This repeated definitional

structure, accompanied by quotation marks and textual descriptions after the word "is," shows the

---

[8] Moderna suggests that the Federal Circuit in *Medicines Co.* announced a rule that, to be definitional, the patent must recite language like "as used herein."  PBr. at 21, n.9.  *Medicines Co.* announced no such rule and merely recited the language used in the patent at issue in that case. 853 F.3d at 1306.  *Medicines Co.* supports Defendants' position here by focusing on the use of quotation marks to signal that a definition follows, and the fact that the definition followed the form of other definitions nearby.  *Id.*

patentee's intent to define the term "open reading frame." *Sinorgchem Co.*, 511 F.3d at 1138.

Belying its position that the quoted language is not definitional, Moderna actually incorporated that definition nearly verbatim into their proposed construction (*see* PBr. at 20), but then erroneously altered the definition to include not just DNA, but mRNA.  *See Falana v. Kent State Univ.*, 669 F.3d 1349, 1355 (Fed. Cir. 2012) ("[A] court may not import limitations from the written description into the claims.") (quoting *Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1347 (Fed. Cir. 1998)).

Moderna points to several embodiments where "the specification uses the term 'open reading frame' . . . to encompass an mRNA polypeptide coding sequence."  (PBr. at 21.)  But the mere fact that certain embodiments fall outside the express definition do not trump clear lexicography.  *See August Tech. Corp. v. Camtek, Ltd.*, 655 F.3d 1278, 1285 (Fed. Cir. 2011) ("The mere fact that there is an alternative embodiment disclosed in the [asserted patent] that is not encompassed by [the court's] claim construction does not outweigh the language of the claim.") (quoting *TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1373 (Fed. Cir. 2008)); *see also TIP Sys., LLC*, 529 F.3d at 1373 ("[T]o construe the claim term to encompass the alternative embodiment in this case would contradict the language of the claims.").[9]

Further, the specification's definition of "open reading frame" adopted by BioNTech and Pfizer does not preclude the claim from covering mRNA sequences, but merely requires, per the express definition, that it also *include* DNA.  For example, claim 1 of the '600 patent recites:  "A composition, *comprising*: a messenger ribonucleic acid (mRNA) *comprising* an open reading

---

[9] Moderna also ignores that the specification refers to DNA vaccines. (*E.g.*, '600 patent at 5:4-9 ("Further provided herein . . . *is a nucleic acid (e.g., DNA)* encoding at least one . . . RNA (e.g., mRNA) polynucleotide . . . .") (emphasis added); *id.* at 35:41-44 ("MERS-CoV vaccine may comprise, for example, at least one RNA (e.g., mRNA) polynucleotide *encoded by a nucleic acid (e.g., DNA)*" (emphasis added).)

frame encoding a betacoronavirus (BetaCoV) S protein or S protein subunit."  (Emphasis added).

Moderna's choice of open-ended language in the claims allows for mRNA, DNA, or both to

encode a betacoronavirus S protein or S protein subunit.  *See CIAS, Inc. v. All. Gaming Corp.*, 504

F.3d 1356, 1360 (Fed. Cir. 2007) ("In the patent claim context the term 'comprising' is well

understood to mean 'including but not limited to.'").

Finally, Moderna complains that the inventors' lexicography would "exclude every

disclosed embodiment."  (PBr. at 23.)  But Moderna only disclosed one embodiment of a vaccine

for a betacoronavirus (MERS-CoV).  (*See* Ex. O, Ho Tr. 137:23-139:10.)  Even were it true that

this particular claim as phrased would exclude these embodiments, that does not permit ignoring

the lexicography.  *Tr. of Columbia Univ. in City of New York v. Symantec Corp.*, 811 F.3d 1359,

1366 (Fed. Cir. 2016).  Neither this Court nor Moderna can "redraft claims, whether to make them

operable or to sustain their validity."  *See Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371,

1374 (Fed. Cir. 2004).  In sum, Moderna's lexicographical definition of "open reading frame"

should be adopted.  *Sinorgchem*, 511 F.3d at 1138 ("When the specification explains and defines

a term used in the claims, without ambiguity or incompleteness, there is no need to search further

for the meaning of the term.").

## V.   <u>CONCLUSION</u>

For the foregoing reasons, BioNTech and Pfizer respectfully request that the Court adopt

their proposed claim constructions, which reflect the meanings that a POSA would have ascribed

to the disputed claim terms at the time of the invention based on the intrinsic record.

\*       \*       \*

Dated:  July 7, 2023

DEFENDANT AND COUNTERCLAIM-
PLAINTIFF PFIZER INC.

By their Counsel,

/s/ *Lee Carl Bromberg*
_____
Lee Carl Bromberg (BBO # 058480)
Erik Paul Belt (BBO # 558620)
Wyley Proctor (BBO # 666613)
**MCCARTER & ENGLISH LLP**
265 Franklin Street
Boston, MA 02110
P: 617.449.6500
F: 617.607.9200
lbromberg@mccarter.com
ebelt@mccarter.com
wproctor@mccarter.com

OF COUNSEL:

Thomas H. L. Selby
Stanley E. Fisher
Kathryn S. Kayali
Michael Xun Liu
D. Shayon Ghosh
Julie Tavares
Derrick M. Anderson
Haylee Bernal Anderson
**WILLIAMS & CONNOLLY LLP**

680 Maine Avenue, S.W.
Washington, DC 20024
Telephone: 202-434-5000
Facsimile: 202-434-5029

*Attorneys for Defendant and Counter-Claim*
*Plaintiff Pfizer Inc.*

DEFENDANTS AND COUNTERCLAIM-
PLAINTIFFS BIONTECH SE,
BIONTECH MANUFACTURING GMBH,
AND BIONTECH US INC.

By their Counsel,

/s/ *Jeffrey S. Robbins*
_____
Jeffrey S. Robbins, BBO #421910
Joseph D. Lipchitz, BBO #632637
Gregory M. Boucher, BBO #665212
**SAUL EWING LLP**
131 Dartmouth Street, Suite 501
Boston, MA 02116
Tel: (617) 723-3300

OF COUNSEL:

Bruce M. Wexler
Eric W. Dittmann
Young J. Park
Simon F. Kung
Rebecca A. Hilgar
Ryan Meuth
**PAUL HASTINGS LLP**
200 Park Avenue
New York, NY 10166
(212) 318-6000

*Attorneys for Defendants and Counter-Claim*
*Plaintiffs BioNTech SE, BioNTech*
*Manufacturing GmbH, and BioNTech US, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I, Lee Carl Bromberg, hereby certify that this document filed through the ECF system on July 7, 2023 will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

<u>/s/ *Lee Carl Bromberg*</u>
Lee Carl Bromberg