# EXHIBIT A

**IN THE HIGH COURT OF JUSTICE**                 **Claim No: HP-2022-000022**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**INTELLECTUAL PROPERTY LIST (ChD)**
**PATENTS COURT**

**B E T W E E N :**

**MODERNATX, INC.**

<u>**Claimant**</u>

**– and –**

**(1) PFIZER LIMITED**
**(2) PFIZER MANUFACTURING BELGIUM NV**
**(3) PFIZER INC.**
**(4) BIONTECH MANUFACTURING GMBH**
**(5) BIONTECH SE**

<u>**Defendants**</u>

_____

**PFIZER / BIONTECH'S AMENDED**
**RESPONSIVE STATEMENT OF CASE**
_____

1.      This Amended Responsive Statement of Case on behalf of the Defendants (the
        "**Defendants' ARSoC**") is served pursuant to paragraph 6 of the Order of Sir
        Anthony Mann (sitting as a Judge of the Chancery Division) dated 16 February 2023
        and paragraph 2(a) of the Order of Meade J dated 14 July 2023. It responds to the
        Claimant's Statement of Case dated 9 March 2023 (the "**Claimant's SoC**") and
        provides further particulars of the Defendants' case as pleaded at paragraph 10(a)
        of its Amended Defence dated 28 February 2023 in response to paragraphs 10-16
        of the Claimant's Particulars of Claim dated 23 September 2022 (the "**PoC**"). In this
        document:

        (a)     save as otherwise identified, the definitions used are the same as those that
                appear in the PoC, the Amended Particulars of Infringement dated 13 February

2023 (the "**PoI**") and the Claimant's SoC, without any admission being made in relation to them;

(b)    the Claimant's announcement of 8 October 2020 at Annex 2 to the PoC is referred to as the "**Pledge**", and the announcement of 7 March 2022 at Annex 1 to the PoC is referred to as the "**March 2022 Statement**"; and

(c)    the Defendants' position is advanced without prejudice to paragraphs 2 and 5 of the Defendants' Amended Defence, and in particular without prejudice to any technical invalidity / non-infringement arguments which the Defendants wish to advance in relation thereto.

## A.    Factual background

2.    Upon the outbreak of the novel coronavirus (2019-nCoV) in 2019, the Director-General of the World Health Organization (the "**WHO**") convened an Emergency Committee under the WHO's International Health Regulations (2005) (the "**IHR**").

(a)    Following the Emergency Committee's first meeting, the WHO described its role in a statement on 23 January 2020 as follows: "*to give advice to the Director-General, who makes the final decision on the determination of a Public Health Emergency of International Concern (PHEIC). The Committee also provides public health advice or suggests formal or temporary recommendations as appropriate*".[1]

(b)    A Public Health Emergency of International Concern ("**PHEIC**") is defined in Article 1 of the IHR as "*an extraordinary event which is determined, as provided in these Regulations: (i) to constitute a public health risk to other States through the international spread of disease; and (ii) to potentially require a coordinated international response*".

---

[1] https://www.who.int/news/item/23-01-2020-statement-on-the-meeting-of-the-international-health-regulations-(2005)-emergency-committee-regarding-the-outbreak-of-novel-coronavirus-(2019-ncov).

3.      At the second meeting of the IHR Emergency Committee regarding the outbreak on 30 January 2020,[2] the WHO Director-General, on the advice of the Emergency Committee, declared that the novel coronavirus (2019-nCoV) was a PHEIC.

4.      Subsequently, the WHO Director-General characterised COVID-19 as a pandemic on 11 March 2020.[3]

5.      The Claimant's Pledge of 8 October 2020 stated *inter alia* as follows:[4]

> *Our portfolio of intellectual property is an important asset that will protect and enhance our ability to continue to invest in innovative medicines. A summary of our intellectual property can be found* <u>*here*</u>*. A selection of representative issued US patents relevant to our mRNA-1273 vaccine against COVID-19 is available* <u>*here*</u>*.*

> *Beyond Moderna's vaccine, there are other COVID-19 vaccines in development that may use the Moderna-patented technologies. We feel a special obligation under the current circumstances to use our resources to bring this pandemic to an end as quickly as possible. Accordingly, while the pandemic continues, Moderna will not enforce our COVID-19 related patents against those making vaccines intended to combat the pandemic. Further, to eliminate any perceived IP barriers to vaccine development during the pandemic period, upon request we are also willing to licence our intellectual property for COVID-19 vaccines to others for the post-pandemic period.*

6.      Alongside the Pledge, on 8 October 2020,[5] on the *Vaccine Program Call to Discuss Updates on Respiratory Syncytial Virus (RSV)*, Stephen Hoge, the president of the Claimant, stated in response to the question "*just on your COVID patents, just curious about the path for retrospectively litigating the patent estate after the*

---

[2] https://www.who.int/news/item/30-01-2020-statement-on-the-second-meeting-of-the-international-health-regulations-(2005)-emergency-committee-regarding-the-outbreak-of-novel-coronavirus-(2019-ncov).

[3] https://www.who.int/director-general/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[4] https://investors.modernatx.com/Statements--Perspectives/Statements--Perspectives-Details/2020/Statement-by-Moderna-on-Intellectual-Property-Matters-during-the-COVID-19-Pandemic/default.aspx.

[5] https://s29.q4cdn.com/435878511/files/doc_events/2020/10/08/Conference-Call-Update-Transcript-(10.08.20).pdf.

*pandemic subsides. There's obviously going to be a lot more interest in leveraging some components of your technology of the RNA LNP technology, and so obviously, you want to protect that" inter alia* as follows:

> *On the COVID patent question, and specifically, I think you said retrospective litigation, so after the pandemic, going out after people. That would be inconsistent with the value statement we're trying to make today. So what we're trying to say today as clearly as we can is we will not enforce these patents for any activity undertaken on the pandemic. … We've shown what's possible and we've been issued composition of Moderna patents that cover key aspects of this. That, under any normal circumstances, you might say is something that would disincentivize others from bringing forward vaccines. And what we wanted to be clear about today is that we have no interest in that disincentive. We do not want to stop vaccines being brought forward during the pandemic. It's a decision we've taken previously but not disclosed publicly. But as we sort of -- as time passed here, we feel an obligation to now disclose it publicly because there are good well-intentioned questions about IP, the use of IP as vaccines come closer to market, what that would mean where rights are. But it would be -- it will not be our intention retrospectively to kind of come back around and say, no, no, now we're going to enforce for activity that happened in the pandemic.*

7.    The following statements were made by the Claimant and / or senior officials acting or speaking on behalf of the Claimant. The Defendants will rely upon these statements, and such further or other statements made by the Claimant or its representatives of which it becomes aware, at trial on the basis that (i) under the law of the Commonwealth of Massachusetts and / or United States federal law, extrinsic evidence (including evidence of post-contractual conduct and statements) may be relevant in determining the meaning of ambiguous contract terms,[6] (ii) under the law

---

[6] *Parrish v. Parrish*, 30 Mass.App.Ct. 78, 86 (1991) (quoting *USM Corp. v. Arthur D. Little Sys., Inc.*, 28 Mass.App.Ct. 108, 116 (1989)) ("*Extrinsic evidence bearing upon the background and purpose of the parties as well as their understanding of the meaning of particular language used in the contract, may be considered… in the construction of ambiguous contract language…*"); *see also Lanier Professional Services, Inc. v. Ricci*, 192 F.3d 1, 4 (1st Cir. 1999) (applying Massachusetts law) (stating that "*ambiguity turns on the parties' intent*" and that evidence may be admitted to resolve the ambiguity by, "*in descending order of importance: (1) the parties' negotiations concerning the contract at issue; (2) their course of performance; and (3) trade usage in the relevant industry*"); *Bourgeois v. Hurley*, 8 Mass. App. Ct. 213, 215–216 (1979) ("*A person's actions subsequent to executing a legal document which*

of England and Wales, they are admissible as an aid to the interpretation of the March 2022 Statement, and (iii) under the law of the Commonwealth of Massachusetts and / or United States federal law and / or the law of England and Wales, they are admissible evidence of the valuable consideration that the Claimant received by way of the Pledge:

(a)    The Claimant's Chairman and co-founder, Noubar Afeyan, is reported to have stated in an interview, the contents of which were made public on 6 May 2021 *inter alia*:

> *[L]ast October we publicly stated that we would not voluntarily enforce any of our patents during the pandemic on anyone making a vaccine… Moderna is the only company that has declared it publicly. And we did that in October… from an intellectual property point of view, we have broken down any barrier so that it can be used during the pandemic since October…*

> *We have made [the technology] available not only to countries, but to companies.*

> *There are many companies currently making mRNA vaccines that would need the intellectual property that Moderna has developed for 10 years. Two years ago there was no one working on mRNA as a vaccine of the type that we make and now obviously multiple companies are making it.*

> *I think you don't need an agreement if you have some sort of voluntary statement that that's our position. We've had that stance and we welcome others to join.*

(b)    The Claimant's CEO, Stéphane Bancel stated by a letter first published on 8 October 2021[7] and then again on 4 January 2022[8] *inter alia* as follows:

---

*tend to show his understanding of the document's legal effect may be considered in determining his intention at the time of execution*").

[7] https://investors.modernatx.com/Statements--Perspectives/Statements--Perspectives-Details/2021/Our-Global-Commitment-to-Vaccine-Access/default.aspx.

[8] https://www.modernatx.com/media-center/all-media/blogs/our-global-commitment-to-vaccine-access.

*…in October 2020 and before we had our Phase 3 data, we announced that we would not enforce our COVID-19 related patents during the pandemic… we never wanted our patents to be a barrier to others bringing forward mRNA vaccines.*

(c)   Stéphane Bancel stated in an interview for the podcast *In the Bubble with Andy Slavitt* on 25 October 2021 *inter alia*:[9]

*The other piece we did is we put a statement in October 2020, and we talked to the media that we're not going to enforce our IP… it was very important for us as a company to put this out there saying please, if you're doing mRNA vaccine, go at it. Our goal as a country, as a company, is to get as many vaccines in arms as we can. Don't be afraid we will not sue anybody until the pandemic is going, because we should only focus on one thing, all of us, is stopping this virus…*

(d)   Noubar Afeyan stated in an interview with CNN on 5 December 2021 *inter alia*:[10]

*[T]he first time we spoke was around the time a year ago when we voluntarily pledged -- the only company to have done that voluntarily pledged not to enforce our patents against anybody who uses our patents to make a vaccine against the pandemic… Next year, we've said we will produce 2 to 3 billion doses. So combined by adding production capacity and allowing others to use our intellectual property, we've taken steps voluntarily to do the maximum we can.*

8.   The Claimant's March 2022 Statement (dated 7 March 2022) stated *inter alia* as follows:[11]

*To underscore our commitment to low-and middle-income countries, Moderna is now updating our patent pledge to never enforce our patents for COVID-19 vaccines against companies manufacturing in or for the 92 low-and middle-income countries in the Gavi COVAX Advance Market*

---

[9] https://lemonademedia.com/podcast/the-future-of-vaccines-with-moderna-ceo-stephane-bancel/.

[10] https://transcripts.cnn.com/show/fzgps/date/2021-12-05/segment/01.

[11] https://investors.modernatx.com/Statements--Perspectives/Statements--Perspectives-Details/2022/Modernas-Updated-Patent-Pledge/default.aspx.

*Commitment (AMC), provided that the manufactured vaccines are solely for use in the AMC 92 countries. …*

*In non-AMC 92 countries, vaccine supply is no longer a barrier to access. In these countries, the Company expects those using Moderna-patented technologies will respect the Company's intellectual property. Moderna remains willing to licence its technology for COVID-19 vaccines to manufacturers in these countries on commercially reasonable terms.*

9.   On the same day (7 March 2022), the Claimant's CEO (Mr Bancel) was reported as having "*declined to say if and when Moderna might begin enforcing its patents in higher-income countries*".[12]

10.   On 5 May 2023, at the fifteenth meeting of the IHR Emergency Committee on the COVID-19 pandemic, the Director-General "*… concur[red] with the advice offered by the [Emergency] Committee regarding the ongoing COVID-19 pandemic. He determines that COVID-19 is now an established and ongoing health issue which no longer constitutes a public health emergency of international concern (PHEIC)*".[13] The deliberations of the Emergency Committee included the following analysis:

*The Committee considered the three criteria of a PHEIC: whether COVID-19 continues to constitute 1) an extraordinary event, 2) a public health risk to other States through the international spread, and 3) potentially requires a coordinated international response. They discussed the current status of the COVID-19 pandemic. They acknowledged that, although SARS-CoV-2 has been and will continue circulating widely and evolving, it is no longer an unusual or unexpected event. The Committee recognized that the Director-General may decide to convene an IHR Emergency Committee on COVID-19 in the future if the situation requires.*

---

[12] Peter Loftus, *Moderna Signals It May Enforce Covid-19 Vaccine Patents in Wealthy Nations*, WALL STREET JOURNAL at 3 (7 March 2022), https://www.wsj.com/articles/moderna-signals-it-may-enforce-covid-19-vaccine-patents-in-wealthy-nations-11646699609?st=hq3qhm7jxap4ygi&reflink=desktopwebshare_twitter.

[13]   https://www.who.int/news/item/05-05-2023-statement-on-the-fifteenth-meeting-of-the-international-health-regulations-(2005)-emergency-committee-regarding-the-coronavirus-disease-(covid-19)-pandemic.

**B.    Applicable law: Rome I**

11.   Regulation (EC) No 593/2008 ("**Rome I**") applies "*in situations involving a conflict of laws, to contractual obligations in civil and commercial matters*" (Article 1(1)). The concept of "*contractual obligations*" is to be interpreted autonomously. Matters relating to contract will include situations where: (i) the offending conduct is considered a breach of contract or the purpose of the claim is to seek damages deriving from what can reasonably be regarded as a breach of contract; (ii) the action is based upon an obligation freely consented to by one party towards another; and / or (iii) the obligation has a contractual source, i.e., a source conveying at the very least an actual and existing commitment.

12.   Where no express choice of law has been made under Rome I, Article 4 applies.

(a)   If none of the special rules in Article 4(1) applies, the starting point is that "*the contract shall be governed by the law of the country where the party required to effect the characteristic performance of the contract has his habitual residence*" (Article 4(2)). For companies, the place of "*habitual residence*" is "*the place of central administration*" at the time of the conclusion of the contract (Article 19). The "*characteristic performance of the contract*" is the obligation that is peculiar to the contractual relationship in issue and / or that marks the nature of the contractual relationship.

(b)   Alternatively, Article 4(3) applies "*[w]here it is clear from all the circumstances of the case that the contract is manifestly more closely connected with a country other than that indicated in paragraphs 1 or 2*".

(c)   In the further alternative, in the event that the applicable law "*cannot be determined pursuant to paragraphs 1 or 2, the contract shall be governed by the law of the country with which it is most closely connected*" (Article 4(4)).

**C.    Express or implied waiver and / or unilateral contract and / or implied licence under law of the Commonwealth of Massachusetts and / or United States federal law**

13.   As particularised in further detail below at paragraphs 15-26, by the Pledge, the Claimant:

   (a)    expressly and / or impliedly waived any rights under the Patents within the meaning of United States law to prevent persons such as the Defendants, who allegedly practised the Patents in connection with the development and manufacture of "*COVID-19 vaccines*" intended to combat "*the pandemic*", from carrying out acts that would otherwise be an infringement of the Patents "*while the pandemic continues*" (i.e., for the "**Pandemic Period**"); alternatively

   (b)    expressly and / or impliedly licensed those, such as the Defendants, who allegedly practised the Patents in connection with the development and manufacture of "*COVID-19 vaccines*" intended to combat "*the pandemic*" to do so for the Pandemic Period.

14.    The legal effect in England and Wales of the matters pleaded at paragraph 13 above and 15-26 below is that, by way of the Pledge, the Claimant gave consent to the Defendants for the purposes of section 60(1) of the Patents Act 1977, rendering lawful any act that would otherwise amount to an infringement for the duration of that consent, i.e., for the Pandemic Period.

Applicable law analysis

15.    Since the Pledge took legal effect with respect to the Claimant's intellectual property rights in the Patents across the world, the Defendants' case as to its governing law in accordance with the principles set out at paragraphs 11-12 above is that:

   (a)    Under the law of the Commonwealth of Massachusetts and / or United States federal law, the Pledge may be characterised as a waiver and / or implied waiver and / or unilateral contract and / or implied licence, in the manner set out in further detail at paragraphs 16-26 below.

   (b)    As to the law of the Commonwealth of Massachusetts and / or United States federal law, when deciding issues in a patent case, a United States district court applies (i) the law of the state or circuit in which it sits (here, the Commonwealth of Massachusetts or the United States Court of Appeals for the First Circuit) to non-patent issues, and (ii) the law of the United States Court of Appeals for the Federal Circuit to issues of substantive patent law as well as to procedural issues that are intimately connected to the substance of the

enforcement of the patent right.[14] Accordingly, a United States court sitting in the Commonwealth of Massachusetts would apply the law of the United States Court of Appeals for the Federal Circuit to issues of waiver (whether express or implied) and implied licence.[15] A court sitting in the Commonwealth of Massachusetts would apply state law to the unilateral contract issues.

(c)     The legal concept of waiver is not considered to be contractual under the *lex causae*, i.e., the law of the United States Court of Appeals for the Federal Circuit. However, when characterised autonomously as Rome I requires, a waiver is to be treated as a "*contractual obligation*" within the meaning of Article 1(1) of Rome I. The concept of waiver as particularised at paragraphs 16-17 below involves (i) a legal obligation freely consented to, and / or (ii) an actual and existing commitment derived from a binding contractual source (i.e., the Pledge).

(d)     A unilateral contract is a "*contractual obligation*" within the meaning of Article 1(1) of Rome I because it constitutes (i) a legal obligation freely consented to, and / or (ii) an actual and existing commitment derived from a binding contractual source (i.e., the Pledge).

(e)     The legal concept of implied licence is a form of implied-in-fact contract under the *lex causae*, i.e., the law of the United States Court of Appeals for the Federal Circuit, and therefore is to be characterised as a "*contractual obligation*" within the autonomous meaning of Article 1(1) of Rome I.

(f)     Accordingly, pursuant to Article 4(2) of Rome I, these obligations are to be governed by "*the law of the country where the party required to effect the characteristic performance of the contract has his habitual residence*".

(g)     The "*characteristic performance*" of the contract at issue is the licensing and / or waiver of the Claimant's intellectual property rights during the Pandemic

---

[14] *Mich & Mich. TGR, Inc. v. Brazabra, Corp.*, 128 F. Supp. 3d 621, 631 (E.D.N.Y. 2015), *aff'd sub nom. Mich & Mich TGR, Inc. v. Brazabra Corp.*, 657 F. App'x 971 (Fed. Cir. 2016) (citations omitted).

[15] See e.g. *Am. Tech. Ceramics Corp. v. Presidio Components, Inc.,* 2018 WL 1525686, at *26 (E.D.N.Y. Mar. 27, 2018) (applying the law of the Federal Circuit to waiver defence); *Gen. Protecht Grp., Inc. v. Leviton Mfg. Co.*, 651 F.3d 1355, 1360 (Fed. Cir. 2011) (same, but to licence defence); *Verinata Health, Inc. v. Ariosa Diagnostics, Inc.*, 2015 WL 5117083, at *4 (N.D. Cal. Aug. 31, 2015), *aff'd*, 830 F.3d 1335 (Fed. Cir. 2016) (same, but to licence defence).

Period. The Claimant is therefore the party "*required to effect the characteristic performance of the contract*".

(h) The Claimant's "*place of central administration*" (Article 19(1), Rome I) is located in Massachusetts, USA.

(i) The governing law for the relevant obligations is therefore the law of the Commonwealth of Massachusetts. As noted above at subparagraph (b), the application of that law requires the application of United States federal law, and in particular the law of the United States Court of Appeals for the Federal Circuit, in relation to issues concerning waiver and / or implied licence.

Waiver and / or implied waiver

16. The Defendants rely on the following principles of waiver under the law of the United States Court of Appeals for the Federal Circuit, as applicable in the Commonwealth of Massachusetts in the manner described at paragraph 15 above (and relying on the authorities cited below without prejudice to any other relevant authorities in the law of the Commonwealth of Massachusetts or United States federal law to which it may be necessary to refer at trial):

(a) Waiver is the intentional relinquishment or abandonment of a known right.[16]

(b) The components of the cause of action are: "*(1) the existence at the time of the waiver of a right, privilege, advantage, or benefit which may be waived; (2) the actual or constructive knowledge thereof; and (3) an intention to relinquish such right, privilege, advantage, or benefit*".[17]

(c) Even if a party does not expressly waive a right, an implied waiver occurs when a party engages in "*conduct that is so inconsistent with an intent to enforce its rights as to induce a reasonable belief that such right has been relinquished*".[18]

---

[16] *In re Google Tech. Holdings LLC*, 980 F.3d 858, 862 (Fed. Cir. 2020) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)).

[17] *In re Garfinkle*, 672 F.2d 1340, 1347 (11th Cir. 1982).

[18] *Qualcomm Inc. v. Broadcom Corp.*, 548 F.3d 1004, 1020 (Fed. Cir. 2008).

17.   The Defendants' position as to the proper construction of the Pledge as an express or implied waiver as a matter of law in the United States insofar as these proceedings are concerned is as follows:

(a)   The Pledge was an intentional abandonment of the Claimant's right to exclude others from using the Patents during the Pandemic Period.

(b)   When the Claimant made the Pledge, it knew that (i) "*there [were] other COVID-19 vaccines in development*", and (ii) in the Claimant's view, some of those vaccines "*may use Moderna-patented technologies*".

(c)   The Claimant repeatedly confirmed that it had abandoned its right to exclude others from using the Patents during the pandemic. Both in its Particulars of Claim in these proceedings and in its Complaint in the United States patent litigation, the Claimant has expressly waived damages for the period before the March 2022 Statement.

(d)   In relation to the above, the Defendants will rely on the facts and matters set out at paragraphs 6 and 7 above.

(e)   Alternatively, even if the matters set out at subparagraphs (a)-(d) above did not constitute an express waiver, such a waiver may be implied from the Claimant's conduct – namely, the Pledge and the Claimant's subsequent statements concerning its enforcement of its intellectual property rights. That conduct would have misled a reasonable market participant into believing that the Claimant had waived its rights for the duration of the Pandemic Period. Whatever the Claimant's actual intentions, the Pledge created a reasonable basis to believe that the Claimant was waiving its right to enforce the Patents for the entire Pandemic Period, and its conduct after making the Pledge as set out at paragraphs 6, 7 and 9 above reinforced this belief.

(f)   Because the Claimant intentionally relinquished and abandoned its right to exclude others from using the Patents during the Pandemic Period, any claims for patent infringement or unlawful act during the Pandemic Period should be dismissed.

Alternatively, unilateral contract

18.  The Defendants alternatively rely on the following principles under the law of the Commonwealth of Massachusetts in the manner described at paragraph 15 above (and relying on the authorities cited below without prejudice to any other relevant authorities in the law of the Commonwealth of Massachusetts to which it may be necessary to refer at trial):

(a)  A contract requires both an offer and an acceptance of that offer.

(b)  An offer is an expression of willingness or desire to enter into a contract. The offer must state with reasonable certainty what is to be exchanged between the parties.[19] An offer may be made orally or in writing, or even by a person's conduct: what is important is that the offer be made in such a way as to justify another person in understanding that his / her / its acceptance of the bargain will bind both parties to the terms of the offer.[20]

(c)  A unilateral contract becomes complete when accepted by performance of the act called for in the offer,[21] which performance constitutes good consideration.[22]

19.  Applying the principles summarised at paragraph 18 above, the Pledge expressly licensed the Defendants – i.e., those who allegedly practised the Patents in connection with the development and manufacture of "*COVID-19 vaccines*" intended

---

[19] *Cygan v. Megathlin*, 326 Mass. 732, 733-34 (1951); Restatement (Second) of Contracts § 33 (1981).

[20] *Chicopee Concrete Serv., Inc. v. Hart Eng'g Co.*, 20 Mass. App. Ct. 315, 318 (1985); *Gilbert & Bennett Mfg. Co. v. Westinghouse Elec. Corp.*, 445 F. Supp. 537, 545 (D. Mass. 1977); see also *Cataldo Ambulance Serv., Inc. v. Chelsea*, 426 Mass. 383, 386 n.6 (1998).

[21] See *Moody v. Inhabitants of Town of Weymouth*, 276 Mass. 282, 286 (1931); *Bartlett v. Keith*, 325 Mass. 265, 267 (1950); *O'Brien v. New England Tel. & Tel. Co.*, 422 Mass. 686, 692-93 (1996) (explaining that an employee's decision to continue working after receiving an employee manual can be considered *"in the nature of an acceptance of an offer of a unilateral contract"*); *McGuigan v. Conte*, No. 200902523, 2010 WL 1051002, at *1 (Mass. Super. Ct. Feb. 24, 2010) (holding that *"a published offer of reward is a unilateral contract that becomes complete when accepted by performance of the act called for in the offer"*).  See further *Bornstein v. Lans*,104 Mass. 214; *Bishop v. Eaton*, 161 Mass. 496, 499; *Mathey v. Louis G. Freeman Co.* 295 Mass. 361, 362-363.

[22] *Gladstone v. Union Warren Sav. Bank*, 2 Mass. App. Ct. 850, 850 (1974) (holding that a bank's unilateral offer to waive a prepayment penalty *"imposed no binding obligation upon the plaintiff and lacked consideration until the plaintiff satisfied the condition"*); *McQueen v. True Partners Consulting, LLC*, No. 09-00657, 2011 WL 7714854, at *6 (Mass. Super. Ct. Jan. 7, 2011) (stating that *"[w]hen an offer calls for an act or conduct to be performed by the offeree, and the offeree performs that act or conduct in accordance with the offer, the offeree has accepted the offer, the offeror has received valuable consideration, and a unilateral contract is formed"*); *Berry v. City of Worcester*, No. 920211, 1998 WL 1181727, at *7 (Mass. Super. Ct. Sept. 10, 1998) (same).

to combat "*the pandemic*" – to perform such acts for the duration of the Pandemic Period. In particular:

(a) By the Pledge, the Claimant (as proprietor of the Patents) made an offer to all the world to the effect that (i) it would refrain from asserting the Patents (ii) against those who would practise them, and who would therefore carry out acts that would otherwise be infringements of the Patents, (iii) in order to make COVID-19 vaccines intended to combat the pandemic, (iv) during the period for which the pandemic continues (i.e., the Pandemic Period). Further or in the alternative, the offer was to permit or license such persons to undertake the aforementioned acts that would otherwise be an infringement of the Patents and / or not to sue such persons for such acts.

(b) If, as Moderna asserts, Comirnaty® uses "*Moderna-patented technologies*" (which is denied), then by developing, making and / or continuing to make COVID-19 vaccines to combat the pandemic, the Defendants accepted the Claimant's offer. Accordingly, the Defendants were licensed under the Patents for the Pandemic Period and / or the Claimant was obliged not to sue the Defendants for such acts.

(c) The Defendants gave good consideration by performing the act that had been requested of them, namely making vaccines intended to combat the pandemic, thus contributing to the Claimant's purpose identified in the Pledge itself, i.e., to *"bring this pandemic to an end as quickly as possible"*.

(d) The Defendants' position as to the proper construction of the contract insofar as these proceedings are concerned is as follows:

  (i) The reference to Moderna's "*COVID-19 related patents*" included the Patents. If, which is denied, the Comirnaty® vaccine made and developed by the Defendants falls within the scope of any valid claim of the Patents, it is and was at the date of the Pledge, one of the "*other COVID-19 vaccines in development*" which Moderna asserts uses *"Moderna-patented technologies"*.

  (ii) The Defendants, in the making and development of the Comirnaty® vaccine, are and were at the date of the Pledge, one of "*those making vaccines intended to combat the pandemic*".

(iii)    The "*pandemic*" is the COVID-19 pandemic, i.e., an extraordinary event which was determined to constitute a public health risk through the international spread of disease and require a coordinated international response, which commenced on or around the date when the WHO declared that the outbreak of COVID-19 constituted a PHEIC, as defined in Article 1 of the IHR, i.e., on 30 January 2020.

(iv)    In the sense in which the term "*while the pandemic continues*" was used in the Pledge, the Pandemic Period would come to an end when this extraordinary event was determined no longer to constitute a public health risk through the international spread of disease and require a coordinated international response, which happened when the WHO declared that the PHEIC had ended (as it in fact did on 5 May 2023). The end of the Pandemic Period could not be determined or declared unilaterally by the Claimant.

(v)    For the avoidance of doubt, as regards the boilerplate disclaimer at the bottom of the Pledge: (1) its true interpretation is to be informed by United States federal law under the Private Securities Litigation Reform Act of 1995 (the "**PSLRA**"); (2) whether or not the Pledge would be actionable as a matter of United States securities law has no effect on the question of whether it creates a legally binding commitment;[23] and (3) as a matter of construction, in light of the United States commercial context and what would objectively be understood of the disclaimer by a reasonably well informed reader given the nature of its wording, its references to "*forward-looking statements*" do not cover words that are intended to have expressly identified and immediate legal effects, such as the licence for the Defendants to use the Patents and / or the waiver of the Claimant's rights to enforce the Patents for a defined period.[24]

---

[23] See *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993) ("*The failure to carry out a promise made in connection with a securities transaction is normally a breach of contract.  It does not constitute fraud unless, when the promise was made, the defendant secretly intended not to perform or knew that he could not perform*").

[24] See, as a matter of United States federal law, *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1189–90 (9th Cir. 2021); see also *In re Gilat Satellite Networks, Ltd.*, 2005 WL 2277476, at *11 (E.D.N.Y. Sept. 19, 2005) ("*For example, if a corporation announces that it will take some future action, the corporation may also be read implicitly to represent that it has the present intent to follow through on that promise. The*

(e)     Save insofar as it is consistent with the foregoing, paragraph 1 of the Claimant's SoC is denied. The last sentence of paragraph 1 is not understood and in any event is not admitted.

<u>In the further alternative, implied licence</u>

20.     The Defendants will, in the further alternative, rely on the following implied licence principles under the law of the United States Court of Appeals for the Federal Circuit, as applicable in the Commonwealth of Massachusetts in the manner described at paragraph 15 above (and relying on the authorities cited below without prejudice to any other relevant authorities in the law of the Commonwealth of Massachusetts or United States federal law to which it may be necessary to refer at trial):

(a)     A patent owner may waive all or part of the right to exclude others from making, using or selling the patented invention by granting an implied licence, which – if granted – is a defence to patent infringement.[25]

(b)     No formal granting of an implied licence is necessary to give effect to that licence; the inquiry focuses on the patent owner's behaviour.[26]

(c)     Any language used by the owner of a patent or any conduct on his / her / its part, (i) from which a reasonable party may properly infer that the owner consents to his use of the patent in making, using or selling it, and (ii) upon which the other party acts, constitutes an implied licence.[27]

(d)     The "*entire course of conduct*" is relevant to the determination of whether an implied licence exists.[28]

---

present component of a statement is not protected by the bespeaks caution doctrine because it is not 'forward-looking'"); *Grant v. Ursula Mgmt., LLC*, 2021 WL 8382243, at *5 (E.D.N.Y. Oct. 6, 2021) (for language in a forward looking statement to be protected under the safe harbour provision of the PSLRA, it cannot be "*boilerplate and must convey substantive information*") (alterations and citations in original omitted).

[25] *Carborundum Co. v. Molten Metal Equip. Innovations, Inc.*, 72 F.3d 872, 878 (Fed. Cir. 1995).

[26] *De Forest Radio Tel. & Tel. Co. v. United States*, 273 U.S. 236, 241 (1927); *Wang Lab'ys, Inc. v. Mitsubishi Elecs. Am., Inc.*, 103 F.3d 1571, 1580 (Fed. Cir. 1997).

[27] *De Forest*, 273 US. at 241.

[28] *Wang Lab'ys, Inc. v. Mitsubishi Elecs. Am., Inc.*, 103 F.3d 1571, 1581–82 (Fed. Cir. 1997);

*Bitmanagement Software GMBH v. United States*, 989 F.3d 938, 947 (Fed. Cir. 2021).

(e)     An implied licence accompanied by consideration is irrevocable over its term.[29]

21.    The Defendants' position as to the proper construction of the Pledge as an implied licence as a matter of law in the United States insofar as these proceedings are concerned is as follows:

(a)     By the Pledge, either alone, or alternatively together with and supported by the conduct referred to at paragraphs 6 and 7 above, the Claimant granted the Defendants an implied licence under the Patents "*while the pandemic continues*". In doing so, the Claimant invited competitors into the market for COVID-19 vaccines by pledging that it would not enforce its patents against companies making vaccines to combat the COVID-19 pandemic. Paragraph 19(d) above is repeated as regards the proper construction of the Pledge.

(b)     The Claimant repeatedly reaffirmed that Pledge by way of the statements set out at paragraph 7 above.

(c)     The Claimant received good consideration for the implied licence. Paragraph 19(c) above is repeated. Furthermore, the Defendants' actions: (i) ensured the availability of vaccines in the market, using their capacity to address the Claimant's inability to meet market needs on its own; (ii) thereby ensured that the Claimant averted the negative consequences that it must have understood could have resulted from an insufficiently developed supply chain, i.e., delays in providing the vaccine and related customer / investor frustration; and (iii) contributed materially to an acceleration in the mainstream usage and acceptance of mRNA technology across the world as a result of its production and distribution by better-established companies like the Defendants, ultimately leading to greater profits for, and investment in, the Claimant, in circumstances where at the time of the Pledge the Claimant had been a small and relatively unknown company, and mRNA technology is at the heart of the Claimant's business. In this regard, the Defendants refer to and rely upon the facts and matters set out at paragraphs 6-7 above.

(d)     The Claimant was aware that competitors were developing mRNA vaccines to combat the pandemic, and in those circumstances chose to invite other manufacturers into the marketplace, represented that it would not attempt to

---

[29] *Asset Mktg. Sys. v. Gagnon*, 542 F.3d 748, 754-55 (9th Cir. 2008).

enforce its alleged intellectual property against those manufacturers, repeatedly reaffirmed its commitment, and did not take steps to enforce its alleged intellectual property until summer 2022 – notwithstanding those manufacturers' public and highly publicised sales of COVID-19 vaccines.

(e) Accordingly, the Claimant's language and / or course of conduct created an inference that the Claimant consented to the alleged use of the Patents.

(f) Because the Claimant granted an implied licence for the use of the Patents for the Pandemic Period, any claims for patent infringement or unlawful act during the Pandemic Period should be dismissed.

Effect of the March 2022 Statement

22. The March 2022 Statement does not alter the above legal analysis under the law of the Commonwealth of Massachusetts and / or United States federal law. In this regard, the Defendants rely on the authorities cited below (without prejudice to any other relevant authorities in the law of the Commonwealth of Massachusetts or United States federal law to which it may be necessary to refer at trial).

23. To the extent that the Pledge is characterised as a waiver, express or implied, under United States federal law as it applies in accordance with paragraph 15 above:

(a) In the circumstances, the Claimant is not entitled to revoke its waiver of the right to enforce the Patents during the Pandemic Period.[30] Absent the consent of the relevant counterparty, a party that intentionally relinquishes a known right cannot ordinarily reclaim the right.

(b) The Defendants at no point consented to the Claimant's reclamation of the rights it waived in the Pledge. As such, the waiver could not be and was not revoked.

(c) In any event, the Claimant's waiver is irrevocable because the Claimant received valuable consideration for the Pledge in the form of significant

---

[30] 28 Am. Jur. 2d Estoppel and Waiver §186; see also *In re Kizelnik*, 190 B.R. 171, 180 (Bankr. S.D.N.Y. 1995) ("*A waiver functions to preclude a subsequent assertion of the right waived or any claim based thereon*"); *Bernhardt v. Harrington*, 2009 ND 189, ¶ 13, 775 N.W.2d 682, 686 ("*When a right is waived, the 'right is gone forever and cannot be recalled'*") (citation omitted).

goodwill and market benefits.[31] Paragraphs 19(c) and 21(c) above are repeated. In this regard, the Defendants will rely on the wording of the Pledge, either alone, or alternatively together with and supported by the conduct referred to at paragraphs 6 and 7 above.

(d)   Alternatively, any revocation of a waiver, to the extent that the waiver may be revoked at all, must be clear and unequivocal.[32] The March 2022 Statement does not satisfy those criteria. The Claimant did not, in its March 2022 Statement, withdraw the Pledge. Instead, it made the vague assertion that it expected other companies to "*respect the Company's intellectual property*". The Defendants further rely on the matters set out at paragraph 9 above.

24.   Alternatively, insofar as the Pledge is characterised as a unilateral contract, that contract granted a licence for a defined period (i.e., the Pandemic Period), and could not be revoked before the end of that period.

25.   In the further alternative, insofar as the Pledge is characterised as an implied licence as a matter of United States federal law:

(a)   Once a party receives consideration for granting an implied licence, the implied licence becomes an enforceable and irrevocable contract for its term.[33] Because the Claimant received consideration in this case, as set out at paragraphs 19(c) and 21(c) above, the implied licence it granted to the Defendants was irrevocable for the Pandemic Period.

(b)   Alternatively, even if the Claimant could revoke its implied licence before the end of the Pandemic Period, it would have needed to give reasonable notice.[34]

(c)   In this context, reasonable notice would equate to at least the time required to develop an alternative vaccine that would not fall within the scope of any valid and infringed claim of the Patents. Alternatively, reasonable notice would be the period of time that would allow the sale of any vaccine (i) the manufacture of which had commenced prior to the March 2022 Statement (if that Statement

---

[31] *Wang*, 103 F.3d at 1579–80.

[32] Corbin on Contracts §40.14; *see Ada Liss Group (2003) Ltd. v. Sara Lee Corp.*, 2014 WL 4370660, at *8–9 (M.D.N.C. Aug. 28, 2014).

[33] *Asset Mktg. Sys. v. Gagnon*, 542 F.3d 748, 754-55 (9th Cir. 2008).

[34] Restatement (Second) of Contracts §255.

was effective, which is denied), and / or (ii) the manufacture of which commenced after the March 2022 Statement (if that Statement was effective, which is denied), but which had been manufactured pursuant to agreements or arrangements made prior to the March 2022 Statement.

26. Accordingly, as to paragraph 2 of the Claimant's SoC, it is denied that the Pledge could be "*updated*" unilaterally in such a way as materially to modify, withdraw or revoke the binding arrangements between the parties. Alternatively, it is denied that the March 2022 Statement had this effect for the reasons given above.

**D.   The Defendants' alternative case: unilateral contract under the law of England and Wales**

27. In the alternative, and without prejudice to the matters outlined at paragraphs 13-26 above, the Pledge took legal effect with respect to the Defendants independently in each territory in which the Defendants accepted the offer made by the Claimant. Applying the principles set out at paragraphs 11-12 above, the law of England and Wales therefore applies for the purpose of these proceedings on the basis that the contract is "*manifestly more closely connected*" with England and Wales than it is with the Commonwealth of Massachusetts or the United States (Article 4(3), Rome I).

28. As a matter of the law of England and Wales:

(a)   The Pledge constitutes a binding unilateral contract and therefore amounts to consent pursuant to section 60(1) of the Patents Act 1977, rendering lawful any act that would otherwise amount to an infringement for the duration of that consent.

(b)   Paragraph 19 above is repeated, *mutatis mutandis*. Intention to create legal relations is presumed in dealings between commercial parties.

Consequences of binding unilateral contract for the Claimant's infringement claims

29. In light of the facts and matters set out at paragraphs 27-28 above, and pursuant to the binding unilateral contract that was formed, the acts particularised in the PoI were done with the contractual licence of the proprietor of the Patents pursuant to the Pledge. That contractual licence remained legally binding until the conclusion of

the Pandemic Period, such that there could be no infringement (which is in any event denied) until after the end of the Pandemic Period.

30.   Insofar as the Claimant relies on the March 2022 Statement as withdrawing or revoking the licence given by way of the Pledge, the Defendants' case under the law of England and Wales is as follows:

(a)   The Claimant was not entitled to revoke the licence or to withdraw from the contract prior to the conclusion of the Pandemic Period. Where a binding contract exists that provides expressly for termination upon the occurrence of a specified event, it is not necessary for the Court to imply any additional or residual right of termination.

(b)   Further or alternatively, the March 2022 Statement, on its proper interpretation, did not (and did not purport to) withdraw or revoke the Claimant's licence. In particular, whilst the March 2022 Statement extended or purported to extend the Claimant's licence indefinitely with respect to "*the 92 low- and middle-income countries in the Gavi COVAX Advance Market Commitment (AMC), provided that the manufactured vaccines are solely for use in the AMC 92 countries*", it did not withdraw the Pledge with respect to non-AMC 92 countries. Instead, it stated that:

(i)   The Claimant wished to "*underscore our commitment*" to AMC 92 countries, i.e., it wished to extend the term of its offer for a portion of those to whom it had originally been made by way of the Pledge, such that it would never enforce its intellectual property rights in those countries.

(ii)   The Claimant "*expects*" that companies in the position of the Defendants "*will respect*" its intellectual property, i.e., in a forward-looking sense regarding some unspecified future point in time.

(iii)   The Claimant "*remains willing to license*", i.e., there was no change in its position with respect to non-AMC 92 countries, and it would continue to licence the use of its Patents on the terms of the Pledge, which it considered "*commercially reasonable*".

      (iv)     This language did not amount to a withdrawal or revocation of the consent that the Claimant had given by way of the Pledge.

      (v)     In support of their proposed construction of the March 2022 Statement, the Defendants will also rely upon the conduct referred to at paragraphs 6-7 and 9 above.

(c)    Paragraph 26 above is repeated, *mutatis mutandis*.

31.    In the alternative, if and to the extent that the Claimant was entitled to withdraw the licence (which is denied) but did not do so effectively by way of the March 2022 Statement, the Defendants were entitled to a reasonable notice period from the date when the Claimant commenced proceedings against the Defendants. In all the circumstances, such a reasonable notice period would be:

(a)    at least the time required to develop an alternative vaccine that would not fall within the scope of any valid and infringed claim of the Patents; or

(b)    alternatively, a period of time sufficient to permit the sale of any vaccine: (i) the manufacture of which had commenced prior to the commencement of these proceedings; and / or (ii) the manufacture of which commenced after these proceedings were issued but which had been manufactured pursuant to agreements or arrangements made before that date; or

(c)    in the further alternative, such other period as the Court considers to constitute reasonable notice.

32.    In the further alternative, if and to the extent that the Claimant was entitled to and did withdraw the licence by way of the March 2022 Statement (which is denied), the Defendants were entitled to a reasonable notice period. In all the circumstances, such reasonable notice period would be:

(a)    the notice period outlined in paragraph 31(a) above; or

(b)    alternatively, a period of time sufficient to permit the sale of any vaccine: (i) the manufacture of which had commenced prior to the March 2022 Statement and / or (ii) the manufacture of which commenced after the March 2022 Statement but which had been manufactured pursuant to agreements or arrangements made prior to the March 2022 Statement; or

(c)  in the further alternative, such other period as the Court considers to constitute reasonable notice.

33.  In the premises, during such notice period, the acts particularised in the PoI were done with the contractual licence of the Claimant such that there was no infringement, which is in any event denied, for the duration of that period.

**E.   The Defendants' further alternative case: non-contractual consent**

34.  Further and / or alternatively, and without prejudice to the Defendants' case as pleaded at paragraphs 11-33 above, the Pledge constitutes a non-contractual consent pursuant to section 60(1) of the Patents Act 1977. The Claimant (as the proprietor of the Patents) gave its consent to the public in general – and therefore to the Defendants – to carry out acts that would otherwise be an infringement of the Patents for the duration of the Pandemic Period.

<u>Consequences of non-contractual consent for a definite term for the Claimant's infringement claims</u>

35.  In the premises, the acts particularised in the PoI were done with the consent of the proprietor of the Patents pursuant to the Pledge, such that there was no infringement, which is in any event denied, until the conclusion of the Pandemic Period.

36.  Insofar as the Claimant relies on the March 2022 Statement as withdrawing or revoking the consent given by the Pledge, paragraph 30 above is repeated. The Claimant expressly provided its consent for a definite term (i.e., until the end of the Pandemic Period). Only if that consent had been granted indefinitely would the Claimant have been entitled to withdraw or revoke its consent at will or on reasonable notice. Accordingly, the Claimant's consent remained in force until the end of the Pandemic Period, in accordance with the terms of the consent it chose to grant.

37.  Alternatively, if and to the extent that the Claimant was entitled to withdraw its consent (which is denied) but did not do so effectively by way of the March 2022 Statement, paragraph 31 above is repeated.

38.   In the further alternative, if and to the extent that the Claimant was entitled to and did withdraw its consent by way of the March 2022 Statement (which is denied), paragraph 32 above is repeated.

39.   During any such reasonable notice period as is referred to at paragraphs 31 and 32 above (as applicable), the acts particularised in the PoI were done with the non-contractual consent of the Claimant such that there was no infringement, which is in any event denied, for the duration of that period.

**F.   Response to the remainder of the Claimant's case**

40.   In the premises, paragraphs 3 and 4 of the Claimant's SoC are denied. The Claimant is not entitled to any relief (financial or otherwise) in respect of any of the acts of the Defendants during the Pandemic Period. In the alternative, to the extent that the Defendants' primary case that the Pledge remained in force and was either irrevocable or not effectively revoked for the entirety of the Pandemic Period does not succeed, any relief would be subject to the period that the Court considers to constitute reasonable notice as set out at paragraph 31 or 32 above. Any acts that were carried out by the Defendants with the Claimant's licence and / or consent, or in the alternative prior to the expiry of the relevant reasonable notice period, did not constitute infringements and the Claimant is not entitled to any relief on the basis of such acts.

41.   Paragraphs 5 and 6 of the Claimant's SoC are noted. In particular:

(a)   Although it is pleaded at paragraph 5 that the Claimant "*does not in this Action advance a case on the interpretation and/or legal effect as a matter of English law of the announcements annexed at Annexes 1 and 2 to the Particulars of Claim*", paragraphs 1-4 do rely upon particular points of interpretation and / or legal effect, without fully particularising that case.

(b)   Despite being required by paragraph 5 of the Order of Sir Anthony Mann dated 16 February 2023 to provide "*full particulars*" of its position in relation thereto, the Claimant has failed properly to plead:

(i)   any basis upon which it says in paragraph 15 of the PoC and paragraph 6 of the Claimant's SoC that it would be legitimate for the "*acts and behaviour of the Defendants*" prior to 7 March 2022 to be "*taken into*

*account*" when assessing the quantum of any financial relief that the Claimant seeks in respect of any of the Defendants' acts which took place after 7 March 2022; or

(ii)    what practical effect any such acts or behaviour could have on quantum in any event.

(c)   In the premises, as to paragraph 6, the Defendants reserve the right to respond to any further allegations in this regard that the Claimant may seek to advance in due course. Pending proper particularisation of any such case, and for the avoidance of doubt, it is denied that the Claimant is entitled to any sort of uplift on damages for any alleged infringements after the date when the Court determines that the Pledge ceased to have effect by reference to the sales made or acts carried out prior to that date. In support of the same, the Defendants will rely *inter alia* on the statement made by Stephen Hoge on 8 October 2020 as set out at paragraph 6 above.

**MICHAEL BLOCH KC**
**WILL BORDELL**
**TAYLOR WESSING LLP**
For the Pfizer Parties (the First to Third Defendants)

**JAMES SEGAN KC**
**POWELL GILBERT LLP**
For the BioNTech Parties (the Fourth and Fifth Defendants)

**Statement of Truth**

The Pfizer Parties believe that the facts stated in this Amended Responsive Statement of Case are true. The Pfizer Parties understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth. I am duly authorised by the Pfizer Parties to sign this statement.

Signed:

Name: SIMON CHARLES COHEN

Position: PARTNER

Date: 5 October 2023

**Statement of Truth**

The BioNTech Parties believe that the facts stated in this Amended Responsive Statement of Case are true. The BioNTech Parties understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth. I am duly authorised by the BioNTech Parties to sign this statement.

Signed:

Name: PENNY XENIA GILBERT

Position: PARTNER

Date: 6 October 2023

SERVED on 6 October 2023 by Taylor Wessing LLP, 5 New Street Square, London EC4A 3TW, solicitors for the Pfizer Parties